UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELISABETH DOHERTY | * | |
| | * | |
| Plaintiff, | * | |
| | * | **PLAINTIFF CLAIMS** |
| v. | * | **TRIAL BY JURY** |
| | * | |
| AMERICAN INTERNATIONAL | * | |
| COLLEGE, | * | |
| | * | |
| Defendant. | * | |

## COMPLAINT

This cause of action arises from Defendant's deliberately indifferent response to a student-on-student sexual assault. Defendant's failure to promptly and appropriately investigate and respond to the assault subjected Plaintiff to a hostile environment, effectively denying her access to educational opportunities. This action alleges violations of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, as well as claims of negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress.

## PARTIES AND JURISDICTION

1.  The Plaintiff, Elisabeth Doherty (hereinafter "Doherty") resides at 10 Nathan Road, Mansfield, MA.

2.  The Defendant, American International College (hereinafter "AIC") is a private institution of higher learning that receives federal funding, and is located at 1000 State Street, Springfield, MA 01109.

3.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction) and the doctrines of ancillary and pendent jurisdiction.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendant,

        "AIC", is located in this judicial district and a substantial part of the events which give rise

        to the claims herein occurred in this district.

### FACTS COMMON TO ALL CAUSES OF ACTION

5.      At all relevant times, "Doherty" was a full-time student at "AIC".  She was a star athlete

        on a sports scholarship for the women's lacrosse team.

6.      On or about August 30, 2014, "Doherty" was sexually assaulted by

        a fellow "AIC" student, Reggie Robinson (hereinafter "Robinson") a football player on

        the college team.

7.      At all relevant times, "Robinson" was a student at "AIC".

8.      On or about the early morning of August 30, 2014, "Doherty" and "Robinson" were

        exchanging text messages to each other. At 2:08 A.M., "Robinson" asked "Doherty" to

        come to his room.

9.      At this time, "Robinson" started to touch her leg. "Doherty" told him to stop, because his

        best friend was in love with her and she did not want to harm the relationship they had

        together.

10.     "Robinson" responded by saying: "What if I told you I was too?"

11.     "Doherty" told him she was leaving, because he was drunk. "Robinson" told her "no," and

        proceeded to sexually assault her physically.

12.     She repeated her request for him to stop, but he wouldn't listen. "Robinson" picked

        "Doherty" up, and threw her on his bed. She repeatedly told him to stop, but he wouldn't.

13.     "Robinson" proceeded to kiss her neck, and unzip her sweatshirt. At this time "Doherty",

repeatedly said: "Stop," "Stop Robinson", "I have a boyfriend," "Stop," "Please, stop."

14.     "Robinson" refused to stop his assault, took his pants off, put a condom on while forcing "Doherty's" legs with his. He then lifted her whole lower body off the bed, and took off "Doherty's" pants. At this time, "Doherty" pleaded with "Robinson" to stop, and that she didn't want it. "Robinson" did not stop his assault.

15.     "Robinson" continued to sexually assault "Doherty", and would not stop even when his roommate TC entered the room. When his roommate entered the dorm room, "Robinson" threw the covers over "Doherty" and himself, and continued to assault her.

16.     "Doherty" continued to plead with him to stop, but he wouldn't. Instead "Robinson" flipped her over, and sexually assaulted her from behind. "Doherty" asked him to please stop, and hit him to try and get him off of her.  "Doherty" was unable to fight off "Robinson" because he was much larger and stronger than her.

17.     At some point someone was knocking on "Robinson's" door. When his roommate answered the door, he told "Robinson" his girl was here and "Robinson" went to find out who was there.

18.     "Doherty" put her clothes on and hid in the room. She wanted to leave, but didn't want the girls at the door to see her. "Robinson" came back, and tried to undress her again.

19.     "Doherty" broke free from him, and ran down the hallway crying.

20.     As soon as she got back into her room, she told her roommates what happened.

21.     At 3:00 A.M., "Doherty" went to campus police to report the assault.

22.     At approximately 4:30 A.M., Nicolle Cestero (hereinafter "Cestero"), the Title IX coordinator, arrived at the campus police station.

23.     "Doherty's" parents arrived at school soon after. At this time, "Cestero" gave the

"Doherty" family Title IX paperwork and told the family she would be "Doherty's" advocate. However, she did not give them proper instructions on the Title IX investigation process. "Cestero" also told "Doherty's" parents that the assailant would be questioned, and would be removed from campus until further notice. "Cestero" also told "Doherty" to go home with her parents, and she would be in contact as soon as possible.

