**Matthew Scott**

1

Volume:  1

Pages:  1 - 82

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:17-CV-10161

- - - - - - - - - - - - - - - - - - - - - - - - -x

ELISABETH DOHERTY,

Plaintiff,

v.

AMERICAN INTERNATIONAL COLLEGE,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -x

DEPOSITION OF MATTHEW E. SCOTT

March 21, 2018

1:26 p.m. - 3:08 p.m.

BOWDITCH & DEWEY

200 Crossing Boulevard

Framingham, Massachusetts

Reporter:  Penni L. LaLiberté, CSR

**Matthew Scott**

2

1    A P P E A R A N C E S:

2

3         SWARTZ & SWARTZ

4         by:  DAVID ANGUEIRA, Esquire

5         Ten Marshall Street

6         Boston, Massachusetts   02108

7         (617) 742-1900

8         dangueira@swartzlaw.com

9         Counsel for the Plaintiff

10

11        BOWDITCH & DEWEY, LLP

12        by:  ARIEL G. SULLIVAN, Esquire

13        200 Crossing Boulevard

14        Framingham, Massachusetts   01702

15        (508) 926-3651

16        asullivan@bowditch.com

17        Counsel for the Defendant

18

19   ALSO PRESENT:

20        CHELSIE VOKES

21

22

23

24

Matthew Scott

3

1                         I N D E X

2     Deposition of:                            Page

3     MATTHEW E. SCOTT

4

5         BY ATTORNEY ANGUEIRA                    4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21     *No exhibits were marked during the deposition.

22

23

24

4

1                    P R O C E E D I N G S

2                    MATTHEW E. SCOTT,

3    having been satisfactorily identified and duly sworn

4    by the Notary Public, was examined and testified as

5    follows:

6

7                    DIRECT EXAMINATION

8    BY MR. ANGUEIRA:

9        Q.    Good afternoon.

10       A.    Hi.

11       Q.    What is your name?

12       A.    Matthew Scott.

13       Q.    Mr. Scott, I'm an attorney for Ms. Doherty

14   and this is a deposition.  Have you ever had a

15   deposition before?

16       A.    I have not.

17       Q.    All right.  If you don't understand any

18   question I ask you, please let me know.  Always

19   answer verbally.  By that I mean words as opposed to

20   gestures and sounds.  If you begin to speak before I

21   finish my question, I'll raise my hand just as an

22   indicator that I haven't finished.  Please allow me

23   to finish, and then you can answer the question to

24   make sure we get an accurate transcription.

Matthew Scott

5

```
1                    If you need a break for any reason,
2    just let me know, and we'll be happy to accommodate
3    you.  All right?
4         A.   Yes.
5         Q.   What's your home address?
6         A.   145 Emerson Street, Springfield, Mass.
7    01118.
8         Q.   And are you currently employed?
9         A.   Yes.
10        Q.   By whom?
11        A.   American International College.
12        Q.   And what do you do for them?
13        A.   I'm their dean of students.
14        Q.   And how long have you been the dean of
15   students?
16        A.   Since January of 2017.
17        Q.   All right.  And when did you start working
18   with the American International College?
19        A.   It would be 2014, so July I believe of
20   2014.
21        Q.   And what was your first position with
22   them?
23        A.   Actually, hold on, sorry.
24        Q.   It's okay.
```

**Matthew Scott**

6

1      A.    It wasn't 2014.  It was -- so it would

2   have been 2013.  I apologize.

3      Q.    And what was your first position with

4   them?

5      A.    Director of residence life.

6      Q.    And for how long did you hold that

7   position?

8      A.    It would have been for about three years.

9      Q.    And then what position did you assume?

10      A.    Associate dean of students.

11      Q.    And for how long were you the associate

12   dean?

13      A.    So it was about a year I guess before the

14   dean of students position.

15      Q.    And then became dean of students?

16      A.    Correct.

17      Q.    And what were your duties and

18   responsibilities as the director of residence life?

19      A.    So I was responsible for all of the

20   housing on campus as well as overseeing the conduct

21   system on campus, and I was also a -- the deputy

22   Title 9 coordinator.

23      Q.    And when did you become the deputy Title 9

24   coordinator?

**Matthew Scott**

1      A.    It was part of the job description of the

2  director of residence life.

3      Q.    Was there a Title 9 coordinator?

4      A.    Yes.

5      Q.    And who was that person?

6      A.    That was Nicolle Cestero.

7      Q.    And in your role as the deputy Title 9

8  coordinator what were your duties and

9  responsibilities?

10     A.    The majority of the duties were mainly in

11  the absence of the Title 9 coordinator, I was

12  somebody that people could report to or they could

13  come and speak with.  But the majority of them

14  were -- the daily responsibilities were just kind of

15  overseeing education and ensuring that the

16  resident -- especially the residence life staff

17  understood the responsibilities when it came to

18  reporting and following up on Title 9 matters.

19     Q.    All right.  And can you give us a more

20  definite time period, perhaps a month, of when you

21  became the associate dean -- I'm sorry, when you

22  first became the deputy Title 9 coordinator.

23     A.    So that would be when I assumed the role

24  of director of residence life.  So it would be -- so

Matthew Scott

8

1   it would have been -- I'm trying to remember if it

2   was June or July at this point, but it was June or

3   July of 2013.

4        Q.   Okay.  Now, when you became deputy Title 9

5   coordinator, had you received any training or

6   education in Title 9 matters?

7        A.   Prior to assuming or once I assumed the

8   role?

9        Q.   Prior to assuming.

10       A.   Yes.

11       Q.   Okay.  And prior to assuming that title,

12   what type of training or education did you receive

13   with Title 9 matters?

14       A.   So I had served as a residents director, a

15   hall director, at a previous institution, so they

16   required us to have training in Title 9, sexual

17   misconduct, there's some training there.  And you're

18   specifically talking about Title 9, not just sexual

19   misconduct?

20       Q.   Correct.

21       A.   So in that role we had training.  And then

22   also when I was at UMass Amherst in a different role

23   we also were required to have training, but that was

24   more around reporting and the responsibilities as an

**Matthew Scott**

9

1   employee to report.

2      Q.   What's the other institution where you had

3   the Title 9 training?

4      A.   Well, now it's Western New England

5   University, used to be Western New England College.

6      Q.   Describe the training that you received in

7   the Title 9 matters at the Western New England

8   School.

9      A.   I couldn't say for certain everything.   I

10  mean it was -- the trainings were, you know, about

11  certainly obligation to report.  They were trainings

12  about victims of trauma and how they might respond

13  in situations when they are a victim of trauma.  And

14  confidentiality, that was definitely a piece of it.

15  But other than that, I can't -- it's been a while.

16     Q.   In terms of what you were trained or

17  educated regarding how victims respond to trauma,

18  what did you learn?

19     A.   Prior to this role you mean?  Prior to

20  assuming the director of residence life role?

21     Q.   We're talking about the training that you

22  received at the other institution, the Western New

23  England.

24     A.   Yeah.

**Matthew Scott**

1    Q.   We're going to break up the training

2  chronologically, so if we can just stick with that.

3    A.   Sure.  So at the time I was -- I was an

4  EMT as well, so I had a lot of training in -- in

5  what responses -- victim responses to trauma.  In

6  that particular case, when I was at Western New

7  England, you know, we would talk about how a

8  victim's memory might not be -- you know, they might

9  not always be able to recall every piece of an

10 incident or a situation, that the -- that they could

11 be reminded; you know, sometimes things will come up

12 as you're speaking with them, and they might be

13 reminded of things.  So a lot of that is talking

14 about if you're ever in a role of trying to take in

15 information, assessing credibility -- assessing if

16 you can credibility.  Sometimes it's very difficult

17 in those situations.

18          So that's -- again I can't remember

19 specific details of any of the trainings, but I

20 certainly know that that was a piece of it because

21 we did have many discussions about that.

22   Q.   And do you recall whether or not you had

23 any subsequent training in the area of recognizing

24 the symptoms of victims of trauma?

**Matthew Scott**

1      A.    Subsequent to --

2      Q.    The one you just described at Western

3 New England.

4      A.    Yes.  When I as an EMT we certainly had

5 training on that.  I worked for American Medical

6 Response, AMR, so they provided training that we had

7 to go to.  We had to take continuing education

8 courses.  And that was, you know, something that was

9 becoming -- especially with the Dear Colleague

10 letter at that time, the Dear Colleague letter and

11 things that were coming out.  We had a lot of

12 colleges in the area, so we did have to respond to

13 the colleges.  So it was something they relied quite

14 a bit on us.

15      Q.    And when you refer to the "Dear Colleague

16 letter," are you referring to the DOE letter, the

17 Department of Education letter?

18      A.    Yes.

19      Q.    And were you familiar with the contents of

20 that letter?

21      A.    Yes.

22      Q.    And did you have to review that and

23 understand that in conjunction with your job as an

24 EMT?

**Matthew Scott**

12

1      A.   It was -- we did not have to read that --

2   that entire document, but we did have to -- because

3   of our interaction with the college campuses, we

4   were required to have a basic understanding of what

5   colleges were obligated to report.  Because many

6   times we would be called to college campuses, and

7   based on our training we wouldn't necessarily think

8   it was as necessary for us to be there, but we knew

9   that the college campuses were obligated to report

10  things so --

11     Q.   Now, in your role as a deputy Title 9

12  coordinator did you become familiar with the

13  contents of the Dear Colleague letter?

14     A.   Yes.

15     Q.   And had you read it in its entirety?

16     A.   Yeah.  I would say I did, yeah.

17     Q.   Did you understand the rights that victims

18  of Title 9 violations have?

