**Bruce Johnson**

1

Volume:  1

Pages:  1 - 120

Exhibits:  1 - 14

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:17-CV-10161

- - - - - - - - - - - - - - - - - - - - - - - - -x

ELISABETH DOHERTY,

Plaintiff,

v.

AMERICAN INTERNATIONAL COLLEGE,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -x

DEPOSITION OF BRUCE D. JOHNSON

March 21, 2018

10:06 a.m. - 12:49 p.m.

BOWDITCH & DEWEY

200 Crossing Boulevard

Framingham, Massachusetts

Reporter:  Penni L. LaLiberté, CSR

2

1    A P P E A R A N C E S:

2

3        SWARTZ & SWARTZ

4        by:  DAVID ANGUEIRA, Esquire

5        Ten Marshall Street

6        Boston, Massachusetts   02108

7        (617) 742-1900

8        dangueira@swartzlaw.com

9        Counsel for the Plaintiff

10

11       BOWDITCH & DEWEY, LLP

12       by:  ARIEL G. SULLIVAN, Esquire

13       200 Crossing Boulevard

14       Framingham, Massachusetts   01702

15       (508) 926-3651

16       asullivan@bowditch.com

17       Counsel for the Defendant

18

19

20

21

22

23

24

**Bruce Johnson**

3

```
 1                    I N D E X

 2    Deposition of:                         Page

 3    BRUCE D. JOHNSON

 4

 5         BY ATTORNEY ANGUEIRA               6

 6

 7

 8                  E X H I B I T S

 9    No.                                     Page

10

11    Exhibit 1  American International College   30

12               Manual, Fire and Safety Report

13    Exhibit 2  Title 9 Victim's Rights          31

14    Exhibit 3  Photocopies of texts             32

15    Exhibit 4  Photocopies of texts             32

16    Exhibit 5  Elisabeth Doherty's statement    33

17    Exhibit 6  Statement of ████ ████           34

18    Exhibit 7  Statement of ████ ███            35

19    Exhibit 8  Statement of █████ ████          36

20    Exhibit 9  Statement of ████ ███            36

21    Exhibit 10 Investigation report             37

22    Exhibit 11 Police report                    38

23

24
```

Bruce Johnson

4

1                    E X H I B I T S (Continued)

2     No.                                              Page

3

4     Exhibit 12 Letter to Ms. Doherty                  40

5     Exhibit 13 Announcement for the hearing           41

6     Exhibit 14 Mr. Scott's Notification letter        41

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22     *Original exhibits retained by Attorney Angueira.

23

24

Bruce Johnson

1          P R O C E E D I N G S

2              BRUCE D. JOHNSON,

3    having been satisfactorily identified and duly sworn

4    by the Notary Public, was examined and testified as

5    follows:

6

7              DIRECT EXAMINATION

8

9              MR. ANGUEIRA:  And just for the

10   record, the stipulations are the usual which means

11   that all objections are reserved until the time of

12   trial except objections as to the form of question

13   or motions to strike reserved until the time of

14   trial.  The deponent will read and sign his

15   deposition transcript within 30 days.  If he needs

16   additional time, counsel can request that, and we

17   can accommodate that request.

18              And there's some additional comments

19   from defense counsel regarding confidentiality

20   matters contained in this deposition transcript.

21              MS. SULLIVAN:  Yes.  I just wanted

22   to state on the record that we've agreed the

23   parties, for the ease of transcribing the deposition

24   here today, without designating portions as

1   confidential, that any names of students that come

2   up that would be protected under FERPA will be

3   redacted by the parties prior to submission in

4   connection with any motions to the Court and

5   pursuant to the Court's protective order.

6                   MR. ANGUEIRA:  That's fine.

7   BY MR. ANGUEIRA:

8       Q.   All right.  What is your name, sir?

9       A.   Bruce Johnson.

10      Q.   Mr. Johnson, have you ever had a

11  deposition?

12      A.   No.

13      Q.   All right.  I'm sure your lawyer has

14  explained the basics to you.  I'm going to ask you

15  some questions.  I am a lawyer, and I represent

16  Ms. Doherty.

17                   If you do not understand anything

18  that I ask you, please let me know.  I will try to

19  repeat it and rephrase it; otherwise, I'll -- my

20  understanding will be that you do understand the

21  question and you're answering it.

22                   Always respond verbally.  By that I

23  mean words as opposed to gestures and sounds.  Like

24  that nod of the head you're doing now, it's great

**Bruce Johnson**

7

1    for social conversation --

2         A.    Okay.

3         Q.    -- but if I ask you to repeat an answer,

4    it's probably because you haven't responded

5    verbally.

6                  The other thing that happens

7    frequently is you can anticipate many of my

8    questions and begin to speak before I finish it, so

9    what I tend to do is instead of interrupting you,

10   I'll raise my hand, not to be disrespectful, but

11   it's a symbol to you to hold off, let me finish my

12   question, and then answer the question.

13        A.    Okay.

14        Q.    And then finally, if you need a break for

15   any reason, let us know.  We'll try to accommodate

16   you as much as we can.  There's a rule that says

17   you're supposed to answer a question before taking a

18   break.  Counsel and I may vary that rule if need be.

19   If you really need to talk to your lawyer, we'll

20   figure out a way to get that done and make it

21   happen.  All right?

22        A.    So if I'm not quite sure about a question,

23   I can ask counsel to meet or --

24        Q.    Well, first if you don't understand my

**Bruce Johnson**

8

1    question, please let me know.

2        A.    Okay.

3        Q.    Then if you do understand my question and

4    you still have an issue, then you -- you do want to

5    address your counsel, and she and I can figure out

6    what to do.  Okay?  We want to make it as

7    comfortable as possible.

8        A.    Sure.

9        Q.    What is your home address?

10       A.    110 Main Street, Northampton,

11    Massachusetts.

12       Q.    All right.  And are you currently

13    employed?

14       A.    Yes.

15       Q.    By whom are you employed?

16       A.    American International College.

17       Q.    And what's your position with the college?

18       A.    Professor of English.

19       Q.    And how long have you been with the

20    college?

21       A.    28 years.

22       Q.    All right.

23       A.    Teaching for 20, yeah.

24       Q.    Okay.  What did you do before you began

**Bruce Johnson**

9

1   teaching?

2       A.   I worked as an academic advisor.

3       Q.   All right.  And is that the only subject

4   that you teach is English?

5       A.   Correct.

6       Q.   All right.  And just briefly, what college

7   did you go to and when did you graduate?

8       A.   I went to the University of Massachusetts

9   Amherst and graduated in 1983.

10      Q.   Okay.  What degree?

11      A.   English.

12      Q.   Any further education?

13      A.   Yes.  I earned a master's at UMass Amherst

14  in '86, a master's in education.

15      Q.   Any further education after that?

16      A.   And my doctorate in 2002 at University of

17  Massachusetts.

18      Q.   Okay.  Any other formal education?

19      A.   Nothing.

20      Q.   Okay.  Now, you understand that you're

21  here to answer some questions regarding a Title 9

22  investigation at the college conducted regarding

23  some complaints made by Ms. Doherty?

24      A.   Yes.

**Bruce Johnson**

10

1      Q.    All right.  And what experience, if any,

2   did you have with Title 9 investigations or hearings

3   before you became involved in the Doherty matter?

4      A.    Okay.  I've served on -- I served on an

5   appellate board for student -- I guess it's student

6   behavior, any issue that was non-academic, you know,

7   bad conduct, that kind of thing.  I served on an

8   appellate board, so we heard cases that students

9   appealed.  I still serve on the faculty athletic

10  council, and we hear cases regarding students who

11  drug test positively, maybe, you know, a scholarship

12  might be taken away, a student might charge that.

13  And of course I had Title 9 training for two

14  years -- or two training sessions of Title 9

15  training away from those two other experiences.

16     Q.    Have you completed your answer?

17     A.    Yes.

18     Q.    Okay.  The appellate board issue on

19  student behavior, prior to it getting to the level

20  of an appeal where you would get involved, at this

21  college would there typically be an investigation

22  and some hearing regarding the allegations?

23     A.    Yes.

24     Q.    Were you ever involved in that part of the

**Bruce Johnson**

11

1   process?

2        A.    No.

3        Q.    So you didn't have any experience

4   whatsoever in the investigatory role or the hearing

5   in terms of allegations of misconduct by a student,

6   correct?

7        A.    Correct.

8        Q.    So what training or education did you

9   receive with respect to sitting as an appellate

10  board member, if any?

11       A.    We had training -- boy, this is going back

12  a ways.  I had -- I can't really answer that.  I

13  know I had training for this board, but I don't know

14  what it involved to be honest with you.

15       Q.    That's okay.  And that's what we want you

16  to tell us, what you can remember.  And if you

17  can't, just tell us.

18       A.    We learned about -- there are three -- you

19  know, was the charge -- we learned sort of like

20  three things to look for:  New evidence had emerged,

21  the punishment didn't fit the crime, and there was a

22  third element which I can't remember.  But we're

23  sort of trained on understanding -- those were the

24  three reasons a student could appeal a case, and it

**Bruce Johnson**

12

1    had to fit those three categories.

2         Q.   All right.  If you remember or if you

3    know, was it part of the appellate process to review

4    the evidence, the existing evidence, without any new

5    evidence and determine whether or not the hearing

6    panel conducted itself appropriately and whether or

7    not the result was appropriate, or was it limited to

8    these three specific areas, two of which you've

9    already identified?  Do you understand my question?

10        A.   Yes.

11        Q.   Okay.

12        A.   I don't recall if it involved reviewing

13   evidence.

14        Q.   Okay.  Do you still sit on that appellate

15   board?

16        A.   No.

17        Q.   All right.  Second --

18        A.   I'm sorry, I believe it was like a three-

19   or four-year commitment.

20        Q.   Okay.  Faculty advisory counsel, you would

21   hear drug cases, scholarship-related matters.  Would

22   you be part of the investigatory process or the

23   hearing process or another component of that

24   process?

**Bruce Johnson**

13

1      A.    I'm not part of the investigation with

2 that committee.   It's academics and athletics board.

3      Q.    Okay.

4      A.    There is an attorney on that board, and I

5 think she does the investigative work with the

6 athletic director or people involved there, but I'm

7 not part of that.

8      Q.    So what role do you have with respect to

9 those issues?

10      A.    We review a case and determine by vote the

11 outcome.

12      Q.    And when you say you review the case, do

13 you actually hear the evidence?   Is that the --

14      A.    Correct, yes.

15      Q.    Is it part of a hearing, or is it all just

16 written notes, or what does it entail?

17      A.    We meet -- I'm trying to think now.   It

18 very rarely happens.   We meet ahead of time to

19 review the case, and then we hear the case.

20      Q.    And when you say "hear the case," do you

21 hear live testimony from witnesses?

22      A.    Yes.   A student arrives with or without

23 witnesses, usually not, and states his or her case,

24 explains the circumstances, and then we vote.

**Bruce Johnson**

14

1      Q.   Okay.  And the last component of your

2  training or education you mentioned was Title 9

3  training.  You said something about two years or two

4  sessions, and I was a little confused by your

5  answer.  Am I correct that you had two separate

6  training sessions?

7      A.   Yes.

8      Q.   When were they?

9      A.   I believe -- I don't know for sure.  I

10  believe they were the year or the two years

11  preceding the incident.

12      Q.   So you had two separate training sessions,

13  both which occurred prior to Ms. Doherty's hearing?

14      A.   Correct.

15      Q.   And how long was each session?

16      A.   I would say in the vicinity of about two

17  hours.

18      Q.   And where was the training?

19      A.   On campus.

20      Q.   And who provided the training?

21      A.   Attorney Sullivan.

22      Q.   And were you provided with written

23  materials?

24      A.   Yes.

**Bruce Johnson**

15

1    Q.   Were you provided with -- well, instead of

2  my guessing, tell me what did the training consist

3  of?

4    A.   We sat in a big conference room.   There

5  was a video set up.   We had lots of written

6  materials.   We learned how to ask questions, how to

7  sort of bring no bias in, any preconceived ideas on

8  things, sort of the different nuances of cases.   I'm

9  not fully clear.   This is five or six -- five years

10  ago now.   And we also did a couple of sort of case

11  studies where we worked in groups on a hypothetical,

12  you know, case, and I think we -- I'm not perfectly

13  sure, but I think we sort of documented questions

14  we'd ask in that case.   So we were practicing on

15  hypothetical cases.

16    Q.   Okay.   What type of questions did you

17  learn that you should ask?   And my follow-up

18  question is going to be, what type of questions were

19  you trained that you should not be asking?

20    A.   I can't recall specifically.

21    Q.   Either one?   Either subject?

22    A.   I could give a logical response.   I'm just

23  not sure if that was part of training.

24    Q.   I don't want a logical response because

**Bruce Johnson**

16

1    that's not the same as what you were trained to do

2    and not to do.  So is it your testimony that you do

3    not recall what that training consisted of with

4    respect to what you learned about the types of

5    questions you should ask or the types of questions

6    that you should not ask?

7          A.    No.  We trained on the kinds of questions

8    that were good and bad.

9          Q.    Okay.

10         A.    For instance, you would, you know, not ask

11   someone what she was wearing.  I mean we're trying

12   to, you know, keep our minds open on things.  I'm

13   trying to think.  Just, you know, what they said

14   during the encounter, what they said to friends, who

15   they reported to, what they thought happened, you

16   know, in a certain timely sequence.

17               Let me think what else we were

18   asked.  Yeah, it's -- and then some of the more

19   negative questions would be something like I said

20   before, asking what someone -- you know, what she

21   wore or asking questions that would be somehow, you

22   know, hurtful or bring someone back to the

23   experience; you know, we try to -- as much as these

24   questions are uncomfortable, there's a way to ask

**Bruce Johnson**

17

1    them in such a manner that is sensitive to the

2    person but -- yeah.

3        Q.    Okay.  Were you --

4        A.    I'm sorry, I just want to finish.

5        Q.    Yes.

6        A.    It's just a little bit unclear on

7    specifically the kinds of questions we were told to

8    ask and not ask.  We trained on this and we did it

9    all.  I'm just not recalling them right now.