24.  At this time, "Doherty" was too much in shock to make a decision about a formal investigation, but "Cestero" informed "Doherty" and her family that an informal investigation would start anyways.

25.  "Doherty" provided "Cestero" text messages between her and "Robinson" before going to her parent's house.

26.  On August 31, 2014, "Doherty" went to Brigham & Women's Hospital where she had an examination and a rape kit taken.

27.  As "Doherty" dealt with the emotional and physical trauma of the assault, there was no contact from "Cestero" as promised.

28.  "Doherty's" mother finally contacted "Cestero" herself, because she was concerned. "Cestero" told her that the assailant was cooperating, and he would be kept off campus until "Doherty" decided whether or not to pursue a formal investigation.

29.  "Doherty" originally thought she wanted to pursue an informal investigation, but decided to pursue a formal investigation after hearing from friends that her rapist was on campus. When "Doherty" asked "Cestero" why he was on campus, she explained it was because of the informal investigation.

30.  At all relevant times, "Doherty" did not understand the difference between an informal and formal investigation, because "AIC" and "Cestero" were vague in their description of

the two, and "Doherty's" Title IX rights. "Doherty" believed that in pursuing an informal investigation her rapist would be kept off campus while the investigation was ongoing. "Doherty" had been told the campus police were actually Springfield police officers, which they were not.

31. After "Doherty" decided to pursue a formal investigation, "Cestero" informed "Doherty" that her assailant would still be allowed on campus, but under strict regulations. "Doherty" was told that he would only be allowed to go to class and attend football practice. This caused "Doherty" extreme fear and emotional distress.

32. During this time, "Doherty" began to see a therapist in order to help her heal from the traumatic experience.

33. "Doherty" wanted her lacrosse coach to tell her teammates what had happened to her, but "Cestero" told "Doherty" that her coach could not disclose to the team what happened. Instead, the coach had to tell the team that "something" happened to her, and that due to that, she wasn't on campus.

34. Two weeks after the assault, "Doherty", feeling uncertain about her future at "AIC", decided to return to campus. "Doherty" wanted to meet with "Cestero" as well as have dinner with her lacrosse teammates. While in her dorm room, "Doherty" saw her assailant enter her dormitory building. "Doherty" immediately reported this to campus security.

35. "Doherty" asked campus security why her assailant was not only still on campus, but also entering a dorm room. Campus police was unable to give "Doherty" an answer to her questions.

36. At all relevant times, "AIC" did not enforce the restrictions "Cestero" told "Doherty" would be put in place. No one checked to see if "Robinson" had moved out, and no one

made sure he wasn't entering approved buildings.

37.    "Doherty" felt deceived, unprotected and threatened by her assault and by "AIC". She

believed no one at "AIC" took her assault seriously.

38.    After these events, "Doherty" went to the Springfield police and filed a rape charge

against her assailant.

39.    Once the Springfield police became involved, campus police removed "Robinson" from

campus.

40.    "Doherty" was contacted by "Cestero" shortly after this incident. "Cestero" told her that

her assailant withdrew from "AIC" for unrelated reasons, but that he may be back in

January. It was his choice.

41.    Between September 12, 2014 and October 15, 2014, "Doherty" met with "AIC"

investigators, and cooperated with them every time. She answered their questions, and

retold her story to them. "Doherty" even returned to classes during this time, because she

wanted to get her life back on track at "AIC".

42.    On October 1, 2014, "Doherty" went to "AIC" campus police in order to get her statement

for the Springfield police. Campus police stated that they had to get the paperwork from

"Cestero", and when "Doherty" finally received the forms, names were whited out.

43.    On October 22, 2014 "Doherty" received a letter stated that there would be a hearing.

44.    On October 27, 2014, the hearing took place. "Doherty" was told that the board would just

be asking her questions about her sexual assault.

45.    Her assailant was not present at the hearing, even though he was invited.

46.    At the hearing, "Doherty" had to answer inappropriate questions from the board such as:

"Can you show us how you screamed?" and "How big is the Kid? Is that physically

possible?" "Doherty" was also frequently asked why she didn't scream for help. "Doherty" felt embarrassed and betrayed because it seemed the board was blaming her as a rape victim for not screaming loud enough to get help.