19     A.   Yes.

20     Q.   Did you understand that it was the

21  college's responsibility that when allegations of

22  sexual misconduct are reported to it that the

23  college is to conduct a prompt and reasonable

24  investigation?

13

1     A.   Yes.

2     Q.   Did you also understand it was the

3  college's responsibility to maintain a safe

4  environment for the victims during the course of the

5  investigation?

6     A.   Yes.

7     Q.   Did you understand that during the course

8  of the investigation if the college received any

9  evidence that the victim was concerned about her

10  safety due to retaliation by either the person who

11  had committed the act against her or any friends or

12  associates of that person, that that is something

13  that should be investigated as well?

14           MS. SULLIVAN:  Objection.  You can

15  answer.

16           THE WITNESS:  Yes.

17  BY MR. ANGUEIRA:

18     Q.   And did you understand it was the school's

19  obligation to conduct a full and thorough

20  investigation regarding any potential retaliation

21  against the victim?

22           MS. SULLIVAN:  Objection.  You can

23  answer.

24           THE WITNESS:  To the extent that a

**Matthew Scott**

14

1    victim -- to the extent that someone comes forward

2    and tells us that they would like us to move

3    forward, it's a very sensitive situation when

4    someone comes forward with a complaint, we take our

5    lead from them many times, unless it's something

6    that we feel is a -- is a larger threat to the

7    institution.

8              So, yes, I am aware and was aware

9    that if somebody brings a complaint forward and says

10   they would like us to move toward and do something

11   with that, we will; however, it's important to note

12   that many times college students, if they do come

13   forward with something, they often will specifically

14   either tell us not to move forward with it, or they

15   would say I just want you to have this for the

16   record just in case something comes up in the

17   future.  Because they're very sensitive to their --

18   the image or they're very sensitive to the way that

19   it could impact their -- you know, their

20   relationships on campus so -- but yes.

21   BY MR. ANGUEIRA:

22       Q.   Was it your understanding that as a

23   Title 9 coordinator, a deputy coordinator, that if a

24   student reported that she had been raped on campus

**Matthew Scott**

15

1   to the institution and said she does not want the

2   Title 9 investigation, that the college cannot

3   conduct a Title 9 investigation?

4       A.   No.  We still have to conduct a

5   reasonable -- while protecting as many -- you know,

6   we have to protect the privacy as best we can.  We

7   do still have to conduct an investigation.  It's

8   whether or not we move forward with a formal hearing

9   and, you know, how we conduct the investigation, who

10  we pull in.  So we do modify, if we can, if it's the

11  first report that we have from the alleged victim or

12  the alleged perpetrator or complainant/respondent,

13  then, yes, we will investigate, but we determine --

14  we take our lead from them if we can as to whether

15  or not we move forward with a formal hearing.

16      Q.   And certainly if the victim is willing to

17  participate in the investigation and wants the

18  college to conduct the investigation, then you

19  understand it's the school's obligation to conduct a

20  full and thorough investigation, correct?

21      A.   Correct.

22      Q.   You were one of the panel members on the

23  Doherty matter?

24      A.   Correct.

**Matthew Scott**

1    Q.    And the other panel members were whom?

2    A.    It was Bruce Johnson and Nila Lenna.

3    Q.    Okay.  Prior to the Doherty hearing, how

4  many Title 9 hearings had you actually been on?

5    A.    Prior to the Doherty matter I hadn't

6  served on a hearing board for a Title 9 matter;

7  however, I did oversee the conduct process which was

8  very similar, and I had to serve on many hearing

9  boards and just formal conduct meetings with

10 students.

11   Q.    And how are conduct hearings very similar

12 to a Title 9 investigation and hearing with

13 allegations of rape?

14   A.    Just in terms of the process, in terms of,

15 you know, our preponderance of the evidence

16 standard, our -- the manner in which we conduct our

17 investigations.  And a hearing board, whether it's

18 for -- whether it's for just a non-sexual misconduct

19 case or a sexual misconduct case, there's a

20 three-person hearing board with the right to the

21 appeal.  We give that right.  It isn't, you know,

22 something that we have to give, but we do give that

23 right because we believe in it.

24   Q.    With respect to your -- as I understand

**Matthew Scott**

17

1  it, you never sat on a board -- a Title 9 hearing

2  board to hear a sexual misconduct hearing before the

3  Doherty matter; is that correct?

4      A.    Correct.

5      Q.    But you're saying that you did sit on many

6  student conduct hearing boards to hear different

7  types of matters, correct?

8      A.    Correct.

9      Q.    Were any of those matters related to

10  sexual misconduct?

11      A.    Not that I recall, no.

12      Q.    Otherwise they'd be a Title 9 hearing,

13  right?

14      A.    Correct.

15      Q.    So the ones that you dealt with would be

16  dealing with what?  Things like violations of the

17  school policy for drugs and alcohol?  Would that be

18  one subject area?

19      A.    Could be but typically if it's at the

20  level of a board, it's typically, you know, an

21  assault.  So if there's a fight between students or

22  something of that nature.

23      Q.    Or a threat by one student to another?

24      A.    Correct.  Which could result -- you know,

Matthew Scott

18

1   if it's something that could result potentially in

2   suspension or expulsion from the institution, it

3   would rise to the level of a board.

4       Q.   So what other types of student conduct

5   hearings did you actually participate in in terms of

6   the nature of the alleged offense?

7       A.   Do you mean on a three-person or just a --

8   because all of our -- the challenge with conduct is

9   conduct is -- conduct on a college campus can be --

10  so, for instance, I could have a one-on-one meeting

11  with an alleged or an accused student, and, you

12  know, it could result in a suspension just from the

13  meeting with me.  So in some ways they're

14  interchangeable; however, in cases that are a little

15  bit more -- so like our sexual misconduct cases, we

16  use a three-person hearing board so that it isn't

17  just one person that's making the final decision.

18             But, yes, certainly there was -- you

19  know, there would be -- I'm trying to think through

20  specific cases that I would have sat on;

21  unfortunately, I oversee all conduct, so it's

22  challenging to think back to that timeframe or --

23  because I'm assuming you're asking prior to --

24      Q.   The Doherty matter.

**Matthew Scott**

19

1    A.   Yeah.  So prior to that I wouldn't be able

2 to put my finger on exactly which cases had happened

3 by then and which had happened prior.

4    Q.   Okay.  By the time that you were seated

5 for the Doherty hearing, had you had any subsequent

6 training in how to investigate and handle Title 9

7 matters?

8    A.   You said after?

9    Q.   So by the time that you sat on the Doherty

10 hearing --

11    A.   Okay.

12    Q.   -- had you had any additional training in

13 Title 9 matters that you have not already described

14 for us?

15    A.   That I haven't described.  Yeah, we had

16 trainings at IAC, at the college, where we had

17 internal trainings where we would conduct trainings

18 with our staff, but then we also had external

19 training from our attorney -- from the attorneys

20 here that would come in, and they did it for us as a

21 whole.  So with anybody that was involved in the

22 Title 9 process, in the hearing process,

23 investigation process, we had multiple trainings on

24 that.

**Matthew Scott**

1    Q.   And were some of the subject matters

2   discussed during that training the types of

3   questions that could be asked of a victim and the

4   types of questions that should not be asked of a

5   victim?

6    A.   I can't remember specifically.  I've

7   certainly had a lot of training on that, but I can't

8   remember specifically if those types of questions

9   were part of that training.  I know I've trained my

10   staff, and I could guarantee that I did before that

11   date, you know, what types of things to ask and how

12   to ask things and -- yeah.

13    Q.   When you say that you can guarantee that

14   you trained your staff before that date, are you

15   referring to the hearing date for Ms. Doherty?

16    A.   Correct, yes.

17    Q.   When you say your staff, what staff did

18   you train in Title 9 matters?

19    A.   Sure.  So, you know, part of the -- part

20   of my responsibility as overseeing especially

21   residence life is -- we have all of our hall

22   directors in the building, and we have all of our

23   resident advisers, which are undergraduate students

24   on the floor.  So, you know, they're not part of the

**Matthew Scott**

21

1    hearing process certainly, and they actually don't

2    have much of a role in an -- actually really any

3    role in the actual investigation.  But, you know, we

4    do talk with them; you know, I would conduct

5    training during RA training or RD training about

6    being sensitive to students or anybody that has

7    alleged that they were a victim, whether, you

8    know -- even if you don't know the details, just

9    understanding what they might be going through, that

10   they might have a difficult time recalling, you

11   know, that type of thing.  So yeah.

12        Q.   Was it your understanding that the college

13   was supposed to follow the OCR guidelines with

14   respect to Title 9 investigations?

15        A.   Yes.

16        Q.   The investigators that were involved in

17   the investigation of the Doherty matter, what were

18   their names?

19        A.   It was Cindy Shiveley and I believe it was

20   Terrence O'Neill.

21        Q.   All right.  Do you know what their level

22   of experience was in conducting an investigation of

23   a Title 9 matter?

24             MS. SULLIVAN:  Objection.  You can

**Matthew Scott**

22

1    answer.

2                    THE WITNESS:  And I don't.  I don't

3    know what their experience was.

4    BY MR. ANGUEIRA:

5         Q.    Okay.  Well, we do know that you never

6    handled a Title 9 hearing before the Doherty matter,

7    so do you know whether or not either of those two

8    investigators had ever even participated in a

9    Title 9 investigation?

10        A.    I don't.

11        Q.    Of the three panel members that were on

12   that hearing, had any of them ever handled a Title 9

13   hearing?

14        A.    I don't know.

15        Q.    Well, you know that you didn't, correct?

16        A.    Correct.

17        Q.    Can you describe for us the level of

18   training, if any, the investigators had received

19   before they investigated the Doherty allegations?