10       Q.    Do you still sit on Title 9 hearings?

11       A.    I do not, no.

12       Q.    So, for example, if you were a hearing

13   officer on a case involving a Title 9 allegation of

14   a student -- female student having been raped, and

15   you had some doubt in your mind as to whether or not

16   the rape occurred because of the manner in which the

17   woman acted during the rape, including whether or

18   not she yelled or screamed loud enough, were you

19   trained that it was appropriate to ask the woman how

20   loud she screamed and why she didn't scream louder?

21            MS. SULLIVAN:  Objection.  You can

22   answer, if you know.

23            THE WITNESS:  Excuse me?

24            MS. SULLIVAN:  I said you can

Bruce Johnson

1  answer.

2                      THE WITNESS:   No.

3  BY MR. ANGUEIRA:

4      Q.    That would have been highly inappropriate?

5      A.    Correct.

6                      MS. SULLIVAN:   Objection.

7  BY MR. ANGUEIRA:

8      Q.    And inconsistent with your training,

9  correct?

10     A.    Can you repeat the question?

11                     MS. SULLIVAN:   Objection.

12  BY MR. ANGUEIRA:

13     Q.    The first one or the one I just asked?

14     A.    The first one.

15                     MR. ANGUEIRA:   And I'm going to have

16  the stenographer read it back so it's exactly the

17  way I asked it because I can't remember exactly the

18  way I asked it.

19                     (Record read.)

20                     MS. SULLIVAN:   Objection.

21  BY MR. ANGUEIRA:

22     Q.    And your answer -- I think he's confused

23  when you object.

24                     MS. SULLIVAN:   Okay.  So I'm

**Bruce Johnson**

19

1  objecting to the form of the question.  You can

2  answer.  If you know, you can answer.

3                    THE WITNESS:  No.

4  BY MR. ANGUEIRA:

5      Q.   So you -- I want to understand your

6  answer.  You said you were not trained that it was

7  inappropriate to ask those types of questions; is

8  that --

9      A.   That's not -- I'm sorry, that's not what I

10  said.

11      Q.   That's what I thought.  That's why I asked

12  again.

13                  So am I correct that you were

14  trained during the Title 9 training, at least one of

15  the two sessions, that those types of questions were

16  inappropriate?

17      A.   Yes.

18      Q.   Okay.  Did you need that type of training

19  to tell you that, or did you have some sense that

20  that was inappropriate anyway?

21                    MS. SULLIVAN:  Objection.  You can

22  answer.

23                    THE WITNESS:  I'm sorry, I get

24  confused when you ask a question and you object.  I

20

1   don't know what that means.

2                   MR. ANGUEIRA:  I'm going to help.

3   She's doing a great job though.  Lawyers have an

4   obligation to object if they think that the question

5   that's being asked is inappropriate.  That's legal

6   stuff for a judge later on.  It should not interfere

7   with your ability to answer the question; however,

8   she's the only one you listen to in this place.  If

9   she doesn't want you to answer a question, she'll

10  tell you.  She'll say I don't want you to answer the

11  question, and then she and I will have a discussion.

12                  But when you hear an objection,

13  don't worry about it, but wait for instructions.  So

14  if you can answer the question, go ahead.  What

15  happens is you're listening to that, you forget the

16  question, and then we've got to go back.  I don't

17  know if that helps.

18                  MS. SULLIVAN:  Yes.  Do you mind if

19  we take a quick break so I can just talk to him?

20                  MR. ANGUEIRA:  Sure.

21                  (Recess taken.)

22                  MR. ANGUEIRA:  All right.

23                  MS. SULLIVAN:  Do you want to read

24  the question back again?  Do you feel like that was

**Bruce Johnson**

21

1 asked and answered?

2          MR. ANGUEIRA:  Unless the witness

3 thinks he needs to clarify something, I believe it

4 was answered.

5          Do you need to clarify anything

6 about your answer?

7          THE WITNESS:  I need to hear the

8 question again.

9          MS. SULLIVAN:  I think the objection

10 made it muddled for him.

11          THE WITNESS:  I'd like to hear the

12 question and my -- I'm not sure I answered the right

13 way to be honest with you.

14          MR. ANGUEIRA:  Then in fairness to

15 you, and to make sure the record is accurate, let me

16 ask the question again and maybe break it down.

17          MS. SULLIVAN:  It was very long.

18 BY MR. ANGUEIRA:

19      Q.   So let's -- I'm asking about the training

20 that you received; do you understand that?

21      A.   Yes.

22      Q.   And during that training you told us that

23 you were trained about what types of questions to

24 ask and what types of questions not to ask, correct?

**Bruce Johnson**

1      A.   Correct.

2      Q.   So during the course of the training did

3 they discuss the kinds of questions that you should

4 be asking the victim of a sexual assault, a rape

5 victim?

6      A.   Yes.

7      Q.   Okay.  And during that training did they

8 instruct you in the types of questions that would be

9 inappropriate?

10      A.   Yes.

11      Q.   And was part of the training that you

12 received as to what questions would be inappropriate

13 to ask a rape victim why she didn't scream louder

14 than she actually did?

15      A.   No.  That was never asked --

16      Q.   Okay.  So you were never --

17      A.   -- as part of training, correct.

18      Q.   So whatever testimony you gave before was

19 not accurate about that?

20      A.   Correct.  I misunderstood the question at

21 that time.

22      Q.   That's okay.  So did you ever receive any

23 training about what the rape victim was wearing?

24      A.   Only in that it doesn't matter what a rape

**Bruce Johnson**

23

1  victim wears.

2      Q.   Okay.  Were you trained not to ask the

3  rape victim what she was wearing?

4      A.   No -- yes, we were trained not to ask

5  that, correct.

6      Q.   And you understood the reason for that was

7  because that would be inappropriate, correct?

8      A.   Correct.

9      Q.   Were you trained to ask a rape victim

10 whether or not she consented to the sex?

11     A.   I don't recall.

12     Q.   Okay.  Were you trained to ask a rape

13 victim whether or not -- during the course of any

14 sexual event, if it was consensual at the beginning,

15 whether or not at some point in time it became

16 non-consensual?

17     A.   Yes.

18     Q.   Okay.  Did you understand as part of your

19 training that a woman has the right to engage in

20 whatever sexual activity she feels like, as long as

21 it's not harming someone else, and during the course

22 of those events can change her mind at any time, and

23 the person that she's with, particularly a student

24 of the university, has the obligation to stop?  Did

**Bruce Johnson**

24

1    you understand that as part of your training?

2        A.    Yes.  I've understood that when the word

3    no is spoken, everything stops, regardless of where

4    the sex has taken them.  It's sort of a fundamental

5    belief in this kind of thing.

6        Q.    Okay.  I understand.  Fundamental beliefs

7    are one thing, but I'm focused on your training.

8    Your statement is accurate, correct?

9        A.    Correct.

10        Q.    Okay.  Do you know what the Cleary Act is?

11        A.    I do not.

12        Q.    Never heard of it?

13        A.    No.

14        Q.    Do you know whether or not colleges like

15    the college you work with had any type of obligation

16    or duty or responsibility of reporting sexual

17    assaults on its campus?

18        A.    Yes, I do.

19        Q.    Had you ever seen those reports prior to

20    the Doherty incident?

21        A.    No.

22        Q.    Did you know that those reports are a

23    matter of public record?

24        A.    I do.

**Bruce Johnson**

25

1    Q.    Do you know how many sexual assaults there

2    had been at this campus prior to the Doherty

3    assault?

4    A.    No idea.

5                MS. SULLIVAN:   Objection.

6    BY MR. ANGUEIRA:

7    Q.    Did you ever look at that information?

8    A.    No.

9    Q.    As part of your training were you told

10   that this information is available?

11   A.    I don't recall.

12   Q.    Have you ever read or reviewed any of the

13   Department of Education guidelines regarding Title 9

14   rights?

15   A.    Department of Education?

16   Q.    Mm-hmm.

17   A.    I don't know.

18   Q.    Do you know if they even exist?  Not the

19   Department of Education, I mean guidelines issued by

20   the DOE regarding Title 9 rights.

21   A.    I don't know.

22   Q.    We were talking about your involvement in

23   investigations and hearings, and the question that I

24   want to ask you now is, apart from your training how

**Bruce Johnson**

26

1    many actual Title 9 investigations or hearings were

2    you actually involved in as an active participant

3    before the Doherty matter?

4        A.    I don't think any.  I think none.

5        Q.    As part of any education or training that

6    you've had, including your education in terms of

7    being a professor and a teacher, have you ever

8    received any education or training in dealing with

9    victims of sexual assault?

10       A.    Could you -- do you mean as part of the

11   committee we worked on or just in general?

12       Q.    At any point in time during your

13   professional career, including your education and

14   training as an educator --

15       A.    Yeah.

16       Q.    -- and your positions at the college in

17   terms of investigations and hearings of sexual

18   misconduct or misconduct, have you ever learned

19   anything about the appropriate way of dealing with

20   victims of sexual assault?

21       A.    Yes.  There have been videos.  We, I

22   think -- I'm not sure if it's biannual or -- I know

23   that we have -- it's a requirement that we watch

24   videos and pass an exam.  I think that's part of the

**Bruce Johnson**

1    video.  That's regular.

2        Q.   Are you talking about sexual

3    discrimination, or are you --

4        A.   No.  Sexual harassment, too.  They give

5    scenarios with people in an office or a college, and

6    we have to study, learn the policies and recognize

7    and answer questions.

8        Q.   Okay.  But more specifically my question

9    deals with the appropriate way or ways of dealing

10   with victims of sexual assaults, not just

11   harassment, even though sexual assault is a form of

12   harassment or discrimination.  But, for example, a

13   woman has been actually raped and traumatized by

14   that rape.  Have you ever learned anything about how

15   to deal with those victims?

16       A.   I don't know for sure.  I guess I thought

17   it was part of the training that we had with

18   Attorney Sullivan.

19       Q.   Okay.  Did you learn during any part of

20   your training or education in dealing with victims

21   of sexual abuse or sexual assaults that these women

22   are often traumatized and that the trauma can affect

23   their memories?

24              MS. SULLIVAN:  Objection.  You can

**Bruce Johnson**

1  answer.

2                    THE WITNESS:  I don't recall.

3  BY MR. ANGUEIRA:

4      Q.    Do you know anything about post-traumatic

5  stress disorder?

6      A.    Yes.

7      Q.    What's your general understanding of what

8  that is?

9      A.    It's a very serious condition that comes

10  after a traumatic event in a person's life and can

11  have all sorts of negative consequences for any

12  length of time --

13     Q.    Do you know --

14     A.    -- recognizable or not.

15     Q.    Do you know if women that have been raped

16  can suffer from PTSD?

17     A.    Absolutely.

18     Q.    Do you know whether or not women who have

19  been raped and suffer from PTSD can forget parts of

20  their rape?

21                    MS. SULLIVAN:  Objection.  You can

22  answer.

23                    THE WITNESS:  Yeah, I don't know

24  that specific point you make.

**Bruce Johnson**

29

1   BY MR. ANGUEIRA:

2       Q.   Do you know what repressed memories are?

3       A.   Yes.

4       Q.   What are they to your understanding?

5       A.   Memories we've pushed out of our -- into

6   our subconscious, and they exist and can reveal

7   themselves from time to time.

8       Q.   So you understood during the course of

9   your participation in the Doherty matter -- the

10  Doherty hearing, that as a rape victim suffering

11  from whatever condition she may have been suffering

12  from, that may have affected her ability to recall

13  and testify about events, correct?

14              MS. SULLIVAN:   Objection.  You can

15  answer.

16              THE WITNESS:   I have no way of

17  knowing that.

18  BY MR. ANGUEIRA:

19      Q.   Okay.  You had no way of knowing that at

20  the time, correct?

21      A.   Correct.

22      Q.   All right.  So you didn't take that into

23  consideration in determining issues regarding her

24  credibility?

**Bruce Johnson**

30

1    A.   I didn't say I wouldn't take into

2    consideration what my common sense would tell me,

3    but I -- could you repeat the question again?

4    Q.   Sure.  Did you take into account in

5    determining Ms. Doherty's credibility, with respect

6    to participation in her Title 9 hearing, whether or

7    not her memory could have been impacted as a result

8    of the trauma that she sustained during this rape?

9    A.   I did not.

10   Q.   Now, we marked at the beginning of this

11   deposition a bunch of paperwork that was provided to

12   us by the college in this litigation, and I'm going

13   to have you formally identify for us -- and your

14   counsel may be able to assist you what these things

15   are if you don't know.

16          This is Exhibit 1.  Can you look at

17   that document and tell us whether or not you know

18   what that is.

19          (Deposition Exhibit 1 was marked.)

20          THE WITNESS:  Looks like it's part

21   of the student handbook.  I mean do I know what this

22   document is?

23   BY MR. ANGUEIRA:

24   Q.   Yes.

Bruce Johnson

1        A.    Yes.

2        Q.    Okay.  What is it?

3        A.    It's a --

4        Q.    Well, what's the title of the document?

5        A.    American International College Manual,

6    Fire and Safety Report.

7        Q.    Have you ever seen that document before

8    today?

9        A.    I don't know.

10       Q.    Okay.  Do you know whether or not there's

11   anything in that document about Title 9 policies or

12   procedures of the college?

13       A.    I don't know.

14       Q.    Have you ever read the --

15       A.    I can't recall I should say.  I can't

16   recall.

17       Q.    Okay.  Have you ever read any of the

18   Title 9 policies and procedures in the college

19   manuals including the student handbooks?

20       A.    Yes.

21       Q.    All right.  Can I have that back, please.

22       A.    Sure.

23             (Deposition Exhibit 2 was marked.)

24   BY MR. ANGUEIRA:

**Bruce Johnson**

32

1      Q.    I'm showing you Exhibit Number 2, and do

2  you know what that is?

3      A.    Victim's Rights Statement.  I don't

4  recall.

5      Q.    Okay.

6        (Deposition Exhibits 3 and 4 were marked.)

7  BY MR. ANGUEIRA:

8      Q.    Showing you Exhibit Numbers 3 and 4 at the

9  same time.  These are exhibits that were provided to

10  us in conjunction with this litigation.  And they

11  appear similar, but there are some differences.  And

12  I'm asking you whether or not you know what these

13  two documents are?