47. During the hearing, there was also testimony from witnesses that weren't there on the night of the assault, and "Doherty" never actually got to see any of their statements or who they were.

48. "Doherty" did not even know she could have reviewed the documents or have her own witnesses.

49. An hour after the hearing, "Doherty" was asked to return to the hearing room. The board told her that there was not enough evidence the rape actually happened, because "no one saw or heard" it happen. "Doherty" felt betrayed and unprotected. She tried to stand up for herself, and the school victimized her again.

50. "Doherty" asked for copies of the hearing documents, but was told she could only look at them. However, no members of the board or any Title IX investigator was available to show "Doherty" the documents.

51. On October 28, 2014, "Doherty" sent withdrawal forms to "AIC".

52. That same day, for the first time she spoke with the President and the Dean of Students. They told her there was nothing they could do and that their hands "were tied."

53. On October 29, 2014, "Doherty" received the official hearing results from "AIC".

54. "Doherty" appealed the board's decision on November 5, 2014, and on November 18, 2014, she received a letter stating her appeal was denied. The letter stated that "sufficient information has not been presented to allow a reconsideration of the hearing board's decision. Therefore, your appeal is denied."

55.     As a result of "AIC's" treatment of "Doherty", "Doherty" continues to suffer not only

emotionally, but also financially and academically. As a result of "Doherty's" withdrawal,

she forfeited thousands of dollars of scholarship money, was unable to receive a tuition

reimbursement, and left school before completing her Nursing Degree, permanently

damaging her academic opportunities.

## COUNT I
## VIOLATION OF TITLE IX AGAINST DEFENDANT AMERICAN INTERNATIONAL COLLEGE

56.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through

55 of this Complaint as more fully stated herein.

57.     "AIC's" acts and failure to act with respect to "Doherty's" allegations of sexual assault by

a male "AIC" student, deprived "Doherty" of her rights on the basis of her gender.

58.     The assault suffered by "Doherty" is, by nature, discriminatory on the basis of her female

gender.

59.     "AIC" and its officials had actual and/or constructive notice of the assault on "Doherty".

These officials had the duty and authority to address this type of conduct.

60.     "AIC" and its officials had actual and/or constructive notice of the frequency of sexual

assaults on college campuses. According to reported available national statistics, one in

every five women reported being sexually assaulted during their college career. "AIC"

failed to adequately implement policies designed to educate their students and

administrators and protect their students.

61.     "AIC" and its officials and officers responded to "Doherty's" complaint by failing to act

and/or acting with deliberate indifference or in a manner clearly unreasonable in light of

the known circumstances.

8

62.   "AIC" failed to investigate "Doherty's" reported sexual assault in any meaningful way.

63.   "AIC" failed to act promptly and equitably in response to "Doherty's" reported sexual assault.

64.   "AIC" took no steps to provide appropriate academic support or to otherwise accommodate "Doherty" after she reported the assault.

65.   "AIC's" failure to act in an appropriate manner resulted in "Doherty" feeling unsafe on her own campus, taking prolonged leave of absences, and eventually withdrawing from school, thereby exacerbating her impaired mental state arising from the assault and effectively denying her access to the educational benefits and opportunity from either "AIC" or from any other college or university.

66.   "AIC's" response to "Doherty's" complaint of sexual assault was not reasonably calculated to, and thereby failed to, end the discriminatory conduct faced by "Doherty".

67.   "AIC's" responses to "Doherty's" complaint were not reasonably calculated to prevent this type of discrimination from recurring on campus.

68.   "AIC" failed to restore "Doherty" to pre-deprivation status.

69.   The sexual assault committed upon "Doherty" occurred in a Residence Hall that was operated by "AIC", and under the supervision and monitoring of its security personnel.

70.   The assault on "Doherty" involved conduct so severe and objectively offensive that it deprived "Doherty" of her educational access and benefits.

71.   At all relevant times, "AIC" received federal funds.

72.   "AIC's" policies and procedures for educating students about sexual assaults and Title IX, reporting sexual harassment and sexual assault and were inadequate.

73.   In addition, "AIC" failed to follow its own published guidelines by not following its own

policies in regards to what effective consent actually means. The College by a preponderance of the evidence ruled that there was not enough evidence to show that "Doherty" said "no." However, in their sexual misconduct policies consent is not: "merely the absence of a verbally stated 'no'."