20                    MS. SULLIVAN:  Objection.  You can

21   answer.

22                    THE WITNESS:  I don't know all of

23   the training, but I do know that they were part of

24   the kind of cohort of people that were -- that would

**Matthew Scott**

23

1   have received the same training that I would have.

2   So that would have been -- prior to that there would

3   have -- there would have been two, I would assume,

4   that I would have gone through with them

5   specifically.

6   BY MR. ANGUEIRA:

7       Q.   Two training sessions you mean or

8   something else?

9       A.   Yes, two training sessions that I would --

10  that I could say that I would have gone through the

11  same training as them.  But I don't know all

12  training that they would have received.

13      Q.   And do you know whether or not the

14  investigators are trained in investigative

15  techniques?

16      A.   I don't know.

17      Q.   Do you know if the investigators are

18  trained in making sure that they speak to all of the

19  available witnesses to make sure they gather all the

20  evidence?

21      A.   I should qualify my previous statement.

22  When you say are they -- I do know, because I've

23  seen the content, you know, I went through some of

24  the training, we were all cross-trained.  So, you

**Matthew Scott**

24

1  know, we were trained on being on the hearing board

2  or investigation so that we understood what the

3  other side would be doing during something like

4  that.  So to the extent of what occurred in those

5  trainings, I know that that was a piece of the

6  training that they received, but I don't know if

7  they had any other training.  Especially Cindy was

8  in human resources, and I don't know if they had any

9  sort of -- because of, you know, employee --

10  employee relation suits, I don't know what other

11  types of --

12      Q.   Do you know if any of the investigators or

13  for that matter even the hearing officers on the

14  panel were ever trained in determining the

15  credibility of witnesses and how that's done?

16      A.   I do know that that was the content of the

17  training that we had received from the -- our

18  attorney's office, but I don't know at which

19  training session that would have been.  You know, we

20  have them regularly, so it's difficult for me to

21  remember at what point that was part of it, but that

22  was typically part of our conversation during every

23  training.

24      Q.   And was any part of that training dealing

**Matthew Scott**

25

1   with the issues of the memories that a trauma victim

2   may have or not have?

3       A.   I don't recall specifically for those

4   trainings.  I don't recall.

5       Q.   But you certainly had your own training in

6   terms of what trauma can do to a victim's memory,

7   correct?

8       A.   Yes.

9       Q.   And you learned during the course of your

10  training that there are many times that victims are

11  traumatized, particularly rape victims, and some of

12  them have a total absence of the event; you knew

13  that, right?

14      A.   Yes.

15      Q.   Many of them have different recollections

16  of what happened and when it happened, correct?

17      A.   Correct.

18      Q.   Many of them recall different part of the

19  rape or the events in different ways even when you

20  ask them repeatedly about how the event occurred,

21  correct?

22      A.   Correct.

23      Q.   And none of those issues mean that the

24  person is not telling the truth.  It simply means

**Matthew Scott**

26

1   that that's how their memory is working in

2   conjunction with the trauma that they underwent,

3   correct?

4        A.   That can be correct, yes.

5        Q.   So you shouldn't just discredit the

6   victim's testimony because there may be

7   inconsistencies based on her or his statement alone,

8   correct?

9                 MS. SULLIVAN:  Objection.  You can

10  answer.

11                THE WITNESS:  You shouldn't

12  discredit based on -- based on just their

13  recollection alone?  Is that what you said?

14  BY MR. ANGUEIRA:

15       Q.   Yes.

16       A.   Based on just their recollection alone,

17  no, you shouldn't.

18       Q.   Because what you have to do is take into

19  account the other evidence including accounts by

20  other witnesses and any other evidence you may have

21  available to you, correct?

22       A.   Correct.

23       Q.   At this college, when you were going to

24  conduct a Title 9 hearing, was it the protocol to

**Matthew Scott**

27

1    call in live witnesses if they were available or

2    not?

3         A.    Typically -- do you mean for the hearing

4    board members to call them in?

5         Q.    Yes.

6         A.    Typically we wouldn't unless we felt that

7    it would add something based on -- you know, if we

8    had holes that were missing, but we could always --

9    you know, what we would typically do is during any

10   conduct -- if we had separate investigators, they

11   would go out and get more information; however, both

12   the complainant and the respondent are able to

13   produce their own witnesses and provide us with a

14   list of witnesses that they would like to be

15   present, regardless if we were asking to call them

16   in or not.

17        Q.    Were you ever trained in any investigative

18   techniques, or in any of your work in conjunction

19   with your educational roles, that one of the best

20   ways to determine the credibility of a witness is to

21   actually see and hear that witness?

22        A.    I don't know that I can say that that was

23   part of any training, but I can say that I -- I can

24   understand that statement; however, that is also

**Matthew Scott**

1   something that -- based on our training of assessing

2   credibility, that is something that the

3   investigators were -- were doing at the same time

4   as -- because they did meet with -- they heard and

5   saw the witnesses, so they were assessing some of

6   the -- you know, that credibility as they were going

7   through and conducting the investigation.

8          Q.   And in the Title 9 investigation that's

9   conducted at your college, if the investigators form

10  opinions about the veracity of credibility of a

11  particular witness, is that information that you as

12  a hearing officer rely upon?

13         A.   We reply upon it in -- they do give us

14  details of if they believed somebody was credible

15  and why.  But they are instructed not to put their

16  opinions in in terms of, you know, things like this

17  person is lying or, you know, that type of -- those

18  types of statements.

19              But based on incongruities between

20  statements or, you know, someone saying that they

21  were in one place and they weren't, or, you know,

22  there's other evidence to say that they were

23  somewhere else, those are the types of -- or

24  relationships, sometimes relationships between

**Matthew Scott**

29

1   people.  So they would put those statements in

2   there, and that would be -- they would tell us that

3   that was the way that they determined if they felt

4   someone was credible.

5        Q.    When conducting a Title 9 investigation

6   and determining whether or not a rape occurred, is

7   the nature of the relationship between the rapist

8   and any witnesses supporting that rapist's version

9   of his story a relevant matter?  Do you understand

10  my question?

11       A.    Yeah, I'm trying to --

12       Q.    It was a little awkward.

13             In the course of an investigation,

14  if there's an allegation by a student that she'd

15  been raped by Mr. X, let's say, who is another

16  student, and Mr. X has witnesses that testify in a

17  way to provide evidence that's inconsistent with

18  what the victim says happened, is it part of the

19  investigatory process to determine the relationship

20  between Mr. X and the witnesses supporting his

21  version of the story?

22             MS. SULLIVAN:  Objection.  You can

23  answer.

24             THE WITNESS:  That is typically part

**Matthew Scott**

30

1   of the process.  Usually we want to know how people

2   are connected.  Especially on a college campus,

3   there are lots of connections going on in lots of

4   different ways.  So, yes, typically we will try to

5   find out are they on the same team, are they

6   previous significant others or, you know, something

7   like that.

8   BY MR. ANGUEIRA:

9       Q.   Okay.  Because if you find out that

10  somebody had a previous relationship or an existing

11  intimate relationship or close friendship, you know

12  that sometimes people will lie for their friends,

13  correct?

14      A.   Yes.  And so we --

15      Q.   That's a matter of life, right?

16      A.   Yes.

17      Q.   So then part of the role of investigators

18  is to make sure that they understand and provide

19  evidence to you as a hearing officer about the

20  nature of any relationships that witnesses may have

21  to the accuser and the accused, correct?

22      A.   Correct.

23      Q.   Because it not only applies to the

24  accused, but if a victim has witnesses supporting

**Matthew Scott**

31

1   her account, then you want to know whether or not

2   there may be any bias or prejudice on those

3   witnesses' part because they're protecting their

4   girlfriend or what have you?

5       A.   Absolutely, yes.

6       Q.   Do you know what the Cleary Act is?

7       A.   Yes.

8       Q.   What is it?

9       A.   So we are required to report our

10  statistics every year.  My role in that is providing

11  the -- well, I reviewed the document, but ultimately

12  it's our campus police that is updating it.  I

13  provide the statistics for the conduct referral

14  numbers.

15      Q.   Okay.  And what were the number of sexual

16  assaults on campus of -- let's say for the five-year

17  period prior to the Doherty sexual assault?

18      A.   I don't know that information off the top

19  of my head.

20      Q.   Do you have any idea what the numbers were

21  annually?

22      A.   I don't.  Prior to the Doherty, no.

23      Q.   Okay.  You were a -- were you the chair of

24  the panel for the Doherty hearing?

**Matthew Scott**

32

1      A.   Yes.

2      Q.   Okay.  And was that because of your role

3  as the Title 9 coordinator or something else?

4           MS. SULLIVAN:  Objection.  I just

5  want to clarify, he's not the Title 9 coordinator.

6           MR. ANGUEIRA:  That's what I

7  thought.

8           MS. SULLIVAN:  Deputy.

9           MR. ANGUEIRA:  No, no, that's fine.

10  BY MR. ANGUEIRA:

11      Q.   So who asked you to be the chair?

12      A.   It would have been Nicolle.  So she was

13  the Title 9 coordinator and still is, so she was the

14  one that formed the panel.

15      Q.   If you have a Title 9 investigation and

16  simultaneously there's a police investigation

17  regarding the same event, like a rape, was it your

18  understanding that there should be some level of

19  communication between the school and the police --

20  not the campus police, but the outside police, to

21  see if there's any evidence that should be shared

22  between the two to help in the investigation or not?

23      A.   That information does not typically get

24  shared very readily.  And we also -- that's

**Matthew Scott**

1  partially because the police protect that

2  information, but we also do not wait for a police

3  investigation.  So in that situation, you know, we

4  move forward with the information that we can so

5  that we can provide a timely -- we're under very

6  different timelines than the police are, so we need

7  to move forward so that we can resolve the case.  So

8  we don't always have the information that the police

9  have, nor can we always wait for it.