14      A.    Looks like the texting exchange between

15  Ms. Doherty and ████████ I believe, right?

16      Q.    Okay.

17            MS. SULLIVAN:  Is the only

18  difference the redactions?

19            MR. ANGUEIRA:  Yes.

20            MS. SULLIVAN:  Oh, okay.

21            THE WITNESS:  These I certainly

22  read.

23            MR. ANGUEIRA:  Okay.  Let me have

24  that back.  And then I'm going to show you Exhibit 5

**Bruce Johnson**

33

1  and ask you what that is.

2                    (Deposition Exhibit 5 was marked.)

3                    THE WITNESS:   These are the

4  reports -- I've read these as well.   These are the

5  reports from the evening.

6  BY MR. ANGUEIRA:

7         Q.    And when you say, "the reports from the

8  evening" --

9         A.    Police report.   Let me just look it over.

10        Q.    Take a better look at it because I'm going

11 to ask you if -- and I have a few of these, if these

12 are statements provided by witnesses or police

13 officers or exactly what they are, and then for the

14 name of the individual who provided the report, if

15 you can even tell with the redactions.

16        A.    This looks like Elisabeth's report.

17        Q.    So that's Ms. Doherty's report?

18        A.    Correct.

19        Q.    Okay.   And did you have that available to

20 you during the course of your hearing?

21        A.    Yes.

22        Q.    And did you --

23        A.    I don't recall.   I mean I -- I know we

24 read all the police reports, and we had everything

**Bruce Johnson**

34

1   available to us --

2       Q.   Okay.

3       A.   -- so I assume, yes.

4       Q.   Okay.  So at some point you're either --

5   either before, during, or after the hearing, before

6   you made a decision on her case, you had access to

7   that information?

8       A.   Before.

9                   (Deposition Exhibit 6 was marked.)

10  BY MR. ANGUEIRA:

11      Q.   Okay.  Exhibit 6, what is that?

12      A.   This is a witness statement.

13      Q.   Can you identify the witness for us?

14      A.   By name, no.

15      Q.   All right.  Let's go off the record.

16      A.   Possibly -- I don't know for sure.

17              MR. ANGUEIRA:  No guessing.  Let's

18  go off the record.

19                  (Discussion held off the record.)

20              MR. ANGUEIRA:  So defense counsel

21  has agreed to identify the names of these witness

22  statements, even though the documents have the name

23  redacted.  And this is all in conjunction with the

24  statement defense counsel made, this information

**Bruce Johnson**

1    will be kept confidential.

2              So whose statement is that?

3              MS. SULLIVAN:  So this is the

4    statement of ████ ████████   And that's

5    ███████████ I believe, ████████████████

6              MR. ANGUEIRA:  And by "this" you're

7    referring to Exhibit 6?

8              MS. SULLIVAN:  Yes, Exhibit 6.

9              (Deposition Exhibit 7 was marked.)

10   BY MR. ANGUEIRA:

11       Q.    Showing you Exhibit 7, and maybe it's

12   easier for your counsel to tell us who the witness

13   is.

14              Do we know whose witness statement

15   this one is?

16              MS. SULLIVAN:  That is ████ ██████

17   BY MR. ANGUEIRA:

18       Q.    Okay.  Now, sir, can you look at ████

19   ████████ statement contained in Exhibit 7, and is

20   this a document you also had available to you during

21   the --

22       A.    Yes.

23       Q.    -- during the hearing process and/or

24   before?

**Bruce Johnson**

36

1      A.   Yes.   Before.

2                  (Deposition Exhibit 8 was marked.)

3                  MR. ANGUEIRA:  Okay.  Looking at

4    Exhibit 8, can we identify who that witness is?

5                  MS. SULLIVAN:  That is ███████

6    ███████  I believe it's ███████████

7                  MR. ANGUEIRA:  Close enough.

8                  MS. SULLIVAN:  Yeah.

9    BY MR. ANGUEIRA:

10      Q.   All right.  And is Mr. ████████

11   statement another piece of evidence that you had

12   available to you?

13      A.   Yes.

14                  (Deposition Exhibit 9 was marked.)

15                  MR. ANGUEIRA:  All right.  Looking

16   at Exhibit 9, whose statement is that?

17                  MS. SULLIVAN:  I don't want --

18                  MR. ANGUEIRA:  You were on a roll.

19                  MS. SULLIVAN:  I believe I know who

20   that is, but I hate to commit without

21   double-checking so --

22                  MR. ANGUEIRA:  You can double-check

23   later.

24                  MS. SULLIVAN:  I believe it's -- I

**Bruce Johnson**

37

1    believe that is the statement of ████ ████

2    ████████ ██████

3    BY MR. ANGUEIRA:

4        Q.   Okay.  And if this is, in fact,

5    Ms. ██████ statement, is this information you had

6    available to you during the Title 9 process?

7        A.   Yes.

8                (Deposition Exhibit 10 was marked.)

9    BY MR. ANGUEIRA:

10       Q.   Okay.  Thank you.  Looking at Exhibit 10,

11   this appears to be an e-mail from Cindy Shiveley to

12   several people.  And it says, "Hi, Matt, attached is

13   a write-up of the investigation."

14               Look at this document and tell us

15   whether or not you know what that is, and then what

16   is it.

17       A.   Yes.  This was the investigation report

18   from Cindy and Terrance, and we had this before the

19   hearing as well.

20       Q.   Okay.  So am I correct that when

21   Ms. Doherty reported her allegations that the

22   college undertook an investigation?

23       A.   Yes.

24       Q.   Okay.  And as a result of that

**Bruce Johnson**

38

1    investigation, the hearing officers on her case were

2    provided with that document?

3        A.    Correct.

4        Q.    And apart from that document and all of

5    the statements and the actual testimony at the

6    hearing, what other evidence, if any, did your

7    hearing panel look at or consider before it made its

8    decision?

9        A.    I believe there may have been police

10   reports that I may not have seen here.

11       Q.    Okay.  Let me show you Exhibit 11, and see

12   whether or not this is that missing piece of

13   information that you just mentioned.

14                   (Deposition Exhibit 11 was marked.)

15                   THE WITNESS:   I know I read police

16   reports.

17   BY MR. ANGUEIRA:

18       Q.    And those are not the police reports?

19       A.    I can only assume they are, correct.   I

20   see letters at the end here from Elisabeth to Scott,

21   you know --

22       Q.    Take your time, look at the document.   It

23   contains a lot of pages, but it was given to me that

24   way.  That's why I gave it to you that way.  And I

**Bruce Johnson**

1   don't mind if your counsel needs to help you at all

2   to identify whether or not that is the police

3   reports or something else.

4              MS. SULLIVAN:  Okay.  This is the

5   police report.  This is not part of that.  This is

6   not --

7              MR. ANGUEIRA:  Perfect, good.

8              MS. SULLIVAN:  This is not --

9              MR. ANGUEIRA:  Just take the staple

10  off.

11             Let's go off the record.

12             (Discussion held off the record.)

13  BY MR. ANGUEIRA:

14     Q.   Now that we're looking at Exhibit 11, is

15  it your understanding that this is the police report

16  that you had available to you?

17     A.   Yes.

18     Q.   Okay.  All right.  Now --

19             MS. SULLIVAN:  Can I just clarify,

20  not to testify for him, but that -- you would have

21  had an unredacted copy of that without the lines

22  through it.

23             THE WITNESS:  Good point.

24             MR. ANGUEIRA:  Let's mark this

**Bruce Johnson**

40

1    document.

2                    (Deposition Exhibit 12 was marked.)

3    BY MR. ANGUEIRA:

4        Q.    Looking at Exhibit 12, do you know what

5    that is?

6        A.    I'm not sure if --

7                    MR. ANGUEIRA:  Don't say anything

8    until she gets back.

9                    (Discussion held off the record.)

10                   THE WITNESS:  I can't recall.

11   BY MR. ANGUEIRA:

12       Q.    So you have no idea what that is?

13                   MS. SULLIVAN:  Objection.  That's

14   not what he said.

15                   THE WITNESS:  I thought you asked

16   the question do I recall reading it or seeing it.

17   BY MR. ANGUEIRA:

18       Q.    Oh, no.  Do you know what it is?

19       A.    It's a letter sent to Elisabeth informing

20   her of her hearing.

21       Q.    Okay.  And if you know, was that the

22   standard procedure that the college would follow

23   when a woman made an allegation of sexual assault

24   with respect to a Title 9 investigation?  And if you

**Bruce Johnson**

41

1   don't know --

2        A.    I don't know.

3        Q.    Okay.  Who was the Title 9 coordinator

4   during the Doherty matter?

5        A.    Nicolle Hazler (phonetic) -- Nicole

6   Cestero.  There's two Nicolles, and I can't --

7   Nicolle Cestero.

8                   MR. ANGUEIRA:  Can you mark these

9   two separate documents.

10                   (Deposition Exhibit 13 was marked.)

11  BY MR. ANGUEIRA:

12       Q.    Exhibit 13, do you know what that is, sir?

13       A.    That's the announcement for the hearing

14  sent out to the committee.

15                   (Deposition Exhibit 14 was marked.)

16  BY MR. ANGUEIRA:

17       Q.    Okay.  Exhibit 14, what is that?

18       A.    This is Matt Scott's notification letter

19  regarding the hearing and the questions I guess.

20       Q.    It says -- and this is an e-mail from

21  Matthew Scott by the way.  Who is Mr. Scott?

22       A.    Okay.

23       Q.    Who is he?

24       A.    Oh, I meant Matt.

**Bruce Johnson**

1      Q.    Yeah, but who is he?

2      A.    Chair.

3      Q.    Who is Matthew Scott?

4      A.    The chair of the committee.

5      Q.    Okay.  And he sent out this e-mail saying,

6  "I have printed copies of the questions as well as

7  statements and timelines."  Now we saw some

8  timelines and we saw the statements.  Do you know

9  where the printed copies of the questions are?

10     A.    No idea.

11               MR. ANGUEIRA:  Off the record.

12               (Discussion held off the record.)

13  BY MR. ANGUEIRA:

14      Q.    Do you remember getting any printed copies

15  of the questions as this mail indicates?

16      A.    I don't recall.

17      Q.    Do you remember if anybody had some

18  prepared questions to ask during the hearing?

19      A.    I don't recall anything formal.

20      Q.    Okay.  I'm actually going to play the

21  audio of the hearing during this deposition at some

22  point, and even though I'm not sure who's saying

23  what, I think it's Mr. Scott, he mentioned something

24  about, well, we had some questions prepared to ask

Bruce Johnson

1    [redacted] and you.  But since he's not here, we'll ask

2    you some of these questions.

3                    Does that bring back a memory that

4    you had some written questions ready to ask

5    Ms. Doherty --

6        A.    I don't recall.

7        Q.    -- and [redacted]

8        A.    I don't recall.

9        Q.    What was [redacted] last name by the way?

10       A.    [redacted] -- it began with "R" I think.  I

11   don't know his last name.

12       Q.    If it helps to get it from your lawyer,

13   that's fine, too.

14                    What was his last name?

15                    MS. SULLIVAN:    [redacted] I think.

16   BY MR. ANGUEIRA:

17       Q.    Is that consistent with your memory?

18       A.    I don't recall his last name.

19       Q.    Fair enough.

20       A.    This is a while back, too.  That's one of

21   the issues here; it's four years ago.

22       Q.    I understand.  Who was it that asked you

23   to be on the hearing board for this matter, the

24   Doherty matter?

**Bruce Johnson**

1      A.    Nicolle Cestero.

2      Q.    Who were the -- by the way, what did you

3  call that hearing panel?  Was there a name that the

4  college used for that?

5      A.    A Title 9 -- I don't know what the formal

6  name was for the committee, the Title 9 hearing

7  board or committee.  I don't --

8      Q.    Or panel, can we use that?

9      A.    Possibly.  I don't know.

10     Q.    But you're comfortable with that if I say

11 "the panel"?

12     A.    Okay.

13     Q.    So who was on the Title 9 hearing panel

14 for the Doherty matter?  You, Mr. Scott, and who

15 else?

16     A.    The woman in financial aid, whose name is

17 in there as well.  I've forgotten her first name.

18     Q.    See if it's on one of those documents.

19     A.    Yeah.  Nila.

20     Q.    Okay.  And do you know how many Title 9

21 hearings either Nila or Mr. Scott had participated

22 in before this Doherty matter?

23     A.    I do not.

24     Q.    Now, when the college received the

**Bruce Johnson**

45

1   complaints by Ms. Doherty about this matter and they

2   assigned certain people to investigate the matter,

3   who were the investigators that looked into this

4   matter?

5       A.   Terrence O'Neill and Cindy Shiveley I

6   believe is her last name.

7       Q.   And do you know what experience, if any,

8   these individuals had in investigating Title 9

9   matters before the Doherty matter?

10      A.   I believe they had training, but I do not

11  specifically know what type of training they had for

12  that.

13      Q.   Okay.  Well, apart from the training my

14  question really is actual experience, because you

15  can have training --

16      A.   Correct.

17      Q.   -- and not do anything with respect to the

18  training.  So my question is, if you know, did

19  either of these investigators have actual experience

20  in conducting the Title 9 investigation?

21      A.   I don't know.

22      Q.   Okay.  Did you rely on the investigators'

23  reports, including their comments about their views

24  of credibility, in reaching your decision in the

**Bruce Johnson**

1  Doherty matter?

2      A.   We considered their report along with all

3  evidence and reports and the hearing itself.

4      Q.   And do you know who it was that appointed

5  or selected these two individuals as the Title 9

6  investigators?

7      A.   I assume Nicolle Cestero decided that, but

8  I don't know for sure.

9      Q.   Okay.  Can you -- since you received the

10  Title 9 training and you were asked to sit on this

11  panel, I assume, correct me if I'm wrong, that you

12  must have been familiar with the Title 9 policies

13  and procedures at the college at the time that you

14  were asked to sit on this panel, correct?

15      A.   Yes.

16      Q.   Describe for us the protocol, the policies

17  and procedures, for a Title 9 investigation in

18  effect at this college at the time that Ms. Doherty

19  reported her sexual assault.  Take us from the very

20  beginning right up to the panel hearing and

21  decision.