74.   "AIC's" procedures failed to meet the requirements of Title IX. These failures include, but are not limited to:

  a.   Failure to properly educate and train their administrators.

  b.   Failure to properly educate their students about sexual assaults and Title IX.

  c.   Failure to provide adequate timelines for the prompt investigation and resolution of complaints.

  d.   Failure to define which sanctions are available through various "AIC" College procedures, how they overlap, and under what circumstances they may be implemented.

  e.   Failure to provide reasonable accommodations for the "Doherty" to complete her education.

  f.   Failure to provide competent and adequate counseling services.

75.   "AIC" had more than enough evidence to meet the threshold of the evidentiary standard of the hearings process, yet was unable to determine if "more likely than not that non-consensual sexual intercourse occurred."

76.   In addition, "AIC's" procedures placed the burden on the complainant to initiate all relevant procedures to fully resolve a complaint of sexual abuse. The requirement of Title IX that procedures be equitable is to ensure that the reporting process is not dependent upon a complainant's inner fortitude and tenacity.

77.   "AIC's" procedures were on their face, and in their application, inequitable because they were not enforced uniformly and were not easy to follow, thus functioning as a barrier to complainants.

78.   "Doherty" was systematically denied the means to achieve a prompt and equitable resolution of her complaint, including her right to a thorough and objective investigation, and hearings process.

79.   Between 2001 and 2014 the Department of Education Office of Civil Rights (hereinafter "OCR") provided recommendations and guidance to colleges including "AIC" governing their obligations under Title IX.  In April, 2011 the OCR again reiterated the regulations governing colleges in handling sexual assaults and students Title IX rights.  "AIC" acted in violation of these regulations by failing to comply with the OCR requirements.

80.   "AIC" has fostered and perpetuated a hostile education environment on the basis of sex on its campus in violation of Title IX and its implementing regulations.  "AIC" and their administrators failed to take seriously sexual assault complaints, and did not provide their students with the proper resources they needed to handle these assaults. Instead, they left their female students, who had been assaulted, isolated and afraid to come forward for fear of being re-victimized and humiliated.

## COUNT II
## NEGLIGENCE AGAINST DEFENDANT AMERICAN INTERNATIONAL COLLEGE

81.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 80 of this Complaint as more fully set forth below.

82.   "AIC", through its school publications, acknowledged and accepted its duty to protect its students, including "Doherty", and to provide a safe environment for them.

83.   "AIC", its officials, and administrators had a duty to implement and enforce the school's

published guidelines, codes, regulations, and policies designed to protect "AIC's"
students.

84.  "AIC's" own publications acknowledge that sexual assaults at colleges are foreseeable
circumstances.

85.  "AIC's" own publications acknowledge that a student may be unable to consent to sexual
conduct due to coercion or voluntary or involuntary alcohol or drug use.

86.  "AIC" failed to take reasonable precautions to safeguard its students, and failed to follow
the school's guidelines with respect to responding to reported sexual assaults perpetrated
by "AIC" students.

87.  "AIC's" lax enforcement of its alcohol policy created an environment in which alcohol-
induced misconduct was manifestly foreseeable, and accepted it, ignored it, and allowed
this type of misconduct to proliferate.

88.  Sexual assault is a widely acknowledged risk of unchecked alcohol consumption occurring
on a college campus where young adults are left improperly supervised by college
officials.

89.  "AIC" breached its duty to "AIC's" students, including "Doherty".

90.  The breaches committed by Defendant "AIC" proximately caused severe physical and
psychological injuries to "Doherty".

91.  The illegal, wrongful and negligent acts committed by Defendant "AIC" resulted in
"Doherty's" departure from "AIC" and her persistent pain and suffering that arose from
the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's
support, and in the face of the school's manifest disregard of the duties it owed to her.

92.   "Doherty" endured months of pain and suffering following the attack, which was caused

by "AIC's" blatant indifference towards her, and towards its obligations both prior to and

after the attack occurred and the complaint was filed.

93.    By reason of the above, "Doherty" was subjected to conscious pain and suffering, loss of

the educational opportunities, and loss of earning capacity caused by "AIC" from the day

she reported the assault to the school to the present.