10      Q.   Did you understand that it was the

11  school's obligation in conjunction with the

12  students' Title 9 rights to provide a reasonably

13  safe environment once a victim of sexual assault

14  reports that to the school?

15      A.   Yes.

16      Q.   Did you also understand it was the

17  school's obligation to provide that victim of any

18  necessary counseling to assist the rape victim in

19  dealing with those events?

20      A.   Yes.

21      Q.   What counseling services did this school

22  have available to Ms. Doherty at 2- or 3 o'clock in

23  the morning when she reported the rape?

24      A.   So we do have -- we do have licensed, you

34

1  know, counselors on campus that are on call that

2  could be called in.  I do know that -- let me take a

3  step back.  I don't know that, but I believe that

4  Nicolle responded that night to take the initial

5  report.  But, you know, unfortunately it isn't

6  uncommon that campuses don't have 24-hour counseling

7  on campus; however, had she requested it from

8  Nicolle, we would have called.

9           We also have access to -- we have

10  relationships with counseling -- I guess you can

11  call them hotlines in the area, so those are all --

12  that's all information that we -- that we have

13  available for all of our students.

14     Q.   Are you saying that the student victim has

15  to ask for counseling before the school offers the

16  counseling?

17     A.   No.  So whenever we meet with a student,

18  we have the Title 9 victim's rights form that we

19  give out, and then we also have what we just call a

20  one-pager.  I don't even know what's on it.  And

21  that has the phone numbers of local -- if they want

22  to speak with somebody else, it has the phone

23  numbers of local agencies that they can contact as

24  well as the information of our counseling services,

**Matthew Scott**

1   but it's offered.  It's something they can take

2   advantage of.

3                    MR. ANGUEIRA:  Did you want to --

4                    MS. SULLIVAN:  Yeah.  I just thought

5   it would be appropriate to show him the Title 9

6   Victim's Rights form because I think that that was

7   something that -- it appears it was given to

8   Elisabeth Doherty on the night.

9                    MR. ANGUEIRA:  Let's ask him because

10  the other gentleman didn't know what that was.

11                   MS. SULLIVAN:  Okay.

12  BY MR. ANGUEIRA:

13      Q.   First of all, do you know what that

14  document is?

15      A.   Absolutely.  I give it out every time

16  somebody talks to me about sexual misconduct at all.

17      Q.   And that's Exhibit 2.  What do you mean

18  you give it out?  Who do you give it to first of

19  all?

20      A.   So I'm one of the named people that

21  somebody can come to and report sexual misconduct on

22  campus.  Any time that somebody meets with me or

23  talks with me on the phone, I try to schedule a

24  meeting with me if possible.  These two documents --

**Matthew Scott**

36

1    that's the one-page of the reference guide.  So

2    these are documents that we -- that I would give out

3    any time that I spoke with somebody who is alleging

4    any sort of -- not just rape, any sort of sexual

5    misconduct.  And Nicolle does that as well.

6         Q.    In this particular case that's a document

7    that was signed by Ms. Doherty?

8         A.    Correct.

9         Q.    And do you know what time of the day or

10   what date it was signed?

11        A.    I don't.  Well, the date says August 14 --

12   or August 30th, 2014.

13        Q.    Was that on the same day that she reported

14   the allegations?

15        A.    I don't remember specifically, but I can

16   just tell you in general it's usually when we meet

17   with the student, you know, at that time or when we

18   have the formal meeting the next day.

19        Q.    So when you say when we meet with the

20   student or have a formal meeting, is that something

21   that happens after the initial intake of the

22   allegation?

23        A.    Not -- so this is where it's difficult on

24   a college campus.  So many times incidents are

**Matthew Scott**

1   reported at 2 o'clock in the morning, in the middle

2   of the night.  So our campus police and our hall

3   directors and such are given this information that

4   they can give out to the students; however, as a

5   Title 9 coordinator, you know, Nicolle and me, the

6   deputy Title 9 coordinator, we want to make sure

7   that it didn't just stop there, that it didn't just

8   stop with, here, we gave you this piece of paper,

9   now figure it out.  So we always reach out to the

10   student and try to set up a meeting with them.

11   Sometimes they don't want to talk to us, but we

12   always try to set up a meeting so I can have a

13   personal conversation to make sure that they really

14   understand what they were given.  In this case I

15   believe Nicolle came on campus that night, and she

16   would have been speaking with her directly.

17       Q.   Okay.  Is Nicolle still with the school?

18       A.   Yes.

19       Q.   Okay.  And do you have any personal

20   knowledge of what Nicolle told Ms. Doherty?

21       A.   I don't.  I wasn't there.

22       Q.   Do you know if Nicolle offered Ms. Doherty

23   any counseling services?

24       A.   I don't know personally if she -- you

**Matthew Scott**

38

1  know, I wasn't there.

2      Q.   Do you know if Ms. Doherty was offered any

3  medical assistance?

4      A.   Again I don't know because I wasn't there

5  but --

6      Q.   Well, not just from being there but from

7  any information you received later on, do you know

8  if she went to any hospital, had a rape kit done on

9  her or anything like that?

10     A.   I don't recall in this case -- I don't

11 recall.

12     Q.   One way or the other?

13     A.   Yeah, I don't recall one way or the other.

14     Q.   At the end of the hearing, the Title 9

15 hearing in this case, there was a deliberation,

16 correct?

17     A.   Correct.

18     Q.   We have the audiotape of the hearing, and

19 I played segments of it for the other witness, and

20 I'm trying to avoid doing that in this case with you

21 if I can.  But what was not recorded in any way were

22 the actual deliberations.  Was that standard

23 procedure at your school?

24     A.   It is, yeah.

**Matthew Scott**

39

1        Q.    Why?

2                   MS. SULLIVAN:  Objection.  You can

3    answer if you know.

4                   THE WITNESS:  I -- I didn't create

5    that policy.  I do know that that is relatively

6    standard at institutions that I've been at, and also

7    at -- you know, I've gone to conduct conferences

8    where we have extensive training on -- and this is

9    all since then.  What I can say is that typically in

10   a deliberation, you know, we're talking about

11   sometimes other students, we're talking about the

12   connection between the students.  And I think what

13   tends to happen is if -- especially during a

14   deliberation, you know, you have to -- you have to

15   really -- you have to dig in, and you have to

16   challenge yourself and each other on things.  And so

17   I just think that's a reason why they don't -- they

18   want to record the hearing so that nothing is

19   missed.

20                   Typically the main reason that the

21   hearing is recorded is mainly so that, if we needed

22   to, especially during deliberation, we can go back

23   and listen to something, and, you know -- so during

24   the -- really the recording is more for us to go

**Matthew Scott**

40

1  back during deliberation if we need to ever go back

2  or during the appeal process if we need to go back

3  and listen to the actual hearing.  So there isn't

4  really a reason that they would typically record the

5  deliberation.

6  BY MR. ANGUEIRA:

7      Q.   Are there any policies or procedures

8  regarding the proper way to conduct a deliberation

9  in terms of what should be said, what should not be

10  said?

11      A.   Not -- I don't know that I would say that

12  it's specific training on deliberation, but it's

13  more calling on our knowledge and our training, you

14  know, such as the training when we're talking about

15  credibility, because that is part of -- that

16  conversation is, you know, what came up and pulling

17  together the pieces and -- so we do, we call on

18  our -- I guess the way that I can say it is it's

19  not -- it's not like we sit down and have a specific

20  training on deliberation.

21      Q.   Okay.  So if the deliberation is being

22  conducted properly and nobody is saying anything

23  that should not really be said inappropriately --

24          MS. SULLIVAN:  Objection.

**Matthew Scott**

41

1    BY MR. ANGUEIRA:

2       Q.    -- why would you not want to have a record

3    of what's said?

4                MS. SULLIVAN:   Objection.

5                THE WITNESS:   Again I wasn't part of

6    creating that policy, so I'm not sure why it was

7    written that way.   But, you know, it's relatively

8    standard on college campuses that -- as a matter of

9    fact, most conduct cases in general are not

10   recorded, so even non -- mostly non-sexual

11   misconduct cases are not recorded at all during

12   deliberation.

13      Q.    I understand that you've said that.   I'm

14   just trying to get your understanding of the

15   rationale, if you have any, as to why you would not

16   want to have a record of what the persons on the

17   hearing panel were actually saying during the

18   deliberation.   Can you think of any rationale for

19   that?

20               MS. SULLIVAN:   Objection.   You can

21   answer.

22               THE WITNESS:   No.   I mean I don't

23   have -- I don't know the rationale, and I don't know

24   that I -- I don't have a strong opinion one way or

**Matthew Scott**

1　another.  But I think if I could -- you know, I

2　would say that it could -- yeah, I really -- I don't

3　have a strong opinion one way or another, and I

4　wasn't -- you know, and I wasn't part of creating

5　that policy.

6　BY MR. ANGUEIRA:

7　　　　Q.　So let's say during a deliberation one of

8　your panel members might make a comment that you as

9　the head or a chairperson thought was inappropriate,

10　like, you know what, that girl was asking for it,

11　she didn't scream loud enough, she wanted to have

12　sex; is that a proper part of the deliberation, to

13　have a comment like that from a panel member?

14　　　　　　　　MS. SULLIVAN:  Objection.  But you

15　can answer.

16　　　　　　　　THE WITNESS:  Is it proper for

17　somebody to say something like that during a

18　deliberation?  Is that what your question was?