22          MS. SULLIVAN:  Objection.

23          THE WITNESS:  I don't --

24          MS. SULLIVAN:  You can answer.

**Jones & Fuller Reporting**
**617-451-8900   603-669-7922**

**Bruce Johnson**

47

1            THE WITNESS:  I do not know the

2   specific steps involved other than sort of a general

3   view of what goes on with -- you know, report,

4   investigation, hearing, but specifics I don't know.

5   BY MR. ANGUEIRA:

6       Q.    Okay.  Did any part of the Title 9

7   investigation by the college take into account the

8   investigation being conducted by the Springfield

9   police?

10              MS. SULLIVAN:  Objection.  You can

11  answer.

12              THE WITNESS:  I don't know.

13  BY MR. ANGUEIRA:

14      Q.    Did any of the --

15              THE WITNESS:  I don't recall.  I

16  don't recall.

17  BY MR. ANGUEIRA:

18      Q.    Did any of the investigators at the

19  college or any of the panel members or anybody at

20  the college ever communicate with the Springfield

21  police to see if they had any additional evidence

22  that may help the college in reaching a fair and

23  reasonable decision?

24      A.    I don't know.

**Bruce Johnson**

48

1          Q.    Okay.   Now, you did consider any

2    information that the campus police gave you,

3    correct?

4          A.    Correct.

5          Q.    Do you know if the campus police ever

6    communicated with the Springfield police to see what

7    evidence, if any, they had regarding this matter?

8          A.    I don't recall that.

9          Q.    You do understand as a person -- strike

10   that.   You do understand as a professor at this

11   college and a person involved in Title 9 matters

12   that the college had a responsibility to make sure

13   that Ms. Doherty and other students at the college

14   were provided with a reasonably safe environment for

15   their learning experience, correct?

16         A.    Yes.

17         Q.    And you did understand that the college

18   had a responsibility to provide an environment that

19   was free and safe from things like discrimination,

20   sexual harassment, and sexual assault, correct?

21         A.    Correct.

22         Q.    And you understood that this college had

23   an obligation to conduct a reasonable and prompt

24   investigation of any allegations of sexual assault,

**Bruce Johnson**

1   correct?

2      A.   Yes, correct.

3      Q.   Did you also understand that once a

4   student, whether it's a woman or a man, reports a

5   sexual assault, that it was the school's

6   responsibility to conduct a reasonably prompt

7   investigation and to make sure that that student is

8   provided a safe environment?

9      A.   Correct.

10      Q.   And you understood that in order to

11   provide a safe environment the college may need to

12   undertake procedures to keep the abuser or the

13   attacker away from the victim, correct?

14      A.   Correct.

15      Q.   And how would the college go about doing

16   that?

17             MS. SULLIVAN:  Objection.  You can

18   answer.

19             THE WITNESS:  I'm not -- I don't

20   understand -- I don't know those kinds of policies,

21   other than a general knowledge that they can throw

22   people off campus.  They can keep them --

23   trespass -- they can keep them from buildings or

24   classes or sports.  I understand there's different

**Bruce Johnson**

50

1    levels of trespass, but I -- with this particular
2    case I'm not aware of what they did.
3    BY MR. ANGUEIRA:
4        Q.    And when you use the term "trespass," what
5    do you mean by that?
6        A.    For instance, a student might be banned
7    from one particular dorm or one part -- we have two
8    campuses or one part of the campus.
9        Q.    Okay.  So the word trespass really is to
10   prohibit the student from going onto those --
11       A.    Correct.  It refers to a specific place a
12   student may not visit.
13       Q.    Okay.  Did you also understand that for
14   victims of sexual violence reporting a possible
15   Title 9 investigation that the school had a
16   responsibility to provide that student with
17   counseling services if she needed it?
18                 MS. SULLIVAN:  Objection.  You can
19   answer.
20                 THE WITNESS:  Yes, I know that.
21   Well, all students have the ability to have
22   counseling services at any time they like.
23   BY MR. ANGUEIRA:
24       Q.    What emergency counseling services did

**Bruce Johnson**

1    this college provide for Ms. Doherty?

2         A.    I do not know.

3         Q.    Did the college ever provide any

4    counseling services for Ms. Doherty?

5         A.    I don't know.

6         Q.    Did you understand as a Title 9 panelist

7    that students who allege that they were victims of

8    sexual violence had the right to request and the

9    college had the obligation to provide that student

10   with reasonable accommodations if they needed it in

11   terms of giving them more time for their studies and

12   their tests?  Or you didn't know that?

13                    MS. SULLIVAN:  Objection.

14                    THE WITNESS:  I don't know that

15   specifically.

16   BY MR. ANGUEIRA:

17        Q.    What I'm going to do, sir, is we received

18   an audio from your counsel, the school's counsel of

19   the actual hearing.  There's no written

20   transcription that I have available to me, so I'm

21   actually going to play the audio.  I think I may be

22   now able to recognize when you speak versus someone

23   else, but I'm going to have you identify it.  And

24   it's all in time segments, so as I play it, I'll

**Bruce Johnson**

1    identify the segment, the stenographer is going to

2    transcribe exactly the part that I'm going to ask

3    you about, and then I'm going to ask you a question

4    about that.   Okay?

5         A.   Okay.

6              MS. SULLIVAN:   Can we just take a

7    quick break?

8              MR. ANGUEIRA:   Yes, of course.

9              (Recess taken.)

10              MR. ANGUEIRA:   So what I'm going to

11   do is I'm going to play the beginning -- the whole

12   thing is 55 minutes.   I'm going to try to avoid

13   playing the whole thing, but if for some reason you

14   think you need to hear what was said right before

15   the segment I'm playing, just tell me, we'll play

16   it.   And then I'm going to represent the segment

17   number at the bottom.

18              (Discussion off the record.)

19   BY MR. ANGUEIRA:

20        Q.   So what we did is we played the

21   introduction of the audiotape, the first 30 seconds.

22   And you recognize the gentleman speaking as

23   Mr. Scott?

24        A.   Correct.

1    Q.    And basically he said that he was going to
2  give Ms. Doherty an opportunity to give her oral
3  statement, correct?
4    A.    Correct.
5    Q.    And do you have a recollection of
6  listening to Ms. Doherty?
7    A.    Yes.
8    Q.    Okay.  Did she appear to be credible to
9  you?  Remember you're under oath.
10    A.    Can I ask you a question?  When you say
11  "appear," is that --
12    Q.    Well, let me ask it differently.  You're
13  not supposed to ask me questions, but that tells me
14  that you don't understand my question, so I will
15  rephrase it.
16          Part of your job, as you understood
17  it, tell me if I'm wrong or right, is to weigh the
18  credibility of the witnesses that you listen to and
19  try to figure out in your mind is it likely that
20  they're telling the truth or maybe not.  You
21  understood that to be part of your role, correct?
22    A.    Yes.
23    Q.    When you listened to Ms. Doherty's version
24  or her account of what she believes happened to her,

**Bruce Johnson**

1    did you believe her?

2         A.    I kept an open mind and wanted to listen

3    to all the evidence involved, so I made no judgment

4    until the end of the entire hearing.

5         Q.    And at the end of the entire hearing did

6    you believe Ms. Doherty's account of what happened

7    to her?

8         A.    Not altogether.

9         Q.    What parts of her account did you not

10   believe or credit?

11        A.    I believe she went to the room.   I

12   believe, you know, that the time and the

13   situation -- some of my questions circle around the

14   intimacy moment of ██████ and Elisabeth, the -- when

15   the sex began, that's where I had my questions.

16        Q.    When you say, "that's where I had my

17   questions," you mean you had your doubts about her

18   credibility?

19        A.    Not doubts.   I just was questioning the

20   circumstances of her words and her actions of the

21   night, together with all the witness -- you know,

22   with all the circumstances of the evening.   So I had

23   questions about whether she was telling the complete

24   truth.

**Bruce Johnson**

1      Q.    Okay.  And what part of her account or

2  story did you not believe?  Did you think that she

3  was either lying or saying something inconsistent

4  with what other witnesses said?

5      A.    I questioned whether she -- how to put

6  this?  I questioned her story of his movements with

7  her, how he pinned her down, how -- whether people

8  could have heard what happened to her sort of in the

9  room, and whether or not the knocking on the door

10 had an influence on her perception of what happened.

11     Q.    Okay.  Let's take those -- have you

12 finished your answer?

13     A.    Yes.

14     Q.    Okay.  And those are the areas of her

15 account that you felt were not credible, correct?

16     A.    I questioned.

17     Q.    Well, my question to you again, for the

18 third time is, what parts of her story or her

19 testimony or account did you believe were not

20 credible, that you simply did not believe, if any?

21     A.    Yes.  I questioned how he was able to do

22 what he did in terms of pinning her down, removing

23 his clothing, placing a condom on himself.  I

24 questioned why there was nothing heard in the room

### Bruce Johnson

56

1    by others who were in close proximity.  I know she

2    said that she said no, and I believe that.  I mean,

3    I'm sorry, I knew she said she said no; I'm just not

4    sure when that took place.  I wasn't sure if it

5    was the -- it seemed to me that it came after the

6    fact that the -- there were several girls banging on

7    the door, I think she said violently, I don't know,

8    five or six or something.

9         Q.   Have you finished?

10        A.   Did I answer the three parts of that?  I

11   had three reasons.  Yes.

12        Q.   Okay.  If there's anything else that comes

13   to mind as you listen to the tape and as I ask you

14   questions, please let us know.

15             What you told us is that you did not

16   believe Ms. Doherty's account with respect to ████

17   was able to do what he did, specifically to pin her

18   down, to take off her clothes, and put on a condom.

19   Why didn't you believe that account?  What is it

20   about it that you felt was not credible or not

21   possible?  Take them one at a time.

22        A.   Yeah.  I'm trying to put myself back in

23   this moment.  I questioned how that happened without

24   there being more of a struggle or something that had

**Bruce Johnson**

57

1    a little more sound to it.  I thought there would

2    have been people who came in -- were in the room,

3    walked through I think to the bathroom at one point,

4    heard nothing and said nothing.  So I questioned how

5    that all took place.

6          Q.    Okay.  Well, I'm not sure that answers my

7    question.  Let me try to ask it a different way.

8          A.    Okay.

9          Q.    What was Ms. Doherty's size?

10         A.    She is -- you mean weight wise or --

11         Q.    Height and approximate size as you looked

12   at her and saw her.

13         A.    Yeah.  She is a good-sized girl.  She was

14   an athlete I believe.  I don't know her dimensions,

15   but she was -- you know, I can't tell weight but at

16   least 160, 170, in that area.  She was a slightly

17   overweight woman who is fairly strong appearing in

18   size.

19         Q.    Okay.  What was her height?

20         A.    I can't say specifically.  I'd say in the

21   five five to the five seven range maybe, somewhere

22   in there.

23         Q.    What were ██████ dimensions or size in

24   terms of his height and his weight?

**Bruce Johnson**

58

 1          A.   I believe from the testimony -- from the
 2     hearing, he was a football player.  I think they
 3     said something like 200 pounds, 210 pounds if I
 4     recall.  I'm not remembering all the details from
 5     that, but he was a football player.
 6          Q.   Okay.  What was his height?
 7          A.   I don't recall specifically --
 8          Q.   Okay.
 9          A.   -- but I'm guessing like six to six two.
10          Q.   What position did he play in football?
11          A.   I don't know.
12          Q.   Did you ever hear any evidence or look at
13     any testimony that he weighed about 250 pounds and
14     was a linebacker for the football team?
15          A.   I don't recall that.
16          Q.   Did you take into consideration the
17     difference in sizes between these individuals?
18          A.   Yes.
19          Q.   So you basically thought in your mind,
20     well, if this woman really didn't want to have sex,
21     then she should have been able to struggle more or
22     to scream louder so that somebody would have at
23     least heard her in the room?
24               MS. SULLIVAN:  Objection.

1   BY MR. ANGUEIRA:

2        Q.   Is that essentially what you were

3   thinking?

4        A.   No, not at all.   No.

5        Q.   Okay.   Which part of that is wrong?

6        A.   That she didn't want to have sex.

7        Q.   So you think she did want to have sex?

8        A.   I think that she did want to have sex,

9   correct.

10        Q.   Okay.   So you thought -- by the way, did

11   you form the opinion that you thought she wanted to

12   have sex before you heard her testimony from the

13   evidence that you had seen and gathered through the

14   investigators?

15        A.   No.   No, I wanted to hear everything

16   beforehand.

17        Q.   So after you heard her, your -- part of

18   your thought process was, okay, well, this woman

19   came to ████████ room voluntarily, correct?

20        A.   Correct.

21        Q.   And that she came there understanding that

22   there might be the possibility of a sexual encounter

23   or some intimacy, correct?

24        A.   I have no idea.   I have no way to know

**Bruce Johnson**

1   that.

2        Q.   Okay.   And then when she got there, that

3   she was a willing participant in some level of

4   intimacy; is that what you were thinking?

5        A.   Correct.

6        Q.   And then at some point in time did you

7   ever believe that that level of intimacy in her mind

8   changed, that she became an unwilling participant,

9   or did you always believe that she was always a

10  willing participant?

11       A.   I thought Elisabeth was a willing

12  participant until the sounds on the door occurred.

13       Q.   Okay.   And you'll hear evidence about

14  that.   My understanding is, that at some point she

15  testified that she heard people knocking on the

16  door, that she thought it was the voices of several

17  women and that she tried to hide.   ███████ went to

18  the door, and somehow the people left.   And then

19  that's when she was able to run out of the room and

20  go back to her room.

21       A.   Correct.

22       Q.   Is that consistent with your memory?

23       A.   Yes.

24       Q.   So you think that her level of willingness

**Bruce Johnson**

61

1   changed once those women knocked on █████ door?

2       A.   Correct.

3       Q.   Well, did they continue to have sex after

4   that?

5       A.   They did not as far as I can recall.

6       Q.   Okay.  Do you recall the evidence

7   suggesting or indicating that █████ attempted to

8   continue to have sex but that at that point she said

9   no again?

10      A.   After the --

11      Q.   The girls knocking --

12      A.   -- girls knocking on the door?

13      Q.   Yes.

14      A.   I -- what I recall is that she was running

15  around getting dressed as he was dealing with the

16  girls at the door.  I don't remember exactly, but I

17  thought that's what's happening.  I don't remember

18  those two attempting to have sex after the girls

19  knocked on the door.