**COUNT III**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT**
**AMERICAN INTERNATIONAL COLLEGE**

94.     Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 93 of this

Complaint as if more fully set forth below.

95.    The elements of a claim of negligent infliction of emotional distress are:

   a.    The Defendant engaged in negligent conduct or a willful violation of a statutory
         standard;
   b.    The Plaintiff suffered serious emotional distress;
   c.    The Defendant's negligent conduct or willful violation of statutory standards
         was a cause of the serious emotional distress.

96.     "AIC" engaged in negligent conduct, when the Defendant collectively breached their

duty to not only implement adequate policies designed to protect "AIC's" students, but

also to enforce those published guidelines, codes, regulations, and policies.

97.    "AIC" also engaged in negligent conduct when they breached their duty to protect their

students from sexual assault. The College's own publications acknowledge that sexual

assaults at colleges are foreseeable circumstances, and that a student may be unable to

consent to sexual conduct due to coercion or voluntary or involuntary alcohol or drug use.

However, the College and its' administrators failed to take the necessary precautions to

safeguard and protect their students.

98.    "AIC" violated the statutory standards laid out in Title IX, and negligently mishandled

"Doherty's" sexual assault claim by not conducting a proper investigation, victimizing "Doherty", failing to adhere to the "AIC's" own procedures, and failing to properly sanction the rapist.

99.   "Doherty" suffered emotional stress, and the post traumatic emotional stress was so serious that a reasonable person would not have been able to cope with the mental distress caused by the circumstances.

100.  The Defendant's negligence and willful violations of Title IX caused "Doherty" to suffer this emotional distress.

101.  The illegal, wrongful and negligent acts committed by Defendant "AIC" resulted in "Doherty's" persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

102.   "Doherty" endured months of pain and suffering following the attack, which was caused by "AIC's" blatant indifference towards her, and towards its obligations both prior to and after the attack occurred and the complaint was filed.

103.  By reason of the above, "Doherty" was subjected to conscious pain and suffering caused by "AIC" from the day she reported the assault to the school to the present.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT AMERICAN INTERNATIONAL COLLEGE

104.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 103 of this Complaint as if more fully set forth below.

105.  The elements of a prima facie case for the tort of intentional infliction of emotional distress are:

    a.      outrageous conduct by the Defendant;

    b.      the Defendant's intention of causing or reckless disregard of the probability of causing emotional distress;

    c.      the Plaintiff suffering severe or extreme emotional distress; and

    d.      actual and proximate causation of the emotional distress by the Defendant's outrageous conduct.

106.    "AIC's" response to "Doherty's" complaint was outrageous, insensitive, and humiliating. Despite having more than enough evidence to find non-consensual intercourse occurred, the Board conducting the hearing was unable to determine that non-consensual sexual intercourse occurred.

107.    The Defendant treated "Doherty's" complaint as frivolous, asked "Doherty" inappropriate questions during the hearing including, "Can you show us how you screamed?" "How big is the kid? Is it even physically possible?" "Why didn't you scream for help?"

108.    The extreme and outrageous conduct of the Defendant was sufficiently insensitive as to intentionally cause "Doherty" severe emotional distress.

109.    Given the severity of the assault, circumstances are such that emotional distress was substantially certain to occur from the failure of the Defendant to respond to "Doherty's" complaint in any meaningful way.

110.    As a result, "Doherty" suffered severe emotional distress.

111.    The wrongful and intentional acts committed by the Defendant resulted in "Doherty's" subsequent pain and suffering which arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

112.    "Doherty" endured months of pain and suffering following the attack, and that suffering continues today.

113.    By reason of the above, "Doherty" was subjected to conscious pain and suffering caused

by "AIC" from the day she reported the attack to the College to the present.

114.   Defendant "AIC" acted with actual malice, or so recklessly or wantonly to permit the

inference of malice, to establish punitive damages.

**WHEREFORE,** Plaintiff requests that this Court

1.   Award to the Plaintiff compensatory and punitive damages resulting from her pain

and suffering resulting from the Defendant's deliberate indifference.

2.   Award to the Plaintiff reasonable attorney's fees and costs expended in this manner;

and

3.   Award to the Plaintiff such other relief as it deems just and proper.

The Plaintiff,
By Her Attorney,

*/s/ David P. Angueira*
David P. Angueira
BBO# 019610
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
Tel: 617-742-1900

Date: January 30, 2017