19　BY MR. ANGUEIRA:

20　　　　Q.　Yes.

21　　　　A.　I don't think it's an appropriate

22　statement for -- I don't think that that is

23　something that -- well, one, it would not be

24　something that would be -- it would not impact the

**Matthew Scott**

1   outcome, especially because that's something that

2   is -- and I think -- I even believe -- I remember

3   even saying something like that just to clarify

4   during the hearing process to Ms. Doherty about --

5   just explaining certain things to her and making

6   sure she understood why we ask certain questions,

7   why we have to ask some of these questions.

8          During the deliberation certainly

9   nothing like that would -- did come up because I

10  would remember it.  It would stick out to me.  If

11  something like that came out in the deliberation,

12  then I absolutely would -- I personally would

13  correct that, if there was something like that.

14      Q.   And how would you correct it?

15      A.   Well, one, I would say that it -- you

16  know, that it's inappropriate, that it's not

17  something that we should be considering, and I would

18  make sure that anybody -- in this case it's three of

19  us, so that would be one other person, you know --

20  so in that case during the deliberation I would say

21  that's not something that we can be using when we're

22  considering the outcome of this case.

23      Q.   Would that kind of a statement indicate to

24  you some element of bias or prejudice?

**Matthew Scott**

44

1       A.    If the statement was she was asking for

2   it?

3       Q.    Or comments to that effect, like they

4   didn't believe the victim either because of the way

5   that she was dressed or she didn't scream loud

6   enough or she probably wanted it, things to that

7   effect that you knew were inappropriate, would that

8   indicate to you some element of bias or prejudice by

9   that hearing officer?

10      A.    Well, I think there's a difference between

11  somebody that says she was dressed inappropriately

12  so she was asking for it -- I think there's a

13  difference between a statement like that and a

14  statement like -- you know, talking about -- because

15  I do remember during this case one of the things

16  that we had to look at quite a bit was the fact that

17  there were other people in the room or in the suite

18  at various times, and we had -- it was a key piece

19  of this case.  So we had to get to the bottom -- or

20  get as much information as we could about the level

21  of noise somebody was making or what the -- what a

22  scream -- what a quote, unquote, "scream" was and

23  things of that nature.

24           So if during the deliberations

1   someone was talking specifically about that moment,

2   that scream or the decibel level or whatever, I do

3   think that's appropriate to talk about that during

4   this particular case because it was so critical in

5   determining if it was -- if we could determine that

6   it was more likely than not that a sexual misconduct

7   occurred.

8       Q.   So you didn't answer my question.  So let

9   me ask it again.

10      A.   Sure.

11      Q.   And what I'm trying to do is to ask you

12  questions unrelated to your actual deliberation in

13  this case.  And I will --

14      A.   Okay.

15      Q.   -- in a few minutes.  You keep going to

16  that.

17           My question is, if you hear a panel

18  member during deliberations make a comment like the

19  ones I suggested, would that indicate to you

20  possible prejudice or bias against a rape victim?

21      A.   Again I think it's -- because there were a

22  couple statements that you made.  One, is if there

23  was -- if there were statements made about she was

24  asking for it because of what she was wearing, then,

**Matthew Scott**

1    yes, that's inappropriate, and that should not be

2    asked.  But if it's more about -- these situations

3    are very difficult, and you have to think through a

4    lot of the different scenarios that occurred, and

5    you don't always know every piece of it.  So I can't

6    say that there wouldn't be certain comments that

7    people would make to determine credibility, to

8    determine if the -- if the student had -- you know,

9    what was going through their mind or what was

10   happening in that moment or did their mind change,

11   you know, so -- so as --

12              So specifically to the comment of if

13   she was asking for it because it was -- you know,

14   what she was wearing or that -- those types of

15   comments, yes, that is inappropriate.

16        Q.   What would you do if you suspected that

17   one of your panel members was biased or prejudiced

18   against a rape victim?

19        A.   After the --

20        Q.   During the deliberation.

21        A.   During the deliberation?

22        Q.   Yeah.

23        A.   If there was a -- so after the hearing had

24   occurred and we were in the deliberation stage, and

**Matthew Scott**

47

1    I felt as though there was a strong bias between --

2    or from one of the panelists, what I would -- what I

3    would do personally is first I would consult with

4    the Title 9 coordinator.  Title 9 coordinator is

5    supposed to be -- is, you know, the unbiased, you

6    know, person that is overseeing the procedures, and

7    then I would determine if it was appropriate or

8    allowed in our policy to have that person recuse

9    themselves from the decision.

10       Q.   Okay.  What vote is required on these

11   Title 9 hearings?  Unanimous or less than unanimous?

12       A.   I'm trying to think back to our policy at

13   that time.  I don't remember for the policy at the

14   time because we review those policies every year.  I

15   know that in this case it was unanimous; however, I

16   don't remember if it was the majority or if it's

17   unanimous.

18       Q.   Now, you heard Ms. Doherty testify at the

19   hearing, correct?

20       A.   Yes.

21       Q.   And did you take into consideration the

22   witness statements from the various witnesses that

23   were provided to you by the investigators?

24       A.   Did we -- yes.

**Matthew Scott**

48

1      Q.   And did you take into consideration the
2  relationships between those witnesses and the
3  respective parties in this case, that being
4  Mr. ███████ and Ms. Doherty?
5      A.   Yes.
6      Q.   What was the nature of the relationship
7  between ██████ and Mr. ███████?
8                MS. SULLIVAN:  Can you --
9                MR. ANGUEIRA:  And by the way, you
10  can look at any document and --
11                MS. SULLIVAN:  Can he have a chance
12  to review this?
13                THE WITNESS:  I remember this case
14  and it's actually pretty common on this campus --
15  students have a lot of nicknames, so I have a hard
16  time remembering --
17  BY MR. ANGUEIRA:
18      Q.   That's okay.  I was going to suggest that
19  you could look at anything you want to look at to
20  refresh your memory or to respond to any of my
21  questions.
22      A.   Okay.
23      Q.   You're looking at the unredacted version
24  of Exhibit 10 now, which has the names of all the

1   witnesses, just so the record is clear what you're

2   looking at.  And your lawyer can help you to find

3   certain parts if she wants to.

4             Why don't we go off the record while

5   he's doing that.

6             (Discussion held off the record.)

7   BY MR. ANGUEIRA:

8       Q.   So my question I think was, what was the

9   nature of the relationship between ████ and

10  Mr. ████████

11      A.   Now I'm remembering why I had a hard time

12  remembering, because -- so ████ was the -- I guess

13  she reported that she was his girlfriend I believe;

14  however, she was not the person that came to his

15  room later on in the night.  So I was thinking in my

16  mind that it was somebody else that was his

17  girlfriend.  But, yes, she was -- she, based on her

18  statement, was saying that she was his girlfriend.

19      Q.   So your memory is that ████ never gave a

20  statement or reported that she came to his room

21  later that night with another woman?

22            MS. SULLIVAN:  Objection.  That was

23  not even remotely what he just said.

24            MR. ANGUEIRA:  I'm not asking him

1   what he said.  I'm asking a different question.

2   BY MR. ANGUEIRA:

3       Q.    Was there any evidence that ▆▆▆▆ came to

4   ▆▆▆▆▆▆ room that night with another woman?

5       A.    Yeah.  So we -- yes, there was -- one of

6   the pieces of the case was that there were two -- I

7   think it was originally reported that there were --

8   more in her original statement -- that was the

9   original statement, that there were people that came

10  to the door knocking.  I'm just having a hard time

11  recalling in this moment which one was stated that

12  came to the door.

13      Q.    I don't want you to -- it's not a memory

14  test.  If it's in the investigation report, which

15  you have in front of you, and your lawyer can help

16  you.  What is the name of the woman who came to

17  ▆▆▆▆▆▆ room while Elisabeth was in the room and

18  knocked on the door?

19      A.    So ▆▆▆▆ -- it says ▆▆▆▆ ▆▆▆▆ was the

20  one that came to the room and knocked on the door.

21      Q.    Okay.  And who was the woman that was with

22  her?  Your lawyer can help you with that, too.

23            Maybe I could ask another question

24  while you're looking.  Is that okay with you?

**Matthew Scott**

51

1            MS. SULLIVAN:  Yeah, sure.

2            MR. ANGUEIRA:  Let me ask you a

3   different question while your lawyer finds the

4   information that may be helpful.

5   BY MR. ANGUEIRA:

6       Q.   You said that it was determined somehow

7   that -- or you believe that ████ was ████████

8   girlfriend, correct?

9       A.   Yes.

10      Q.   I didn't see anything in any of these

11  investigation reports, including ████████ own

12  statements, where it says that she was the

13  girlfriend.  Did you find something like that?

14      A.   Yes.  It says, "Saturday night I was told

15  by my boyfriend to come to his room after I left the

16  party."  This is her talking about ████████

17      Q.   This is ████████ statement.  And you're

18  looking at Exhibit -- what number is that?

19      A.   Nine.

20      Q.   Okay.  So now is it clear in your mind

21  that she is the one that went and knocked on the

22  door?

23      A.   Correct, yes.

24      Q.   And she says that her boyfriend ████████

**Matthew Scott**

1  told her to come over?

2      A.   Yes.

3      Q.   Okay.  Why would he ask her to come over

4  if he's having sex with another woman?

5      A.   We'd have to look back at her statement,

6  but I believe she said that he was texting her

7  earlier in the night to come over.

8      Q.   Okay.  So that conversation about her

9  coming over, according to the context of this

10  investigation, was an earlier communication before

11  he asked Ms. Doherty to come over?

12      A.   It appears that way, yes.

13      Q.   And has your lawyer pointed out something

14  that may be helpful with the other question?

15              MS. SULLIVAN:  About the friend.

16              MR. ANGUEIRA:  Yes.  The name of

17  ▄▄▄▄▄▄ friend who she just identifies as a friend.