20      Q.   Okay.  And did you think that at that

21  moment when he left her to address the people at the

22  door, that Ms. Doherty should have been able to

23  scream for help or run away at that point in time?

24            MS. SULLIVAN:  Objection.

**Bruce Johnson**

1          THE WITNESS:  No.  I didn't think

2   she was obligated to do that.

3   BY MR. ANGUEIRA:

4      Q.   So at what point in your mind did you

5   think that she became an unwilling participant in

6   the intimacy?

7          MS. SULLIVAN:  Objection.  It was

8   already asked and answered.

9          MR. ANGUEIRA:  Well, he hasn't

10  answered it to my satisfaction.

11         MS. SULLIVAN:  He --

12         MR. ANGUEIRA:  Just object.

13         MS. SULLIVAN:  Yeah.

14  BY MR. ANGUEIRA:

15     Q.   You told us that you believed initially

16  she was a willing participant for intimacy, and

17  something changed, and you related the timeframe to

18  that change when there was a knock on the door.  So

19  what changed after the knock on the door?

20     A.   From the best of my recollection is that

21  the knock on the door and the commotion that went

22  with it and the sound of the knocking, the number of

23  women, put fear in Elisabeth and frightened her.

24     Q.   Okay.  And as a result of that she no

**Bruce Johnson**

63

1   longer wanted to continue to have voluntary sex with

2   this man.  Is that what you thought?

3        A.   Correct.

4        Q.   Okay.  And she testified, did she not,

5   that she had some fear or some concern that she

6   might get beat up by those girls whose voices she

7   heard?  Do you remember that?

8        A.   I believe so, correct.

9        Q.   And was that part of the evidence that you

10  considered in reaching the conclusion that this

11  woman wanted to have sex first, and after she heard

12  the girls at the door decided in her mind that she

13  did not want to have more sex with ████████  Is that

14  what you were thinking?

15       A.   I don't remember hearing that specifically

16  from her, but I remember thinking that, correct,

17  that, as I said before, it was the commotion and the

18  knocking on the door that stopped everything.

19       Q.   And then the last point that you made

20  was -- my notes were, why such a commotion would not

21  have been heard by others in the room?

22       A.   Correct.

23       Q.   Okay.  Who -- from the evidence that you

24  heard, who were the other people actually in the

**Bruce Johnson**

64

1    room during the time period that Ms. Doherty says

2    she was being raped?

3         A.    I believe there was a roommate who was --

4    and perhaps his girlfriend.  I'm not sure of this

5    but to the best that I can recall.

6         Q.    Sure.

7         A.    Oh, that roommate at one point went to the

8    bathroom and turned off the light -- he was asked to

9    turn off the light I believe, perhaps by ▮▮▮▮▮▮ if I

10   recall.  I can't recall if there was another person

11   in the room at that time, but that was --

12        Q.    But that was part your thinking process,

13   that if Ms. Doherty was saying no, as she testified

14   that she said repeatedly and that she did not want

15   to have sex with this man, then those individuals in

16   that room should have been able to hear something to

17   indicate that something was out of sorts in that

18   room?  Is that fair to sort of summarize your

19   thinking?

20        A.    It was part of the entire -- that was part

21   of the evidence, correct, that that didn't happen,

22   that nothing was heard, and the commotion went

23   without people hearing it.

24        Q.    All right.  So, in other words, if she had

**Bruce Johnson**

65

1   screamed louder, maybe these people would have heard

2   her, correct?  That was your thought process?

3                    MS. SULLIVAN:  Objection.  You can

4   answer.

5                    THE WITNESS:  I don't think she's

6   obligated to scream loud, but I think had she

7   screamed, she may have been heard.

8   BY MR. ANGUEIRA:

9       Q.    Okay.  So did you know anything about a

10  victim's thought process while she is being raped?

11  Do you know anything about that?

12      A.    Personally no.

13      Q.    Do you know anything about how a woman who

14  is being physically held down by a person almost

15  twice her size and much stronger than her and being

16  raped, whether or not those people are even able to

17  communicate during the rape itself?

18      A.    I didn't have the same picture of the

19  situation.

20      Q.    No, I know you didn't.  I'm asking whether

21  or not you understood or knew from any source of

22  information that women while being raped can act in

23  all different ways, screaming, yelling, struggling

24  violently, or being completely still and not saying

1     or doing anything because they're so traumatized?

2     Did you know that or you did not?

3         A.   I think that would be common knowledge

4     that a person would know, that a person being raped

5     can react in a whole range of emotions, from saying

6     nothing to screaming as loud as she can or he.

7         Q.   It was certainly part of your knowledge,

8     correct?

9         A.   Certainly.

10             MR. ANGUEIRA:  So now what I'm going

11     to do, I'm going to skip all of Ms. Doherty's

12     testimony, unless you want to hear it again, and go

13     to another segment which -- I'll play the first 15

14     seconds so you have a sense of where we are.

15             THE WITNESS:  Okay.

16             (Discussion held off the record.)

17             MR. ANGUEIRA:  So at this point she

18     has testified -- given her narrative, and then some

19     of the individuals on the board are sort of asking

20     her questions.

21             Now, I do want to have a

22     transcription from this point for the next several

23     seconds, and I'll tell you when to start.  If you

24     need me to replay this, I will.

**Bruce Johnson**

1           "MR. JOHNSON:  The screaming issue,

2        no one heard that screaming in

3        the room?"

4   BY MR. ANGUEIRA:

5        Q.   Was that you asking that question?

6        A.   Correct.

7           "MS. DOHERTY:  The only time I

8        raised my voice really loud was when I

9        screamed stop, and that's when he let me

10       go.

11          "MR. JOHNSON:  But the noes

12       beforehand were just sort of

13       conversational noes?"

14  BY MR. ANGUEIRA:

15       Q.   What did you mean by asking her if the

16  noes were conversational noes?

17       A.   I meant that they were not loud.

18       Q.   In other words, she wasn't screaming or

19  talking loud enough, that she was just having a

20  regular, normal conversation with this man?

21       A.   Well, no.  Can you ask the question again?

22       Q.   What did you mean by asking this rape

23  victim whether or not her noes, that she had just

24  testified that she repeatedly said no while being

**Bruce Johnson**

68

1  raped, were conversational noes?

2      A.   I was trying to find out the degree to

3  which she said no.

4      Q.   Why did you use the word "conversational"?

5      A.   I can't recall.

6      Q.   What type of an adjective would you use if

7  a woman was saying no and meant no while she was

8  being raped?

9      A.   What kind of a -- can you repeat the

10  question?

11      Q.   Adjective would you use?  Is that -- as

12  opposed to a conversational no, what kind of a no is

13  that?

14              MS. SULLIVAN:  Objection.

15              MR. ANGUEIRA:  Let him answer,

16  please.

17              THE WITNESS:  Can you clarify the

18  question one more time?

19  BY MR. ANGUEIRA:

20      Q.   Sure.  You asked this rape victim whether

21  or not her noes were a conversational no.  I'm

22  asking you if you believed her that she was being

23  raped, how would you describe that no?  What term

24  would you have used?

**Bruce Johnson**

69

1      A.   I didn't believe she was being raped.

2            MR. ANGUEIRA:  Okay.  Let's

3 continue.

4            "MS. DOHERTY:  It was kind of more

5            like stop, like kind of like -- they

6            weren't screams.

7            "MR. JOHNSON:  Why was it not more

8            emphatic?  Why did you say stop as

9            opposed to scream bloody murder stop

10           when" --

11 BY MR. ANGUEIRA:

12     Q.   Why did you ask her that question?

13     A.   I was trying to determine how people in

14 the room did not hear any struggle.

15     Q.   So you were asking her why she didn't

16 scream bloody murder scream?

17     A.   As I said, a more emphatic no.

18     Q.   Is that because you believe that a true

19 rape victim should only be screaming more

20 emphatically as opposed to someone silently telling

21 their rapist no, no, stop?

22     A.    Not at all.  I was trying to make sense of

23 her -- how she was speaking to him and what -- and

24 the -- I was trying to make sense of whether or not

**Bruce Johnson**

70

1  this really took place.  I didn't -- I could not

2  make sense of it.

3      Q.   Did you think that there's some women that

4  say no and they don't mean no, that that means yes,

5  that they want to be raped?

6      A.   Not at all.

7      Q.   Did you think that when this woman was

8  saying no, no, that she didn't mean no, no, and that

9  it meant that she wanted to be -- to have sex with

10  this man?

11      A.   I don't even know what she said.

12      Q.   Well, if you believe that she said no

13  repeatedly, did you understand that women have the

14  right to say no?

15      A.   I didn't say I believe she said no

16  repeatedly, and I do understand that a woman has the

17  right to say no.

18      Q.   So had you believed Ms. Doherty, that she

19  was raped and told this man no repeatedly that she

20  didn't want to have sex, you should have decided to

21  discipline ██████ correct?

22      A.   Say it again, please.

23      Q.   Had you believed Ms. Doherty's account,

24  that she was raped by this student ██████ then your

**Bruce Johnson**

1   decision should have been to discipline ███████

2   correct?

3        A.    Correct.

4                  "MR. JOHNSON:  -- because that's one

5             of the questions --

6                  "MS. DOHERTY:  I guess I was

7             embarrassed."

8                  MR. ANGUEIRA:  I'm going to

9   reference the number we just heard so that everybody

10  knows exactly -- we're at 8:32 right now.  When I

11  stop it, I'll tell you when.

12                 "MS. DOHERTY:  It's kind of

13            embarrassing.

14                 "MR. JOHNSON:  But you were telling

15            him no at the time from --

16                 "MS. DOHERTY:  Yes.  And he

17            acknowledged my noes.  He said like,

18            stop, you know you want it, like don't

19            say no, kind of like you're just making

20            up that you don't want it.  But I was

21            saying please stop the entire time.  And

22            at one point I even started crying.  But

23            it wasn't like I was kidding around like

24            no, like I was --

**Bruce Johnson**

1    "MR. JOHNSON:  And a guy who's maybe

2    had a drink or two or who is distracted

3    may think that's kind of a different

4    message you're sending, but you think it

5    was a clear message that you said no at

6    that point?  Because that's a big moment.

7    "MS. DOHERTY:  I was trying to grab

8    his hands off.  I was clearly saying,

9    please, stop, like don't do this to me.

10   Like from the get-go I was saying no."

11   BY MR. ANGUEIRA:

12   Q.   So you asked this rape victim that a guy

13   who might have had a drink or two may have heard a

14   different type of a message, even though this woman

15   is testifying that she kept saying no, no, please,

16   no, please stop.  What did you mean by that

17   question?

18   A.   I wanted to be sure.  I'm not saying a man

19   who drinks should rape a person and has a right to,

20   but I wanted to make sure of what happened here.

21   Q.   But what is -- I want to understand the

22   reason why you asked that question.  Why did you

23   phrase it that a guy that has a drink or two may --

24   does that mean to you that he may have heard a

**Bruce Johnson**

1    different message and that changes the

2    circumstances?

3        A.   Well, he was reported to have been drunk

4    earlier, which has no -- is not involved in this

5    case.  If he's drunk that means nothing when it

6    comes to a rape case certainly, but I was just

7    trying to make sense from her whether he understood

8    what she meant by that, whether she was emphatic

9    about it.  I was just trying to get to, you know,

10   the full truth of that.

11       Q.   Why not ask him?  Why are you asking the

12   rape victim what he would have understood had he

13   been drinking or not?  Tell me what the basis is to

14   ask this witness that question.

15       A.   Repeat that again, please.

16       Q.   Were you thinking in your mind that, okay,

17   well, maybe she said no, but it wasn't emphatic

18   enough, and maybe because he was drunk he didn't

19   truly understand that she didn't want to have sex?

20   Is that kind of your thought process?

21       A.   No.

22               MR. ANGUEIRA:  We're now at 9:15 on

23   the tape.

24               "MS. DOHERTY:  So I -- personally I

**Bruce Johnson**

1      think it was very clear.  I wouldn't be

2      doing that.

3           "MR. JOHNSON:  Yeah.

4           "MS. LENNA:  Was there any T.V. or

5              light on or anything in that" --

6           MR. ANGUEIRA:  Okay.  I'm stopping

7   it at 9:24, and now I'm going to go to 13:57.  And

8   I'll actually begin at 13:34 just to get the context

9   of the next series of questions and answers.

10          "MS. DOHERTY:  So he like basically

11             picked up my legs and just ripped them

12             off.

13          "MR. JOHNSON:  Because that's a hard

14             act to do to someone else I think.

15          "MS. DOHERTY:  Yeah."

16  BY MR. ANGUEIRA:

17      Q.   Now, there Ms. Doherty is describing how

18  this football player was able to manipulate or

19  maneuver her body during the act, and that's one of

20  the issues you raised before, that you were

21  questioning, right?

22      A.   Correct.

23      Q.   What's your memory of what she says

24  happened about that, with respect to how he was able

Bruce Johnson

1    to take her clothes off and put on a condom and have

2    sex with her?

3         A.    From what I recall, I was wondering how he

4    could pin her down, remove her clothes, and pull her

5    pants off and put on a condom.

6         Q.    Okay.

7         A.    Yeah, I wondered about that.

8         Q.    If you're a six foot two guy weighing

9    about 250, football player, and you're straddling a

10   woman that's half your size --

11                  MS. SULLIVAN:  Objection.

12   BY MR. ANGUEIRA:

13        Q.    -- and you're straddling her above her

14   waist with all of your -- not just body weight but

15   strength, you don't think it's possible to take her

16   pants off?

17                  MS. SULLIVAN:  Objection.  You can

18   answer.

19                  THE WITNESS:  First, she was a bit

20   larger than you just presented I believe, and I have

21   no idea.

22   BY MR. ANGUEIRA:

23        Q.    Well, what type of pants did she have on?

24        A.    I don't know.

**Bruce Johnson**

1    Q.    Well, were they pants that had a belt?

2  Something that had to be removed?  Were they shorts?

3  Were they sweatpants?  What kind of pants?

4    A.    I don't recall.

5    Q.    Well, then how do you know that he wasn't

6  able to do that?  What if they were just gym shorts

7  that you can yank off with one hand while holding

8  the victim down with another hand?