18              MS. SULLIVAN:  There's something in

19  this report about a friend from home and not from

20  school.

21  BY MR. ANGUEIRA:

22      Q.   Let me ask you a different question while

23  she continues to look at that.

24              When you do an investigation like

**Matthew Scott**

53

1    this, is the witness's ability to recall events an

2    important and relevant part of the investigation?

3        A.    Yeah.

4        Q.    And is the nature of the relationship

5    between the witnesses and the principals involved

6    also important?

7        A.    Yes.

8        Q.    So we know that ███ was █████████

9    girlfriend, correct?

10        A.    Yes.

11        Q.    And you certainly understood from your

12    training and your own life experiences that there

13    are times when friends will lie to protect other

14    friends, correct?

15        A.    Yes.

16        Q.    Were you aware that there are times when

17    women will lie to protect their boyfriends if

18    they've been accused of sexual misconduct against

19    other women?

20        A.    It's conceivable that somebody would lie

21    for their partner, yes.

22        Q.    Especially if their boyfriend is facing

23    rape charges, may be thrown in jail, loses a full

24    scholarship, and be thrown out of school?

**Matthew Scott**

54

1          MS. SULLIVAN:  Objection.

2          THE WITNESS:  I mean, yes, it's

3    conceivable that somebody would lie.

4    BY MR. ANGUEIRA:

5      Q.    Do you know whether or not ███ was

6    lying?

7      A.    I don't know if she was lying, but it was

8    something that was put into the assessment of

9    credibility.  It's something that we think about

10   when we're looking at what their relationship is.

11   In this particular case I remember -- and this is

12   0why I had a hard time remembering ███ because it

13   seemed like he had multiple girlfriends, quote,

14   unquote, "girlfriends."  So we didn't necessarily

15   treat ███ as if she was his, you know, long-term

16   girlfriend.  We more -- you know, our students use

17   terms like boyfriend, girlfriend or hookup, and that

18   means different things to different people.  So for

19   us we kind of looked at this as somebody that had a

20   potentially sexual relationship with this person but

21   not necessarily a long-term girlfriend, because we

22   didn't have enough information on that.

23     Q.    Have you found something that assists us

24   in identifying who the person was that was with

**Matthew Scott**

55

1  ████████

2      A.    So it doesn't have the name of ████████

3  friend.  It's her friend from home it says.  So this

4  was somebody that █████ -- so █████ was with Nye,

5  she goes by Nye, but Nye wasn't the one -- it

6  doesn't appear as though Nye was the one that went

7  to the door.  It was ████████ friend from home.

8      Q.    So when was ████████ with Nye?

9      A.    ████████ was with Nye when she went back --

10 it says -- ████████ went in to take a shower, and Nye

11 went down the hall to speak to ████ and --

12     Q.    Just read it to yourself; otherwise, she

13 has to --

14     A.    Sorry.  So it looks like -- so I'm

15 wondering if Nye was ████████ roommate, but it looks

16 like ████████ went back -- after ████████ went to the room

17 and knocked on ████████ door, she went back and told

18 Nye what happened.

19     Q.    Was there any effort made to determine

20 whether or not ████████ was intoxicated or under the

21 influence of alcohol or drugs at the time of these

22 interactions?

23     A.    I don't know to what extent the

24 investigators would have checked that information,

**Matthew Scott**

56

1    but --

2        Q.   Should they have?

3        A.   It's a -- it's a question that we -- it's

4    good to know, but it's --

5        Q.   Why is it good to know?

6        A.   Well, it's not -- it's not always

7    necessary, but it is something just to -- you know,

8    just to know if people were -- especially if we want

9    to know if they were together at the party prior or,

10   you know, were they drinking right before the event,

11   how long had it been since they stopped drinking,

12   all that.

13       Q.   You don't think it's relevant to the

14   witness's ability to recall events whether or not

15   they were under the influence of drugs or alcohol?

16       A.   Yeah.

17       Q.   So then what was the level of sobriety of

18   ███████ or her friend from home at the time that she

19   was involved in these events if you know?

20       A.   I don't know.

21       Q.   Okay.  Did any of your investigators or

22   the panel members know the state of sobriety of any

23   of these witnesses that were investigated by your

24   investigators?

**Matthew Scott**

57

1    A.   We wouldn't have known no more or less

2  than we would have any -- you know, the people

3  involved in it.  So we didn't necessarily know --

4  unless it came up, unless they asked in here and we

5  have their statement -- that they said something

6  like the person had been drinking at a party or

7  something like that, but we wouldn't know their

8  level of sobriety.

9    Q.   But did the investigators try to determine

10 their level of sobriety?  Because people can have

11 one shot and be fine or be pounding down shots and

12 be totally inebriated and therefore their memory

13 affected.

14          So my question is, did these

15 investigators report to you and other panel members

16 the level of sobriety of any of these individuals?

17 Yes or no?

18   A.   No, not that I recall.

19   Q.   They did report for certain individuals

20 who said they had been drinking, correct?

21   A.   Correct.

22   Q.   Were any of the witnesses asked if they

23 had taken any illegal drugs?

24   A.   I don't recall.

**Matthew Scott**

1    Q.    Was there an alcohol policy at this school

2  at the time?

3    A.    Yes.

4    Q.    Is it similar to most of the institutions

5  in the country that underage drinking is prohibited?

6    A.    Yes.

7    Q.    What were the ages of the people that the

8  investigators during the course of their

9  investigation determined were drinking?

10    A.    I don't know.

11    Q.    Were they underage and therefore illegally

12  drinking on campus?

13    A.    I don't know.  However, in our sexual

14  misconduct policy one of the things that we have to

15  do is give -- we can -- we have an alcohol amnesty

16  policy that allows us to make sure we get to the

17  root of when sexual misconduct is -- if there's an

18  alleged sexual misconduct we don't want people to

19  fear coming forward with their -- you know, the

20  accusation or coming forward as a witness because we

21  don't want them to hold anything back.  So we

22  wouldn't have -- even if we did find out that

23  somebody was underage, we wouldn't have held them

24  responsible from a conduct perspective.  We would

**Matthew Scott**

59

1    have a conversation with them about it, but -- yeah,

2    so just so you know, that would be a reason why we

3    wouldn't have done that, because of our alcohol

4    amnesty policy.

5        Q.    Well, did anybody have a conversation with

6    any of these witnesses because they were involved in

7    underage drinking to your knowledge?

8                   MS. SULLIVAN:  Objection.

9                   THE WITNESS:  I don't know.

10   BY MR. ANGUEIRA:

11       Q.    Did you ever speak with ██████ ████████

12   yourself?

13       A.    No.

14       Q.    Did you ever hear any recorded statement

15   that he gave?

16       A.    No.

17       Q.    Did you ever ask Mr. ████████ -- and by

18   "you" I mean the school -- to appear for this

19   hearing?

20       A.    Did we ask him to?

21       Q.    Yes.

22       A.    Yes.

23       Q.    And he chose not to, right?

24       A.    Yeah.  By the time this happened, I

**Matthew Scott**

60

1    believe he was no longer a student, so he chose not

2    to be -- he didn't want to have any part of it.

3         Q.   Well, whether he was a student or not, he

4    had the right to be there or not be there, correct?

5         A.   Yes.

6         Q.   And did the school have the authority to

7    ask the witnesses that they had interviewed to be

8    present at the hearing if they thought their

9    testimony live before the panel members was

10   relevant?

11        A.   Yes.

12        Q.   Could they have called them?

13        A.   Yes.

14        Q.   How many of the witnesses did this panel

15   call to the hearing?

16        A.   We didn't have any witnesses at the actual

17   hearing.

18        Q.   Whose decision was it not to call any of

19   the witnesses?

20        A.   We -- so the panel met prior to go over

21   the documentation, make sure that everybody

22   understood the process, and during that time we did

23   discuss if we felt like we needed any more

24   information to -- you know, to pull in any more

**Matthew Scott**

61

1   witnesses, and we decided that we didn't -- we felt

2   that we had enough.

3       Q.   Now, after you heard Ms. Doherty's

4   testimony and after you considered all of the

5   evidence presented in this case, did you make a

6   decision in your mind as to the credibility of

7   Ms. Doherty's account of what happened?

8       A.   Assessing credibility was part of it, yes.

9       Q.   And did you believe that any part of her

10  account of what she believes happened was not

11  credible or not true?

12      A.   There were -- there were concerns about --

13  and certainly this came up, about the fact that

14  there were multiple people that came in and out to

15  the room or were around at the time, and, you know,

16  there was no effort -- you know, there was nothing

17  that was -- it didn't appear as though she was

18  actively trying to get anybody to recognize that

19  something was occurring.  So that was a piece of it.

20              Another piece is as part of that --

21  because again when you think of a -- you know, a

22  victim of sexual assault or sexual misconduct or

23  rape, I understand that there is a -- everybody

24  responds differently.  So, you know, in this

**Matthew Scott**

1  situation we were also assessing -- trying to think

2  of the right way to say this -- the -- she never

3  made -- she never mentioned being -- having any

4  fear, being in fear, that he had threatened her

5  directly.  So given the fact that she said that she

6  had -- was not -- that she never made any mention of

7  being in fear or that he didn't threaten her in any

8  way, one of things that we had to look at was would

9  a reasonable person assume that she -- if she was

10  not in fear, if she would make some -- some noise or

11  some -- some meaningful effort to get one of the

12  people in the room or in the suite to know that

13  something was occurring, especially people that she

14  was friendly with in the suite.

15         So I think that was a big moment,

16  and that was a big thing that we did talk about.

17  I'm trying to think back to what else we would have

18  talked about.