9    A.    With her pants, not shorts.

10    Q.    Yeah.

11    A.    And I was just trying to make sense of how

12  that could happen.  I don't know.

13    Q.    So you never knew what type of pants she

14  had on, correct?

15    A.    Correct.

16    Q.    But you concluded that, based on the

17  testimony you heard, that it was incredible to you

18  that a man like ██████ could do this to Ms. Doherty:

19  Get her pants off, keep everything quiet, get a

20  condom on, and then have sex with her unless she

21  wanted to, right?

22              MS. SULLIVAN:  Objection.

23              THE WITNESS:  I didn't --

24              MS. SULLIVAN:  You can answer.

**Bruce Johnson**

1              THE WITNESS:  I didn't say that,

2  that she -- my point is that she -- I was trying to

3  make sense of how this can happen quietly in a room

4  and -- yeah.

5  BY MR. ANGUEIRA:

6     Q.   Do you know if Ms. Doherty was in shock

7  during this process at all?

8             MS. SULLIVAN:  Objection.

9             THE WITNESS:  I don't know.  No, I

10  have no way of knowing.

11  BY MR. ANGUEIRA:

12     Q.   Did you ever ask her or did anybody in the

13  panel ask her what her state of mind was during this

14  period of time?

15     A.   I don't recall specifically.

16            MR. ANGUEIRA:  We're picking up at

17  13:43.

18            "MS. DOHERTY:  Yeah.  I honestly did

19          not think someone was capable of moving

20          me how he moved me.  I mean I'm not a

21          little girl.  Like I always thought that

22          no one could throw me around like that.

23          And that's -- that was one of the

24          scariest things for me actually.

**Bruce Johnson**

78

1    "MR. JOHNSON:  I mean was the sex

2    consensual, and then you realized you

3    didn't -- I mean there's very different

4    degrees here, but was it ever consensual,

5    and then you decided because of

6    circumstances that you didn't want it?

7    Because that's just as -- you have every

8    right to say no at any time.  So you're

9    saying --

10        "MS. DOHERTY:  No, it never was

11   consensual.

12        "MR. JOHNSON:  Just the kissing --

13   like what was actually consensual?

14        "MS. DOHERTY:  Nothing.

15        "MR. JOHNSON:  Because you mentioned

16   he was kissing your neck.

17        "MS. DOHERTY:  I said stop.  I said

18   stop immediately.  Immediately I said

19   please don't do this.  Your best friend's

20   in love with me, and I have a boyfriend.

21   Please stop.  Everything -- Nothing was

22   consensual, nothing.

23        "MR. JOHNSON:  What kept you -- when

24   he was kissing your neck on that couch --

**Bruce Johnson**

79

1          "MS. DOHERTY:  He grabbed me.  He

2      grabbed me.

3          "MR. JOHNSON:  Okay.  And carried

4      you to the --

5          "MS. DOHERTY:  Yeah.  I didn't -- I

6      couldn't -- I literally went like this,

7      and he grabbed me immediately and put me

8      on the bed.  From then I wasn't in

9      control.  He had basically control over

10     me.

11         "MR. JOHNSON:  How big is he?  I

12     don't remember seeing that.

13         "MS. DOHERTY:  250 maybe.  He's like

14     a big kid.

15         "MR. JOHNSON:  Is there any details

16     of him on this?  I don't think I've seen

17     anything.

18         "MS. DOHERTY:  He's a football

19     player, so you can look at the roster if

20     you want.  He's a linebacker.  He's like

21     a big kid."

22         MR. ANGUEIRA:  I'm stopping at

23     15:00.

24     BY MR. ANGUEIRA:

**Bruce Johnson**

80

1      Q.    Now, you heard that exchange, correct?

2      A.    Yes.

3      Q.    She told you that he was tossing her

4 around, and she was shocked at his ability to toss

5 her around.  Did you believe that part of her story

6 or not?

7      A.    I had questions about that.

8      Q.    All right.  You heard her testify that she

9 thought he weighed about 250.  Remember I asked you

10 about that weight?

11      A.    Correct.

12      Q.    Does that refresh your memory or not?

13      A.    Until I just heard it.  I don't recall

14 that until I just heard that.

15      Q.    Did you ever look at this man's physical

16 dimensions in any record?  The football records?

17 The school records?  A picture?  Anything at all?

18      A.    No.  All that was given was a description

19 of ███████

20      Q.    Did you ever see ███████

21      A.    No.

22      Q.    Did you ever speak to ███████

23      A.    No.  He did not come to visit for the

24 hearing.

**Bruce Johnson**

81

1      Q.    So when you made your decision or when you

2   were thinking in your mind that it was physically

3   impossible for this man to do what he did to this

4   woman, or you simply didn't believe it because of

5   the size of the woman compared to the man, you had

6   no information about his physical strength and no

7   information about his physical size other than what

8   she told you, correct?

9               MS. SULLIVAN:   Objection.   You can

10   answer.

11               THE WITNESS:   Well, I believed at

12   that point it was consensual.

13   BY MR. ANGUEIRA:

14      Q.    All right.

15      A.    Until the knocking at the door, as I said

16   before.

17               MR. ANGUEIRA:   I'm going to skip to

18   16:15.   Actually I'll begin at 16:00 to get the

19   context.

20               "MR. JOHNSON:   What made you text

21               him after the incident?   You left and I

22               think 20 minutes later on the timeline or

23               maybe 20 or 30 -- I think you went --

24               before you went to the police, you texted

**Bruce Johnson**

82

```
 1              him.  What made you text him?
 2                   "MS. DOHERTY:  I was angry.  I
 3              wanted to let him know what he had done.
 4              That's basically my reasoning.  I wanted
 5              to let him know that like what he did
 6              wasn't okay.
 7                   "MR. JOHNSON:  Yeah."
 8   BY MR. ANGUEIRA:
 9        Q.   What was the rationale behind that
10   question?  That was your question by the way?
11        A.   It was.
12        Q.   Okay.
13        A.   I was trying to put together a picture of
14   this whole scenario.  And I thought it would be good
15   to ask why she was texting him afterwards.
16        Q.   And the texts that you're referring to are
17   the texts that we previously identified as Exhibits
18   3 and 4, correct?
19        A.   Correct.
20        Q.   Okay.  Did you think it was unusual for a
21   rape victim to be texting her rapist like this?
22                   MS. SULLIVAN:  Objection.
23                   THE WITNESS:  No.
24                   MS. SULLIVAN:  You can answer.
```

**Bruce Johnson**

83

1           THE WITNESS:  No.  I didn't know

2    either way.  I just was curious about it.  I wasn't

3    passing judgment or preconceived ideas on this.  I

4    just wanted to get more information.

5    BY MR. ANGUEIRA:

6        Q.   You also understood from the evidence

7    that -- which was corroborated by witnesses by the

8    way, that when Ms. Doherty was able to leave

9    ████████ room that she immediately went back to her

10   room and reported to her roommate that she had been

11   raped, correct?

12       A.   Correct.

13       Q.   Did you believe that part of her account?

14       A.   No.  I believe she told them, but I don't

15   believe a rape happened.

16       Q.   So you formed the opinion in your mind

17   that this woman, after leaving ████ room, went

18   back to her room, was crying hysterically, according

19   to the witnesses, and told them that ████ just

20   raped me, and you thought she was making that whole

21   scenario up?

22       A.   No.  I thought she was extremely upset and

23   scared by all that happened, most particularly with

24   the people who were banging on the door who I think

**Bruce Johnson**

84

1   she felt very extremely threatened by.  So I have no

2   reason to question that she was -- ran out upset and

3   afraid.  I just -- like I said before, I don't --

4   the reasons for that I didn't believe.

5         Q.   So you thought that -- so tell me what

6   your thought process was as to why she was crying

7   and why she told her roommates that she had been

8   raped.

9         A.   We have no way of knowing what happened

10  that night.  Two people know.  All I was trying to

11  do was to make sense of all that happened, and I

12  think a lot of my feeling, as well as the other

13  committee members, was that she was -- what was

14  upsetting -- that we thought it was a consensual act

15  that was made -- upset her when she -- when the door

16  got banged on.

17              So I have no way of knowing what was

18  behind her thinking when she ran down the hall and

19  cried hysterically.  I don't know what caused that.

20        Q.   You didn't form any opinion yourself about

21  what caused her to say that she had been raped and

22  why she was crying hysterically?

23        A.   I don't know why she said that.

24        Q.   Did you even consider the fact that maybe

**Bruce Johnson**

1   she had been traumatized and was actually reporting

2   exactly what happened?  Did you think that?

3       A.   Well, I considered all situations.  I

4   considered that along with the fact that she was

5   completely frightened by what happened with the

6   girls prior to that but -- it was all part of the

7   pieces of evidence that we put together for this.

8       Q.   So did part of your thought process

9   include, well, maybe she's reporting a rape and

10  crying rape because if these girls come after her to

11  beat her up, she could always say that, well, he

12  raped me; I didn't really just want to have sex with

13  ██████   to voluntarily have sex?  Is that part of

14  your thought process?

15      A.   Part of our thinking was that she did not

16  want to be thought of as someone who was having sex

17  with ██████ and these girls would maybe get back at

18  her somehow.

19      Q.   Okay.  Were these other girls students at

20  the college?

21      A.   Yes.

22      Q.   Okay.  Did your investigation identify

23  these other women?

24      A.   It did.

**Bruce Johnson**

1    Q.   Okay.  And since you believed in your mind

2  that this woman, Ms. Doherty, was in fear for -- of

3  harm by these other students, what if anything did

4  you do to make sure that these other students did

5  not harm Ms. Doherty as part of your investigation?

6  Do you understand my question?

7    A.   I wouldn't be part of that process in

8  terms of trespassing these women from Ms. Doherty.

9    Q.   Well, who would?  You're part of the

10 Title 9 procedure.

11              MS. SULLIVAN:  Objection.

12 BY MR. ANGUEIRA:

13   Q.   Did you consider -- since you just

14 testified that Ms. Doherty was in fear of being

15 harmed by these other students, what if anything

16 should be done about that issue?

17              MS. SULLIVAN:  Objection.

18              THE WITNESS:  I don't recall.

19 BY MR. ANGUEIRA:

20   Q.   You don't recall whether anybody did

21 anything about that?

22   A.   No.

23   Q.   Did you do anything about that?

24   A.   No.

**Bruce Johnson**

1    Q.   Were these women interviewed and

2    statements taken from them?

3    A.   That I don't recall.

4    Q.   Were any of the statements that we

5    identified and marked and identified by name by your

6    counsel, were those any of the women that knocked on

7    the door?

8    A.   I don't know the women who knocked on the

9    door.  I don't know who they were.

10   Q.   Well, you told us that they -- that you

11   knew the identity of these women.  My question to

12   you is --

13   A.   I didn't mean that.  I don't know who they

14   were.  I just knew that they were -- she imagined

15   five or six girls out there.  I do not know who they

16   are.

17   Q.   As part of the Title 9 investigation did

18   anybody determine the identity of those women who

19   knocked on ███████ door?

20                MS. SULLIVAN:  Objection.

21                THE WITNESS:  I personally don't

22   know.

23                MS. SULLIVAN:  Can I -- can we go

24   off the record for a second?

**Bruce Johnson**

1          MR. ANGUEIRA:   Off the record, sure.

2          (Discussion held off the record.)

3    BY MR. ANGUEIRA:

4          Q.   A suggestion, a good one made by your

5    counsel, is that maybe if you have time to read the

6    investigative report, that that might help you

7    remember some of the answers to some of these

8    questions.  So at any point in time during this

9    deposition, if you think that looking at a document

10   would help you to answer the question, just grab the

11   document.  And all we're asking is for you to tell

12   us what is the document you're looking at.

13          So there's a document in front of

14   you now, and what is that?  Whose statement is that?

15   A.   Well, they're redacted, so I'm not sure.

16   Q.   Okay.  What exhibit number is it?

17   A.   Nine.

18   Q.   Okay.  And we identified who that person

19   was before so -- off the record.

20          (Discussion held off the record.)

21   BY MR. ANGUEIRA:

22   Q.   Is there anything else you want to look

23   at?

24   A.   Can you ask the question first?

**Jones & Fuller Reporting**
**617-451-8900   603-669-7922**

**Bruce Johnson**

1    MR. ANGUEIRA:   Let's go off the

2  record.

3    (Discussion held off the record.)

4  BY MR. ANGUEIRA:

5    Q.   Sir, we had a pending question and then at

6  your counsel's suggestion, which I mentioned was a

7  good one, we've now looked at Exhibit 9, which we

8  know is ███████  ████████ statement, but we also looked

9  at the investigation report which is Exhibit 10.

10  And your counsel was able to identify that even

11  though the individual pages don't have page numbers,

12  there is a page where the statement begins, "She was

13  at a party downtown and was getting texts from

14  ██████████ --

15    A.   Correct.

16    Q.   -- "beginning around 1:00 a.m. to come

17  over."  And then it continues all the way down.  And

18  you've had a chance to read that part of ████████

19  ██████████ statement as well?

20    A.   Yes.

21    Q.   Okay.  So do you know whether or not the

22  investigators ever spoke to the friend that she

23  identifies just as a friend as the person who

24  accompanied her to go to ██████████ room?

Bruce Johnson

1    A.   I don't recall.

2    Q.   And was it your understanding when you --

3  well, strike that.

4         Did she ever testify at the hearing,

5  this ████ ████

6    A.   No.

7    Q.   Okay.  Was it your understanding at the

8  time of the hearing that ████ ████ was ████

9  girlfriend or allegedly one of his girlfriends?

10   A.   I didn't know that at the time, no.  I

11 knew he had a girlfriend, and I know someone visited

12 him later.  ████ (phonetic) her name was.

13   Q.   And that's another woman?

14   A.   Correct.  She was after everything --

15 after Elisabeth.  I think she came over an hour or

16 two after that even.  That's in the report.

17   Q.   Okay.  So did you take into consideration

18 this statement in terms of making your final

19 decision in the Doherty matter?

20   A.   Yes.

21        MR. ANGUEIRA:  Now I'm going to go

22 to the audio tape and begin at 19:00.  Actually

23 18:51 just to get the context.