19         There was mention of her being -- I

20  think she said embarrassed or -- you know, when

21  the -- when the people came to the door and were

22  knocking on the door, she mentioned something about

23  being embarrassed.  And, you know, she said -- I

24  think she said she was scared or something like

**Matthew Scott**

1    that.  And I believe I asked what do you mean by

2    that, and she said something like, well, I know if

3    somebody was hooking up with my boyfriend, I'd be

4    mad.

5                    And that was another thing that we

6    talked about is, if you are being -- if you are --

7    if you're being raped -- you know, obviously it's a

8    difficult situation to know everything that's

9    happening, but if you're being raped and now after

10   the fact you're talking about it, it didn't seem

11   like she -- her focus in that moment was on him and

12   on what he was allegedly doing.  It was more on the

13   people at the door and that she was fearful of them

14   and of their retaliation and of the fact that they

15   would know that she's hooking up with their

16   boyfriend.

17                   So it was very difficult for us to

18   say that it was more likely than not that a sexual

19   assault occurred because we didn't have enough

20   evidence to say that it did.

21        Q.    Have you finished or is there anything

22   else?

23        A.    Yeah.

24        Q.    That was it?

64

1      A.    That's all I can recall.   Those are some

2  of the big moments that I can recall us speaking

3  about.

4      Q.    So you said that she basically didn't make

5  enough effort to get some attention, to let people

6  know that were in the room or near the room to be

7  able to hear her need for help, in summary.   Is that

8  fair?

9      A.    Yes.   I want to make sure that -- when I

10 say she didn't make enough effort, I want to make

11 sure it doesn't sound like I'm saying if a victim is

12 in that situation, they have to be the one that's

13 making -- but what I'm saying is -- and it's

14 important if we're talking specifically about this

15 case.   I remember we did look at the relationship

16 between her -- and I think it was ███ is one of the

17 people in the room and ████████ is another one.   And

18 it seemed as though there could have been something

19 that she could have done, even if it wasn't

20 screaming at the top of her lungs, which I believe

21 she did say -- you know, when she went back, that's

22 what she told her suite mates, that she was

23 screaming and nobody did anything.   But that's not

24 how she described it to us, so there's some

1    inconsistency there.

2            It just felt as though she could

3    have done something that would have made ████

4    especially who was her -- who she was friendly with

5    at some point, that she could have done something

6    that would have indicated that she didn't want to be

7    there.

8        Q.   What was the -- in terms of the timing of

9    these events, when ████ was allegedly raping this

10   woman and she kept saying no, no, no, please stop,

11   according to her testimony, where was ████ during

12   that precise moment?

13       A.   I'd have to try to recall the timeline we

14   put together.

15       Q.   Take a look at it --

16       A.   Sure.

17       Q.   -- so that you understand my question.

18   There's going to be a series of questions here --

19       A.   Sure.

20       Q.   -- and they're all geared towards this.

21   You're telling us that someone should have heard

22   her.  That's what you're really saying.  Therefore

23   somebody has to be in a position to hear and able to

24   hear.  So my questions are going to be, all the

1   people that you claim should have heard her, where

2   were they, what time they were there, and whether

3   they were awake, and what was their state of

4   sobriety?

5           So as you read this investigation

6   report, think about all those issues and have

7   answers ready for me.  I'll give you all the time

8   you want.

9           MS. SULLIVAN:  All right.  We're

10  going to go take a break.

11          MR. ANGUEIRA:  Sure.

12          (Recess taken.)

13  BY MR. ANGUEIRA:

14      Q.   All right.  Have you had a chance to

15  review any document that you needed to review?  So

16  could you answer those questions?  Do you want it

17  read back?

18          MS. SULLIVAN:  Yeah.

19          MR. ANGUEIRA:  Why don't you read to

20  the witness the series of questions that I wanted

21  him to think about while he was reviewing the

22  documentation, and then we'll break them down.

23          I'm going to save you some time.

24  Let's just keep going.

**Matthew Scott**

67

1    BY MR. ANGUEIRA:

2        Q.    Part of the evidence that you relied upon

3    was the presence of other witnesses that you believe

4    should have been able to hear or see something out

5    of the ordinary or unusual based on what Ms. Doherty

6    reported, correct?

7        A.    Correct.

8        Q.    And those -- some of those witnesses were

9    ▮▮▮ and ▮▮▮▮ correct?

10       A.    They were two of them, yes.

11       Q.    Okay.  Who else other than ▮▮▮ and ▮▮▮▮

12       A.    Nye.

13       Q.    Okay.

14       A.    And ▮▮▮▮ was in the suite but -- yeah.

15       Q.    So "in the suite" you mean in ▮▮▮▮▮

16   room?

17       A.    Well, ▮▮▮▮ room was the living room,

18   so it's the bedroom on the other side of the living

19   room.

20       Q.    Okay.  And are the bedrooms separated by

21   doors?

22       A.    The bedroom is separated from the living

23   room with a door, yes.

24       Q.    Was the door open or closed during the

**Matthew Scott**

1   events that you believe he should have heard

2   something?

3      A.   I don't recall if we had that information.

4      Q.   Okay.  What was ▓▓▓▓ location in ▓▓▓▓▓▓

5   room?  Where did you believe that he was when he

6   should have heard something?

7      A.   He came into the suite and went into the

8   bathroom, and the bathroom is directly connected to

9   the living room where they would have been, and

10  turned on the light.

11     Q.   Okay.  So let's stick with just one person

12  at a time.  Let's go to ▓▓▓▓▓▓  Okay?  Was ▓▓▓▓▓

13  in ▓▓▓▓▓▓ suite the entire time that the events

14  occurred?

15     A.   Yes, I believe so.

16     Q.   Okay.  Was he awake or asleep?

17     A.   I believe it was reported that he was

18  asleep.

19     Q.   Okay.  Had he been drinking that night or

20  taking any drugs?

21     A.   That I don't know.

22     Q.   Did anybody ask him as part of this

23  investigation what his state of sobriety was during

24  these events?

1      A.   I don't recall.

2      Q.   Okay. So if you made the assumption that

3 ███████ was awake, is that -- strike that. Did you

4 make the assumption that he was awake, and therefore

5 he should have heard something?

6      A.   No.

7      Q.   Did you assume that ██████ was sound

8 asleep and drunk and should have heard something?

9      A.   No. We depended less on █████████ -- yeah.

10      Q.   Okay. So let's move on. █████ when did

11 ████ get to the room, ████████ room?

12      A.   I remember specifically asking Elisabeth

13 about that. She didn't know the exact time, so lots

14 of the time, you know, the timeframes were fuzzy.

15 So I don't know exactly when that happened, but I

16 know that she -- that it was -- I can't say that I

17 know. I believe that she said it was before the

18 people came knocking on the door.

19      Q.   Okay. So do you know if █████ was in the

20 room at the time that the assault first began when

21 she was saying no, no, please stop?

22      A.   I don't know if it was when it first

23 began. I don't.

24      Q.   Do you know if █████ was in the room at any

**Matthew Scott**

1    point in time before ██████ and her girlfriend

2    knocked on the door?

3         A.   If ████ was in the room before █████ and

4    her friend -- I specifically remember asking her

5    about that, so in the hearing you would have -- you

6    can hear that.  I don't remember off the top of my

7    head if it was before or after the knocking, but I

8    remember clarifying that.

9         Q.   What was ██████ state of sobriety during

10   these events?

11        A.   I don't know.

12        Q.   Do you know what █████ physical

13   relationship was or proximity to where these events

14   occurred between Mr. ████████ and Ms. Doherty at the

15   time you claimed that he should have been able to

16   hear something?

17        A.   Well, if he's walking through the living

18   room, which is where this would have been occurring,

19   it would have been -- I mean I would say the

20   furthest he could be away from them is maybe six

21   feet --

22        Q.   Okay.

23        A.   -- seven feet.

24        Q.   What was the nature of the relationship

**Matthew Scott**

1   between ████ and ██████

2       A.    They were suite mates I guess.

3       Q.    Were they on the football team together?

4       A.    Yes, I believe so.

5       Q.    Okay.  What was ██████ physical size in

6   comparison with Ms. Doherty's?

7       A.    He's larger than Ms. Doherty, yeah.

8       Q.    What -- did you ever meet him or review

9   anything about his physical dimensions?

10      A.    I didn't meet him specifically.  I did --

11  I do remember seeing pictures of him and looking him

12  up on the -- the roster, the football roster.

13      Q.    What was his height and weight?

14      A.    I don't remember.  I remember Elisabeth

15  guessed, she said something in the mid 200s maybe or

16  something like that.

17      Q.    With respect to -- so you said that ████

18  said he got to the room and then went to the

19  bathroom?  What is it that ████ told the

20  investigators he did?

21            Let him answer.  Or was he in the

22  room the whole time --

23      A.    I --

24      Q.    -- or do you know?

**Matthew Scott**

1    A.   I'm -- well, you asked what he told the

2  investigators, so that's what -- I can tell you what

3  I remember from the hearing is that Elisabeth said

4  that she saw ███ and a girl come into the apartment

5  or into the suite --

6    Q.   I don't mean to interrupt you.  I don't

7  really care what Elisabeth said right now.  I want

8  you to tell me what your investigators found out

9  when they talked to ███ as to what ███ claims that

10  he did, saw, and heard, please.  That's what I want

11  to hear from you.

12    A.   Okay.  He said that he came into the suite

13  at first.  He said he went to the bathroom to brush

14  his teeth, and he said he had Nye with him.  I think

15  he first said it was a girl with him and that they

16  were in his room.

17    Q.   Okay.

18    A.   That's where they were hanging out, but

19  that he went through and went to the bathroom to

20  brush his teeth.