24        "MR. SCOTT:  So he's not trying to

**Bruce Johnson**

1              say that he was not coherent.  Again not

2              that that -- right.  So he's just saying

3              it had nothing to do with the alcohol.

4              He actually said he thought that you

5              wanted it.  Okay.  And then after that

6              you said you are in trouble.  Do you know

7              like what was going on at that point?

8                   "MS. DOHERTY:  I was scared that he

9              was going to come try and find me or

10             something.

11                  "MR. SCOTT:  Some retaliation or

12             something?

13                  "MS. DOHERTY:  Yeah.  Or try and

14             talk to me.

15                  "MR. SCOTT:  Okay."

16   BY MR. ANGUEIRA:

17        Q.   That man's voice at that segment that I

18   identified, was that Mr. Scott?

19        A.   Correct.

20        Q.   And I think I asked you this, who were the

21   panel members?  You, Scott, and --

22        A.   Matt -- me, Matt Scott, and I keep

23   forgetting her name, Nina or --

24                  MS. SULLIVAN:  Nila.  It's on there.

**Bruce Johnson**

92

1  BY MR. ANGUEIRA:

2      Q.   All right.  Just the three of you then?

3      A.   Yes.

4          MR. ANGUEIRA:  I'm going to put the

5  tape back on now.

6          "MR. JOHNSON:  Drinking was not an

7              issue.  That's how I read this.  Do you

8              think he was drunk or had been drinking a

9              little bit?

10         "MS. DOHERTY:  He was drunk."

11         THE WITNESS:  I didn't get that.

12         MR. ANGUEIRA:  I'm going to play it

13 again.  I think it said something like a lot of time

14 passed.  But I'll bring this closer to you so you

15 can hear it and the stenographer.

16         "MR. JOHNSON:  Drinking was not an

17             issue.  Is that -- that's how I read

18             this.  Do you think he was drunk or just

19             had been drinking a little bit?

20         "MS. DOHERTY:  No, I think he was

21             drunk.

22         "MR. JOHNSON:  He was.  Okay.  So a

23             lot of time passed since this -- well, a

24             couple hours.

**Bruce Johnson**

93

1   BY MR. ANGUEIRA:

2       Q.   Were you able to hear what you said there?

3       A.   A lot of time passed, I think a couple

4   hours maybe.

5               "MS. DOHERTY:  Yeah.  He was -- when

6               he was in my room, he was like falling

7               asleep on my couch like -- so he was

8               visibly drink -- like drunk to my

9               opinion.  I mean --

10              "MR. JOHNSON:  You've been social

11              friends since freshman year?  Flirty

12              friends?  I mean there's different kinds

13              of friendships.  You can be flirty

14              friends and totally innocent with

15              someone.

16              "MS. DOHERTY:  No, I" --

17  BY MR. ANGUEIRA:

18      Q.   Okay.  What's a flirty friend?

19      A.   I believe that somebody testified that

20  they had flirted in the past.  That's where I got

21  that.  I was trying to find out her relationship --

22  I was trying to get more pieces to the puzzle here.

23  I was trying to make sense of the nature of their

24  friendship.  But I believe that the word flirty was

**Bruce Johnson**

94

1  used by a witness who described their relationship.

2      Q.  Did you see or hear any evidence from any

3  source suggesting that Ms. Doherty was promiscuous

4  or had sex with a lot of people?

5      A.  Not at all, no.

6      Q.  Did you hear or see any evidence that

7  ███ was promiscuous and had sex with a lot of

8  people?

9      A.  I'd like to backtrack.

10      Q.  Of course.

11      A.  You were asking about Elisabeth.  This is

12  going way back.  I think somewhere in the documents

13  somebody, maybe ███ mentioned that she'd had a

14  few boyfriends, but I think it was a statement in

15  passing.  I remember reading that at some point.  It

16  had no weight with me, but I remember that was

17  stated somewhere.  I don't know where.

18      Q.  I could show it to you in a little bit.

19  There is a document here, which I believe is

20  ███ statement, where he claims that Ms. Doherty

21  is promiscuous and had a lot of boyfriends.  Is that

22  consistent with your memory?

23      A.  No.  No, it really isn't.

24      Q.  Okay.

**Bruce Johnson**

1    A.   I'd heard that he was promiscuous, but I

2  didn't know that she was at all, to be honest with

3  you.

4    Q.   Of course if you're a rapist and your

5  victim is accusing you of rape, then one of the ways

6  to sort of discredit her account is to say that

7  she's promiscuous or a slut, right?

8    A.   Absolutely.

9    Q.   Did you think he was doing that?

10    A.   No.

11    Q.   The --

12    A.   Actually I don't know.  I should say I

13  don't know what he was thinking.

14    Q.   The woman ▮▮▮▮ that came to the door, did

15  you ever get information about the nature of her

16  relationship with ▮▮▮▮

17    A.   I don't recall.

18    Q.   So you didn't know whether or not they

19  were in an intimate relationship at the time that

20  she gave the statement to the investigators?

21    A.   I knew that one of the females who was

22  banging on the door had been involved with ▮▮▮▮

23  That was the extent of my knowledge.

24    Q.   Okay.  Well, you know from the statement

1   you just looked at that she's one of those two

2   females, correct?

3       A.   Correct.

4       Q.   Because she said she's the one that came

5   to the room that ████ contacted --

6       A.   Yeah.

7       Q.   -- when she banged on the door, so that's

8   ████ correct?

9       A.   I didn't know that until today.

10      Q.   Well, you just read it in the statement.

11      A.   Right, right.

12      Q.   All right.   So then if you don't know the

13  nature of their relationship, how do you know

14  whether or not she's lying just to cover up so her

15  boyfriend doesn't get thrown in jail for raping

16  another student?

17                  MS. SULLIVAN:   Objection.

18                  THE WITNESS:   I have no way of

19  knowing any of that.

20  BY MR. ANGUEIRA:

21      Q.   Well, did you ever consider that maybe

22  because of their relationship she's covering up for

23  ████ so that he doesn't get in trouble?

24      A.   I don't recall considering -- I don't

**Bruce Johnson**

97

1    recall.

2         Q.    You know that there are times, do you not,

3    that people that are in relationships with other

4    people will lie, perjure themselves to protect that

5    person because they care about them and love them,

6    correct?

7         A.    Yes.

8         Q.    But you knew nothing about, nor did any of

9    your committee members, panel members know anything

10   about the nature -- the personal relationship

11   between ███ and ███ is that correct?

12                MS. SULLIVAN:  Objection.  You can

13   answer.

14                THE WITNESS:  I personally don't

15   recall, and I don't know what the other committee

16   members knew.

17   BY MR. ANGUEIRA:

18        Q.    Do you know if the investigators ever

19   asked ███ or ███ about the nature of their

20   relationship together?

21        A.    I don't recall that either.

22                MR. ANGUEIRA:  I'm going to skip the

23   tape to 20:45.

24                "MS. DOHERTY:  When he left -- when

**Bruce Johnson**

98

1    he went to answer the door, that was the

2    only time, and I was hiding in the corner

3    at that time.

4        "MR. SCOTT:  So then another

5    thing -- so and also the other thing --

6    and I just wanted to let you know while

7    we're asking these questions, don't

8    think -- so things like -- we're not

9    people who subscribe to she was wearing

10   it, so she deserved it, she flirted so

11   she deserved it.

12       "MS. DOHERTY:  Yeah.  No, I

13   understand.

14       "MR. SCOTT:  So don't think that

15   that's where these lines of questions are

16   coming from because again with consent --

17   even if you did give consent at the

18   beginning, you can revoke it at any time.

19   So that's not what this question is

20   about."

21  BY MR. ANGUEIRA:

22      Q.   You heard Mr. Scott tell Ms. Doherty that

23  even if you gave consent at the beginning you can

24  revoke it at any time, correct?

**Bruce Johnson**

1      A.   Correct.

2      Q.   Do you agree with that statement?

3      A.   Yes.

4      Q.   You understood that Ms. Doherty had the

5  right to do that if, in fact, she did do that,

6  correct?  That is -- by that I mean that she could

7  have consented to an intimate or sexual act, and

8  during that act decided she didn't want to engage in

9  it anymore and revoked her consent, correct?

10      A.   Hypothetically, yes.

11      Q.   And if the individual continued to force

12  himself upon her after she said no, you understand

13  that that's rape, correct?

14      A.   Yes.

15              MR. ANGUEIRA:  I'm going to skip to

16  22:35.

17              "MS. DOHERTY:  The kid he was with

18              was -- he smoked marijuana, but I don't

19              know if he did.  He never said that, and

20              I didn't really ask, so he could have.

21              But I -- personally I don't know.

22              "MR. JOHNSON:  Was he carrying a

23              condom?  I mean it seems like a lot

24              happened in a short amount of time.

**Bruce Johnson**

1          "MS. DOHERTY:  It was there hanging

2      in a shopping bag above my head, so he

3      had a bag full of condoms on his bedpost.

4          "MR. JOHNSON:  So while holding you

5      down, he was able to grab a condom?

6          "MS. DOHERTY:  He had his legs like

7      wrapped around me.  So it was more his

8      legs than his like upper body type of

9      thing.

10         "MR. JOHNSON:  Was he sitting on you

11     or --

12         "MS. DOHERTY:  Yes, he was like on

13     top of me so I couldn't -- "

14  BY MR. ANGUEIRA:

15     Q.   So you heard that exchange between

16  yourself and Ms. Doherty where she described his

17  position and his ability to get a condom from a

18  shopping bag he had over his bed?

19     A.   Correct.

20     Q.   Is that the part of the testimony that you

21  did not believe?

22         MS. SULLIVAN:  Objection.  You can

23  answer.

24         THE WITNESS:  I won't say I didn't

**Bruce Johnson**

1   believe it.  I just had questions about it.

2   BY MR. ANGUEIRA:

3       Q.    In your mind would you -- were you

4   thinking that it didn't seem credible or possible?

5   Which of the two is it that you had in your thought

6   process or both?

7       A.    My feeling was that what was happening was

8   consensual.

9               MR. ANGUEIRA:  Okay.  I'm going to

10  skip to 30:00.

11              "MS. DOHERTY:  The cover -- like he

12              laid on top of me and pulled the covers

13              up so no one could see."

14              MR. ANGUEIRA:  Did you guys make a

15  transcription of this or the college?  Sometimes

16  they do.

17              MS. SULLIVAN:  I can ask the college

18  if they've made copies of certain points.

19              MR. ANGUEIRA:  You might want to do

20  that.

21              MS. SULLIVAN:  I sent it out to be

22  transcribed, but there were a lot of errors because

23  of the names.  So I need to get those corrected, and

24  then I can get you a copy.

**Bruce Johnson**

102

1          MR. ANGUEIRA:  Perfect.  I think
2     it's fair for everyone.
3          MS. SULLIVAN:  I'll do one for
4     attorneys' eyes -- when I produce it, I'll do one
5     for attorneys' eyes only.  Then I'll do one for, you
6     know, with the redactions.
7          MR. ANGUEIRA:  Okay.  Perfect.
8     Sorry for the interruption, still the same frame.
9          "MR. JOHNSON:  I have these three
10               questions:  When did you say no?  What
11               were your words exactly?  What was his
12               reaction?  Can you take us through that
13               moment of how you said no, what beyond
14               the word no you said, and his reaction.
15          "MS. DOHERTY:  Well, originally when
16               we were on the couch, he started touching
17               my leg.  I said -- I said stop, like your
18               best friend's in love with me and like --
19               and you know I have a boyfriend.  He
20               goes -- he said to me he wasn't the one
21               in love with you, it was me.  And I was
22               just like, no, like -- like stop.  And
23               then at that point he picked me up and
24               put me on the bed."

**Bruce Johnson**

1  BY MR. ANGUEIRA:

2     Q.   That's an exchange you had with

3  Ms. Doherty, correct?

4     A.   Correct.

5     Q.   When she said that then "he picked me up

6  and put me on the bed," did you believe that he was

7  physically capable of doing that or not?

8     A.   I believe a strong man is capable of

9  picking up a woman, but I don't know what happened

10  that night.

11     Q.   Okay.  Well, did you credit her account or

12  discredit her account that he actually picked her up

13  and put her on the bed or the couch?

14     A.   I have no way of knowing.

15          MR. ANGUEIRA:  Okay.

16          "MS. DOHERTY:  What I was doing as

17         he was picking me up, I was -- I freaked

18         out.  I was like stop, like trying to

19         like shake when I was being picked up.

20         Well, he didn't pick me up like this.  He

21         like bear-hugged me.  And I kept saying

22         like stop, please stop, like just stop

23         this.  Like you know I have a boyfriend,

24         like stop.  Like I just continued saying

**Bruce Johnson**

1          stop, stop, stop.  And he was like --

2          like you know you want it, like stuff

3          like that like -- and then throughout the

4          whole thing I was like stop, like please

5          stop.  Like I really was like -- like I

6          was crying, you know, I was just stop,

7          just like please, just stop, let me go.

8          And he just kept saying like you want it,

9          like stop, like kind of like laughing it

10         off a little.  And I was like it's not a

11         joke, just stop.  And I just kept asking

12         him to stop."

13   BY MR. ANGUEIRA:

14        Q.   When you testified that you had questions

15   about why other people in the room didn't hear her,

16   was it your understanding that those other people in

17   the room were present in the room during the entire

18   interaction between Ms. Doherty and ███████ or only

19   certain portions of it?

20        A.   I don't recall specifically, but I know

21   that at one point, like I said before, the gentleman

22   went into the bathroom -- putting some things

23   together from memory here.  From the best of my

24   recall it was that I think there was -- the roommate

**Bruce Johnson**

105

1   was in there the entire time with his girlfriend I

2   believe.

3       Q.    Okay.  And what's the -- what's the name

4   of the roommate, and what's the name of the

5   girlfriend?

6       A.    I think it was --

7       Q.    Your lawyer can help you.

8       A.    -- ████████

9              MR. ANGUEIRA:  Do we need to go off

10  the record, do you think?

11             MS. SULLIVAN:  Sure.

12             MR. ANGUEIRA:  Let's go off the

13  record.

14             (Discussion held off the record.)

15  BY MR. ANGUEIRA:

16      Q.    So we're looking at Exhibit 10, and four

17  pages in there's a statement that's dated Monday,

18  September 22, 2014, that begins "Got back to dorm

19  around 2:30, went to the bathroom to brush his

20  teeth."  Who is that person?