21    Q.   Did ███ tell you what time they got to the

22  room?

23         MS. SULLIVAN:   Objection.  You're

24  talking about the investigation report, not who told

**Matthew Scott**

73

1   him anything?

2                    MR. ANGUEIRA:  Yeah, I'm sorry.

3                    MS. SULLIVAN:  And you were the one

4   that wanted to make that clear.

5   BY MR. ANGUEIRA:

6        Q.   Yeah, absolutely.  In other words, did you

7   receive information from the investigators as to

8   what time ████ got in the room?

9        A.   Yeah.  He said around 2:30, right, I

10  think.

11       Q.   In terms of the timing of the events as

12  reported by Ms. Doherty, at what stage of the

13  proceedings was -- were these events occurring in

14  relationship to when ████ got to the room?

15       A.   I'm sorry, can you repeat that one more

16  time?

17       Q.   Sure.  ████ got to the room, and according

18  to Ms. Doherty's account at what point in time did

19  he get to the room when these events were happening?

20       A.   So -- so in terms of our timeline, Nye

21  said that she went to go visit him around 2:00, and

22  Elisabeth said she was there between what, 2:08 and

23  2:10.  So that would imply in that case that ████ was

24  already in the room, that Nye went to go visit him.

**Matthew Scott**

74

1    And then again I think if you go back to the

2    hearing, I did specifically ask was ███ in there

3    prior to or after the knocking that happened on the

4    door.  So I think that's important because she

5    does -- I remember her saying I didn't know the

6    exact time, but then she told me if it was after or

7    before.  So it helps to put that into the timeline.

8         Q.    Did Ms. Doherty ever see ███ in the room?

9         A.    Yes.  She said she saw him come into the

10   room, yeah.

11        Q.    And did she tell the investigators to your

12   knowledge when she saw ███ in relationship to what

13   was happening with ███████

14        A.    I don't recall.  Do you want me to look?

15        Q.    No.

16        A.    I don't recall, but I do remember

17   asking -- because one of the things we wanted to try

18   to determine was again why she wouldn't have said

19   something to him.  And, you know, she -- that's when

20   she was talking about being embarrassed or whatever.

21   So it would make sense that it was happening -- that

22   ███ was walking through when something was occurring

23   because she -- otherwise she would have said this is

24   before any of that happened, you know.

**Matthew Scott**

75

1    Q.    So you made a lot of assumptions about the

2  events?

3                MS. SULLIVAN:   Objection.

4                THE WITNESS:   We used the

5  more-likely-than-not standard, so we have to

6  determine was it more likely than not that that's

7  how it occurred.

8  BY MR. ANGUEIRA:

9    Q.    And what standard did you use to determine

10  the level of sobriety of ▆ and Nye?

11    A.    It would be -- we would have used anything

12  that we would have had or anything that they would

13  have said.  So if anybody told us that they had been

14  drinking or if it had come up in conversation during

15  the hearing.

16    Q.    Did the investigators ask or provide any

17  information to you regarding the state of sobriety

18  of Nye or ▆

19    A.    Nye or ▆ I don't recall.  I could look.

20    Q.    If they did, it would be in the report,

21  correct?

22    A.    Correct.

23    Q.    Okay.  All right.  So we have ▆ Nye,

24  and ▆ that we talked about.  The only one we

**Matthew Scott**

1    haven't spoken about is ███████  And you said that

2    ██████ identified herself as ████████ girlfriend,

3    correct?

4        A.   In her statement, yes.

5        Q.   What information did the investigators

6    provide to you about ███████ state of sobriety?

7        A.   I don't believe there was anything in

8    here, just that she was at a party downtown and was

9    getting texts from ████████ so -- yeah.

10       Q.   So at the time of the hearing you had

11   looked at all this evidence, all the investigators'

12   report, knew that there was nothing in there to

13   indicate the state of sobriety of any of these

14   witnesses, and the panel chose unanimously not to

15   call any of these witnesses, correct?

16       A.   Correct.

17       Q.   By the way, what was ████████ relationship

18   with ████████  Was he on the football team, too?

19       A.   Yes.

20       Q.   So three football team members in the same

21   room --

22       A.   Mm-hmm.

23       Q.   -- right?  And was there some kind of rule

24   at the school that if one of the football team

**Matthew Scott**

1    members gets into trouble, they could get kicked off

2    the team?

3                    MS. SULLIVAN:  Objection.  You can

4    answer.

5    BY MR. ANGUEIRA:

6        Q.   If you know.

7        A.   I mean that's a possible outcome of

8    conduct cases, yes.

9        Q.   Certainly if you're accused of rape and

10   the rape is proven, you'd probably get kicked off

11   the team and out of the school, correct?

12       A.   If you are found responsible for rape --

13       Q.   Yes.

14       A.   -- yes.

15       Q.   And if you're part of a football team and

16   one of your star players is accused of rape and

17   thrown off the team, that's going to hurt the whole

18   team, right?

19                    MS. SULLIVAN:  Objection.

20                    THE WITNESS:  If he was a star

21   player, yes.  I don't know.

22   BY MR. ANGUEIRA:

23       Q.   Was he?

24       A.   I don't know that.

**Matthew Scott**

1      Q.    Was he on some type of scholarship?

2      A.    I don't know that.

3      Q.    Was he first string?  Second string?

4      A.    I don't know that.

5      Q.    Did you consider the possibility that

6   these teammates may be lying to protect ██████

7      A.    We considered that everybody could have

8   been lying to us.

9      Q.    Did you think that Elisabeth should have

10  screamed louder or done something more to voice her

11  objection to what was being done to her?

12     A.    I think that she -- I think that there

13  were multiple opportunities for her to do something

14  that would indicate that something was not right in

15  the room.

16     Q.    So you concluded that she was lying about

17  the rape and really wanted to have sex with ██████

18  and then later on decided to lie and say that she

19  was raped?

20          MS. SULLIVAN:  Objection.

21  BY MR. ANGUEIRA:

22     Q.    That's basically what you concluded,

23  correct?

24     A.    There were multiple things that we

**Jones & Fuller Reporting**
**617-451-8900   603-669-7922**

**Matthew Scott**

1   considered.  It wasn't necessarily exactly that.   It

2   was -- there -- she focused very -- she focused a

3   lot on the people that came to the door.  She

4   focused on being scared of them, thinking they were

5   going to beat her up, that she was hooking up with

6   one of their boyfriends.  She had a boyfriend.  He

7   allegedly had a girlfriend, had multiple

8   girlfriends.  So I think that was something that

9   played into it, saying that we have to use that --

10  is it more likely than not that it occurred and --

11      Q.   So you think she lied because she was

12  afraid of getting beat up by ██████ -- one of

13  ██████ girlfriends, and her boyfriend finding out

14  that she was having sex with ██████ that she ran

15  out screaming, crying down the hallway and reported

16  that she had been raped to her girlfriends, crying

17  hysterically?  She made that all up?

18      A.   There was specifically a text that I

19  remember that said something about she doesn't --

20  she doesn't know you or she doesn't know shit or

21  something like that, and there was nothing in the

22  text messages that showed that there was any

23  conversation about that.  Which was another piece

24  that made it seem as though maybe there had been

**Matthew Scott**

1   some conversation that occurred in the room between

2   ▮▮▮▮▮ and Elisabeth that she was concerned about

3   that they knew what happened in the room and that

4   she was scared of them.

5               So that was another piece that went

6   into that decision.  I remember we asked her

7   about -- there was a missing text message, but there

8   was a text message that did say something like that.

9               MR. ANGUEIRA:  I don't have any

10  other questions.  Thank you.

11              THE COURT REPORTER:  Ms. Sullivan,

12  do you want copies of the transcripts?

13              MS. SULLIVAN:  Yes.  E-trans,

14  electronic is fine.

15

16

17

18

19

20

21

22

23

24

**Matthew Scott**

81

1                    C E R T I F I C A T E

2          I, MATTHEW E. SCOTT, do hereby certify that I

3     have read the foregoing transcript of my testimony,

4     and further certify under the pains and penalties of

5     perjury that said transcript is a true and accurate

6     record of said testimony, with the exception of the

7     following corrections listed below:

8     Page   Line                    Correction/Reason

9     ____   ____    _____

10    ____   ____    _____

11    ____   ____    _____

12    ____   ____    _____

13    ____   ____    _____

14    ____   ____    _____

15    ____   ____    _____

16    ____   ____    _____

17    ____   ____    _____

18    ____   ____    _____

19    ____   ____    _____

20    ____   ____    _____

21    ____   ____    _____

22                           _____

23                           MATTHEW E. SCOTT

24      Dated this _____ day of _____, 2018

**Matthew Scott**

82

1  COMMONWEALTH OF MASSACHUSETTS      COUNTY OF MIDDLESEX

2          I, PENNI L. LaLIBERTÉ, Certified

3  Shorthand Reporter No. 10656 and Notary Public in

4  and for the Commonwealth of Massachusetts, do hereby

5  certify that MATTHEW E. SCOTT came before me on

6  Wednesday, March 21, 2018, the deponent herein, who

7  was duly sworn; the examination was reduced to

8  printing under my direction and control; and the

9  within transcript is a true record of the testimony

10  given at said deposition.

11          I further certify that I am neither

12  attorney or counsel for, nor related to or employed

13  by any of the parties to the action in which this

14  deposition is taken; and, further, that I am not a

15  relative or employee of any attorney or counsel

16  employed by the parties hereto, or financially

17  interested in the outcome of the action.

18          IN WITNESS WHEREOF I have hereunto set my

19  hand this 29th day of March, 2018.

20

21

22  *Penni LaLiberté*

23  PENNI L. LaLIBERTÉ, Notary Public

24  My Commission expires 11/12/21