21      A.    ████████  ████████

22      Q.    Okay.  And that's the person that you said

23  was in ████████ room, his roommate, correct?

24      A.    I don't know if it's his roommate.  I just

1    know he was in the room at the time.

2         Q.   Okay.  So this time that he reported,

3    about 2:30 when he got back to dorm, does that mean

4    that's the time he claims he got into the room?

5         A.   I would -- I can only assume because you

6    would go to your -- the bathroom is in the room.

7         Q.   Okay.  In terms of the timeline that

8    Ms. Doherty gave through her text and the timeline

9    created by the investigators in this case, at what

10   time did the actual altercation, if you will,

11   between ████ and -- or interaction between ████

12   and Elisabeth Doherty begin -- where she says she'd

13   get back into his room and the process began?

14        A.   I'd have to check the times on that.

15        Q.   Sure.  Go ahead.  There's a timeline the

16   investigators created.  I believe it's the second

17   page of Exhibit 10.  It says "Timeline."  Does that

18   help?  Your lawyer can help you find it.

19             Do you see how this timeline --

20   according to your investigators, they say that

21   Ms. Doherty arrived at ████ dorm at about 2:08

22   to 2:10 a.m.?

23        A.   Okay, yeah.

24        Q.   I mean that's what your investigators

**Bruce Johnson**

1   said, right?

2      A.   Yeah.

3      Q.   And this fellow claims that he got back to

4   the room from wherever he was at 2:30, correct?

5      A.   Okay.

6      Q.   So do you agree with me that that means

7   that at least some part of the interaction between

8   █████ and Ms. Doherty occurred before this roommate

9   was even in the room?

10      A.   According to this report, correct.

11      Q.   Okay.  And do you know whether or not --

12   do you know in terms of the timeframe, when this man

13   ███ got into ████████ room, where was Ms. Doherty

14   and what was ██████ doing to Ms. Doherty?  Do you

15   know that?

16      A.   I'd have to read --

17      Q.   Sure.

18           MS. SULLIVAN:  I also just want to

19   point out that there's another name listed, and

20   that's on Page -- I'll show you.  It's on Page --

21   one, two, three, four, five -- that's on Page 7.

22           MR. ANGUEIRA:  Okay.  And he's

23   looking at that now.  Can you point that one out to

24   me, please.

108

1          THE WITNESS:  Okay.  He's the

2    main --

3    BY MR. ANGUEIRA:

4          Q.    So now you found another section of the

5    investigation report, a statement by a ███████

6    ███████  begins about seven pages in in Exhibit 10.

7    It's dated 10-2-2014.  And then it says -- I don't

8    know if that's ██████ ███████  that's blacked out.

9    "Did not have a key to the room so he thought it

10   was" --

11         MS. SULLIVAN:  It says ███████

12   BY MR. ANGUEIRA:

13         Q.    -- "███████ banging on the door.  He opened

14   the door and it was ███████

15         MS. SULLIVAN:  ███████

16   BY MR. ANGUEIRA:

17         Q.    Oh, ███████  Okay.  So as I look at this

18   statement, is it your -- is it your memory that this

19   gentleman ███████ was in the room when Ms. Doherty

20   first came to ███████ room?

21         A.    Yes, that's my memory.

22         Q.    And where does it say that?

23         A.    His head was near the wall, but at what

24   point in time --

**Bruce Johnson**

1    Q.   Well, it said "his head was near the

2    wall," at what point in time?  In other words, what

3    I'm trying to decipher from all this information, if

4    you can help us is, what evidence did you have --

5              MS. SULLIVAN:  Here, it's on Page 2.

6    And I know you don't have the -- you don't have the

7    one that I have that's not redacted, but on Page 2,

8    about halfway down it said, "█████ was home but

9    asleep.  He never came out of his room."

10             MR. ANGUEIRA:  Find that for me.

11             MS. SULLIVAN:  That said █████

12   BY MR. ANGUEIRA:

13   Q.   Okay.  So based on the investigation and

14   the timeline, it was your understanding that this

15   fellow █████ was in the room all the time asleep,

16   correct?  Until the point in time when he claims

17   that he went to the bathroom or did something,

18   right?

19   A.   We only know he was in the room --

20   Q.   Asleep, that's what your investigators --

21   A.   Well, we don't know how -- when he was

22   asleep, but we know he was in the room.

23   Q.   Well, it's 2 o'clock to 2:30 in the

24   morning, right?  Your investigators said he was in

**Bruce Johnson**

110

1    the room asleep.  That's what this note says

2    until -- his statement says that he got up for some

3    reason, right?

4                So my question to you is, how do you

5    know whether or not he was asleep during the

6    interaction when Ms. Doherty was telling ███████ no,

7    no, stop, stop?  Do you know if he was awake during

8    that period of time or not?

9        A.    Excuse me?

10       Q.    Was he awake or was he asleep?

11       A.    I have no way of knowing.

12       Q.    Was he drunk?

13       A.    He said his head was near the wall, he

14   felt like he'd have heard something.  We thought he

15   was a witness.

16       Q.    So his head was near the wall, he was

17   asleep.  What was his state of consciousness in

18   terms of alcohol or drugs in his system at the time?

19       A.    Well, I have no idea about any of that of

20   course.

21       Q.    Was he passed out from having been

22   drinking all day?

23       A.    I have no idea.

24       Q.    What was his state of sobriety?

**Bruce Johnson**

1    A.    No idea.

2    Q.    Did anybody ask him?

3    A.    That I do not know.

4    Q.    Did any of these investigators ever ask or

5  determine the state of sobriety of any of these

6  witnesses?

7    A.    I'd have to read more reports, but I don't

8  know offhand.

9    Q.    Now, we do know from ███ statement --

10  it's ███ right? -- oh, no, this is -- who is it

11  that claims that they got up to go to the bathroom?

12              MS. SULLIVAN:    ███

13  BY MR. ANGUEIRA:

14    Q.    ███  Okay.  Do we know what the state of

15  his sobriety is?

16    A.    No.

17    Q.    Do we know -- or strike that.  Did you

18  know what the nature of the relationship was among

19  these men, this ███ guy, ███ and ███

20    A.    Roommates.  Well --

21    Q.    Were they on the football team together?

22    A.    ███ played football.  I don't know if

23  ███ -- ███ ███ played football.

24    Q.    Did you ever hear that sometimes buddies

**Bruce Johnson**

1    stick up for each other, say things that aren't true

2    so that the buddy doesn't get into trouble?

3                    MS. SULLIVAN:  Objection.  You can

4    answer.

5                    THE WITNESS:  In certain scenarios I

6    suppose that can happen.

7    BY MR. ANGUEIRA:

8        Q.    You knew and you thought about this, that

9    ████████ is a football player, and any other football

10   players on the team with him could get into a lot of

11   trouble if these allegations came out to be true,

12   right?

13       A.    Anyone accused of rape would be in trouble

14   certainly.

15       Q.    They'd get kicked off the team, maybe even

16   get kicked out of the school?

17       A.    Absolutely.

18       Q.    And if his roommate who is on the football

19   team sat silently by while a woman was being raped

20   and didn't do anything about it, were those actions

21   that could result in discipline to the student?

22       A.    You're giving me a hypothetical --

23                    MS. SULLIVAN:  Objection.

24                    THE WITNESS:  -- and I'd have to

**Bruce Johnson**

1    know many more circumstances here.

2    BY MR. ANGUEIRA:

3        Q.   Okay.  So you don't know?

4        A.   Why don't you pose your question one more

5    time.

6        Q.   Of course.  If a student is aware that a

7    rape is ongoing in a dorm at your college and

8    doesn't do anything about reporting it and/or

9    falsely testifies during the investigation, is that

10   action -- or is his conduct the type of conduct that

11   may warrant discipline?

12        A.   Yes.

13        Q.   And neither you nor the other two panel

14   members nor any of the investigators ever looked

15   into the nature of the relationship among these

16   individuals, correct?

17              MS. SULLIVAN:  Objection.

18   BY MR. ANGUEIRA:

19        Q.   Other than what's in the report?

20              MS. SULLIVAN:  Objection.  You can

21   answer.

22   BY MR. ANGUEIRA:

23        Q.   Is that correct?

24        A.   I don't -- I'm not -- I really don't

**Bruce Johnson**

1    recall that.

2        Q.    Who was the -- who are the witnesses that

3    actually testified at the hearing?

4        A.    Nobody.

5        Q.    Well, Ms. Doherty did.

6        A.    Well, Ms. Doherty, right, but no

7    witnesses.  Well, she's the accused.

8        Q.    She's the accused or the accuser?  Or was

9    she the accused in your mind?

10                  MS. SULLIVAN:  Objection.

11                  THE WITNESS:  She was not accused.

12   She was the accused -- wait a minute.

13   BY MR. ANGUEIRA:

14       Q.    That's okay.  The accused means the person

15   that somebody's --

16       A.    I'm sorry, accuser.  I'm getting my --

17       Q.    It's okay.

18       A.    -- and nervousness a little bit here.

19       Q.    It's okay.  Did the board have the

20   authority or the power to call witnesses if it

21   wanted to?  By that I mean the panel.

22       A.    I assume -- I don't -- I don't recall.  I

23   assume so.

24       Q.    Okay.  Did any of the panel members ever

**Bruce Johnson**

1   suggest that maybe we should make these people come

2   in and testify live in front of us so we can see

3   them and hear them?

4       A.   Well, I think we read their statements and

5   there was credibility added to or not added to them,

6   and that's what we went on.  I don't recall -- yeah.

7               MR. ANGUEIRA:  I'm going to go to

8   Section 41:35 in the tape.

9               "MR. JOHNSON:  One thing that came

10                  up in -- so ▬▬▬ statement -- she

11                  just mentioned something.  Let me see

12                  what -- she said that you came back and

13                  both of your roommates were in the room

14                  at the time, right?  So when you came

15                  back, they were both there?

16                  "MS. DOHERTY:  ▬▬▬ was in her

17                  bedroom and ▬▬▬ and her boyfriend were

18                  in her bedroom -- my bedroom.

19                  "MR. JOHNSON:  And you told -- so

20                  then you told her that you yelled and

21                  shouted a lot, but nobody did anything.

22                  So just -- because it -- so I'm just

23                  trying to put that together with kind of

24                  what you were saying that actually

**Bruce Johnson**

116

1          happened.

2              "MS. DOHERTY:  I just -- I mean I

3          don't know what I said to her.  I really

4          don't remember.  I just remember running

5          down the hallway, bawling my eyes out.

6          And then I -- I know I woke her up.  I

7          was just like at the end of her bed,

8          like -- like he just raped me.  And then

9          I honestly have no idea what I said

10         then.  I don't remember."

11    BY MR. ANGUEIRA:

12         Q.   Ms. Doherty is now testifying that she

13    honestly doesn't remember what she said, at least at

14    this hearing.  Did you recognize that as the type of

15    testimony that a rape victim would give because of

16    the trauma or shock that she's been through or not?

17         A.   I have no way of knowing.

18         Q.   So you never received any training or

19    education in that regard?

20         A.   Certainly.  We just were trying to decide

21    what made her react that way.  Part of training is

22    to understand the reactions of people and how they

23    may respond to it.  That was -- the reason was that

24    we weren't sure what traumatized her.

**Bruce Johnson**

```
1                    MR. ANGUEIRA:  Okay.  I'm skipping
2       to 45:35 now.
3                    MS. SULLIVAN:  Can we just go off
4       for one second.
5                    (Discussion held off the record.)
6                    "MR. SCOTT:  What is something
7                that -- what would you like to see
8                from this?  So what is something that you
9                as the person who -- I guess in this
10               you're technically considered the
11               complainant.  So if you" --
12                   MR. ANGUEIRA:  I'm stopping this at
13      45:40.  I'm going to ask Mr. Scott that question,
14      because that's him asking Ms. Doherty, and continue
15      to expedite this depo.
16                   I'm skipping to 49:20.  Let's listen
17      to it, and it may be something for Mr. Scott as
18      well.
19                   "MS. DOHERTY:  He just was living in
20               the same room when he was trespassed.
21                   "MS. LENNA:  But nobody --
22                   "MS. DOHERTY:  Nobody knew, yeah.
23                   "MS. LENNA:  Exactly so we need to
24               have somebody that would speak up
```

**Bruce Johnson**

118

1                    for us."

2                    MR. ANGUEIRA:  I'm stopping it

3    there.  I don't need to ask you questions about that

4    also.

5                    Actually let's go off the record.

6    Let me look at these last three sections.

7                    (Discussion held off the record.)

8                    MR. ANGUEIRA:  I don't have any

9    other questions.  Thank you very much, sir.

10                    THE WITNESS:  Okay.  Thank you.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Bruce Johnson**

119

1                    C E R T I F I C A T E

2          I, BRUCE D. JOHNSON, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify under the pains and penalties of

5    perjury that said transcript is a true and accurate

6    record of said testimony, with the exception of the

7    following corrections listed below:

8    Page   Line                Correction/Reason

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22                   _____

23                        BRUCE D. JOHNSON

24    Dated this _____ day of _____, 2018

**Bruce Johnson**

120

1    COMMONWEALTH OF MASSACHUSETTS     COUNTY OF MIDDLESEX

2              I, PENNI L. LaLIBERTÉ, Certified

3    Shorthand Reporter No. 10656 and Notary Public in

4    and for the Commonwealth of Massachusetts, do hereby

5    certify that BRUCE D. JOHNSON came before me on

6    Wednesday, March 21, 2018, the deponent herein, who

7    was duly sworn; the examination was reduced to

8    printing under my direction and control; and the

9    within transcript is a true record of the testimony

10   given at said deposition.

11             I further certify that I am neither

12   attorney or counsel for, nor related to or employed

13   by any of the parties to the action in which this

14   deposition is taken; and, further, that I am not a

15   relative or employee of any attorney or counsel

16   employed by the parties hereto, or financially

17   interested in the outcome of the action.

18             IN WITNESS WHEREOF I have hereunto set my

19   hand this 29th day of March, 2018.

20

21

22                    *Penni LaLiberté*

23             PENNI L. LaLIBERTÉ, Notary Public

24             My Commission expires 11/12/21