# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ELISABETH DOHERTY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-10161-IT |
| | * | |
| AMERICAN INTERNATIONAL | * | |
| COLLEGE, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM & ORDER

March 31, 2019

TALWANI, D.J.

Plaintiff Elisabeth Doherty, who alleges that she was raped while she was a student, brought this action against Defendant American International College ("AIC"). AIC's Motion for Summary Judgment [#41] is now before the court. After review of the parties' arguments and the evidence presented, AIC's motion is ALLOWED.

At the outset, the court notes what this case does and does not address, and the framework within which this case must be decided. The complaint does not assert claims directly against Doherty's assailant, and is not an appeal of AIC's decision on such claims. Instead, the suit asserts that AIC violated Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688, by failing to respond promptly and appropriately to her report that she was sexually assaulted. On summary judgment, the court assumes that Doherty was indeed raped by her fellow student, but nonetheless must decide the federal claim for damages from AIC in the context of the purpose and scope of Title IX.

Title IX provides, in pertinent part, that "no person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX's primary purpose is "to prevent recipients of federal financial assistance from using [federal] funds in a discriminatory manner." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 292 (1998). Although Title IX does not expressly provide a private right of action, the Supreme Court has held that Title IX's legislative scheme contains the landmarks of an implied private remedy for offending discrimination. See Cannon v. University of Chicago, 441 U.S. 677, 717 (1979).

Unlike Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, Title IX does not explicitly provide for monetary damages. The Supreme Court has recognized that monetary relief may be available in limited circumstances. See Gebser 524 U.S. at 287 ("Whereas Title VII aims centrally to compensate victims of discrimination, Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds."); id. at 292 ("Until Congress speaks directly on the subject, . . . we will not hold a school district liable in damages under Title IX . . . absent actual notice and deliberate indifference.); see also Davis v. Monroe Cty Bd. of Educ., 526 U.S. 629, 643 (1999) ("We consider here whether the misconduct identified in Gebser—deliberate indifference to known acts of harassment—amounts to an intentional violation of Title IX, capable of supporting a private damages action, when the harasser is a student rather than a teacher. We conclude that, in limited circumstances, it does."). Accordingly, a damages recovery against the college is available only when such a remedy will not "frustrate the underlying purpose of the legislative scheme," Cannon 441 U.S. at 703, namely

in cases in which the funding recipient was deliberately indifferent to known acts of discrimination.

With this framework in mind, the court proceeds to the facts in this case.

I.  Factual Background[1]

*Background*

Doherty was a student at AIC from August 2012 through 2014. Def.'s Rule 56.1 Statement (Def.'s SOF) ¶ 1 [#43]. During this time, the college had written policies which prohibited sexual assault, and provided a procedure for reporting incidents and a disciplinary process for resolving sex discrimination complaints against students (hereinafter, "Title IX Policies"). Id. ¶ 2. AIC provided its Title IX Policies and alcohol policies to its students. Id. ¶ 11. At the time in question, Nicole Cestero was the Senior Vice President of Human Resources and Title IX Coordinator at AIC and Mathew Scott was the Dean of Students and the Deputy Title IX Coordinator. Id. ¶¶ 4, 7.

During her junior year, Doherty was living in a dormitory on campus ("the Dorm"). Id. ¶ 12.

*August 30, 2014*

In the early morning hours on Saturday, August 30, 2014, Doherty was in her suite with several other students, including, "Respondent," [2] an AIC student who lived on Doherty's floor.

---

[1] At summary judgment, the court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in her favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). However, the court does not accept "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

[2] Both Plaintiff and Defendant use "Respondent" "[t]o comply with AIC's obligation to protect the privacy of AIC's students." Def.'s SOF ¶ 13 n.2. The court proceeds accordingly.

Id. ¶¶ 13, 15. After Respondent left the suite, he sent Doherty a text message asking if she wanted to come to his room "to chill." Id. ¶ 16. Doherty agreed to go over. Id.

While she was in his room, Respondent took Doherty's clothes off her and raped her while Doherty pleaded with him to stop. Id. ¶ 18. Def.'s SOF Ex. 27 (Hearing Transcript) 3:14-4:17, 5:15-17 [#43-42]. Doherty tried to make noise but was unable to because Respondent pressed his body on her face. Pl.'s SOF ¶ 20 [#52]; Hearing Transcript 4:16-22 [#43-42]; Def.'s SOF Ex. 8 (Investigation Report) 2 [#43-23]; Def.'s SOF Ex. 9 (Doherty's Written Statement) 2 [#43-24]. At some point during the incident, Respondent got off Doherty, during which time she was able to put back on her clothes, fight off his efforts to grab her, and run out of his room. See Pl.'s Resp. to Def.'s Rule 56.1 Statement (Pl.'s SOF) ¶ 18 [#52] ¶¶ 21- 27 [#52]; Hearing Transcript 5:14-20 [#43-43]; Def.'s SOF Ex. 1 (Doherty Dep.) 57:4-20 [#43-1].

Doherty woke up her suitemates, and told them that Respondent had raped her. Pl.'s SOF ¶ 29 [#52]; Doherty Dep. 58:12-59:7 [#43-1]; see also Investigation Report 9 [#43-23]; Doherty's Written Statement 3 [#43-24]; Def.'s SOF Ex. 10 (JK Statement) [#43-25]; Def.'s SOF Ex. 11 (EM Statement) [#43-26]; Def.'s SOF Ex. 12 (SD Statement) [#43-27]. Approximately twenty minutes later, Doherty went with her suitemates to the Campus Police and reported the rape. Pl.'s SOF ¶ 30 [#52].

The Campus Police contacted Cestero, who arrived on campus within 30-45 minutes. Id. ¶ 31-32. The Responding Officer secured the Title IX Victims' Rights form from Doherty and written witness statements from Doherty and her suitemates. Id. ¶ 31. Cestero explained her role as Title IX Coordinator to Doherty and offered her water, a blanket, a professional counselor to speak with, and another place to rest. Cestero also informed Doherty that there were services available to her, including the College's counseling center and off campus resources. Id. ¶ 33.

Cestero asked Doherty for a verbal statement, which Doherty provided. Id. ¶ 32. Cestero explained to Doherty her Title IX rights and reviewed the Victims' Rights form with her, and informed Doherty that she could file a formal complaint though the College's Title IX procedure and press criminal charges with the police. Id. ¶ 33.

After meeting with Doherty, police officers went to Respondent's room and transported him to the Campus Police station for an interview with the Police Chief and Cestero. Id. ¶ 38. Respondent denied raping Doherty. Id. The Chief gave Respondent a trespass notice and Respondent left campus with his mother.

### The ensuing week

A couple of days after their initial contact, Cestero called Doherty to check on her well-being and advised that they should remain in touch. Id. ¶ 39.

On September 3, 2014, Doherty informed Cestero that she had decided to proceed with a formal complaint against Respondent. Cestero answered various questions that Doherty had about the College's complaint process and informed her that because the College could not completely trespass him until the outcome of the investigation, Respondent would be permitted on campus only to attend classes and football practice.[3] Cestero explained that Respondent would be prohibited from contacting Doherty for any reason in any manner, and that the College would provide her with needed support. Id. ¶ 41. The next day, Respondent was verbally informed of the formal complaint against him and told he was to have no contact with Doherty. Id. ¶ 43. The College issued him a written no contact/no trespass order, alerting him that a violation of the order would be grounds for his immediate removal and potential dismissal from the College. The College made Doherty aware of the order and its terms. Id. ¶ 44.

---

[3] Respondent was a member of the AIC football team. Compl. ¶ 6 [#1].

On September 8, 2014,[4] Doherty reported to Campus Police that she saw Respondent walk into the Dorm. Campus Police immediately went to the Dorm to try to find Respondent and serve him with a new trespass notice. Campus Police were unable to locate Respondent but continued to make periodic checks of the Dorm and ensured that all Resident Hall Assistants were informed. Id. ¶ 45. Campus Police also went to the football field and spoke with the Head Coach, who stated that Respondent was not there. Id. ¶ 46.

Doherty emailed Cestero that same day, stating that she was upset about having seen Respondent entering the Dorm, and asking Cestero to confirm the details of Respondent's no contact order "ASAP." Id. ¶ 47. Cestero responded the next morning and confirmed that Respondent was only permitted to be on campus to attend classes and football practice; he was not permitted in the dormitories. Id. ¶ 48. A few hours later, Cestero sent Doherty another email that Respondent stated to Cestero that he would not be returning to AIC for the fall semester. Id. ¶ 49.

Cestero mailed Respondent an updated no contact/no trespass order to his home out of state. Id. ¶ 50. The order prohibited Respondent from entering any AIC dorms pending the investigation and reminded him that a violation of the order would be grounds for dismissal from the College. Id. ¶ 50.

After that, Doherty never saw Respondent again. Id. ¶ 51.

*Interim Accommodations*

In accordance with its Title IX Policies pertaining to victims of sexual assault, AIC provided Doherty interim accommodations, including academic accommodations and counseling

---

[4] Although both Plaintiff and Defendant stated in their statements of fact that this occurred in 2015, the chronology of the remaining facts show that this was a typographical error and the report took place in 2014. See id ¶ 45; Pl.'s SOF ¶ 45 [#52].

services. Id. ¶ 40. When Doherty resumed taking classes and returned to classes a few days later, she was provided counseling from the on-campus counseling center. Id. ¶ 52.

*The Investigation, Hearing and Appeal*

Cestero assigned two individuals to investigate Doherty's formal complaint. Both investigators had received Title IX training, including how to conduct investigations in cases alleging student-on-student sexual assault. Id. ¶ 54. The investigators interviewed ten students, including Doherty and Respondent, took photographs of the scene, reviewed evidence, and prepared a written investigation report to be provided to the Sexual Misconduct Hearing Board (the "Hearing Board"). Id. ¶ 55. The investigation report did not conclude whether Respondent should be found responsible for violating any College policy. Id. ¶ 56.

Six days prior to the hearing on her complaint, Doherty was informed of the prehearing process, and that parties could request witnesses to testify on their behalf. Id. ¶ 58. The board chair, Matthew Scott, answered all of Doherty's questions and explained to her that Respondent had the right to be present at the hearing, but that Doherty also had the right to reasonable accommodations to make her feel comfortable. Id. ¶ 59. Scott also offered to have a police officer present at the hearing. Id. Doherty did not request any accommodations for the hearing or that any witnesses to testify on her behalf. Id.

Respondent did not attend the hearing. Doherty presented her account to the Hearing Board, answered their questions to the best of her ability, and was given the opportunity to ask questions and make a closing statement. See id. ¶¶ 61, 63. Immediately after the hearing, the Board deliberated and unanimously decided that the Hearing Board was unable to find by a preponderance of the evidence that a sexual assault had occurred. Id. ¶ 64. Doherty was informed

of the Hearing Board's decision the next day and was provided information on how to appeal. <u>Id.</u> ¶ 65.

Doherty appealed the Board's decision. <u>Id.</u> ¶ 66. AIC's Executive Vice President for Administration, Mark Berman, handled the appeal and determined that Doherty had not provided any new information related to the case, and that the Hearing Board made no substantial procedural error that might have affected its decision. <u>Id.</u> ¶ 67; Def.'s SOF Ex. 30 (Appeal Denial) [#43-45]. On November 18, 2014, Berman sent a letter to Doherty explaining in detail the reasons that he was denying her appeal. Doherty Dep. 144:17-21 [#43-1]; Appeal Denial [#43-45].

### *Doherty's Withdrawal from AIC*

The same day that she received the Hearing Board's determination, Doherty requested to withdraw from AIC. <u>Id.</u> ¶ 69. While her appeal was pending, Doherty requested that her withdrawal be changed to a leave of absence for the Fall 2014 semester, and AIC granted Doherty's request. <u>Id.</u> ¶¶ 70, 71. Doherty did not return to AIC and officially withdrew in January 2015. <u>Id.</u> ¶ 72.

## II. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is 'material' if it has the potential of determining the outcome of the litigation." <u>Baker v. St. Paul Travelers, Inc., Co.</u>, 670 F.3d 119, 125 (1st Cir. 2012) (quoting <u>Scottsdale Ins. Co. v. Torres</u>, 561 F.3d 74, 77 (1st Cir. 2009)). All reasonable inferences must be drawn in favor of the non-moving party, but the non-

moving party cannot survive summary judgment by "rest[ing] merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

### III. Analysis

In Count 1, Doherty alleges that AIC violated Title IX by failing to act or by acting with deliberate indifference in response to her report of sexual assault, thereby creating a hostile education environment and depriving her of access to education. Compl. ¶¶ 56–80 [#1]. In Count II, Doherty alleges that AIC was negligent in failing to protect her from sexual assault and failing to enforce AIC's sexual assault policies. Id. ¶¶ 81–93. In Counts III and IV, Doherty alleges that AIC's response negligently and intentionally inflicted emotional distress. Compl. ¶¶ 94–114.

#### A. Count I: Title IX

Doherty alleges that AIC failed to investigate her sexual assault in any meaningful way, and that AIC's procedures for handling sexual assault complaints inequitably placed the burden of proof on the complainant. Compl. ¶¶ 61–79 [#1]. Doherty claims that, as a result, AIC's response to her report was clearly unreasonable and systematically denied her the means to achieve a prompt and equitable resolution of her complaint. Id. ¶¶ 74–80.

To establish a Title IX claim, Doherty must prove that AIC: (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive, that it (4) deprived Doherty access to the educational benefits or opportunities provided by the school. See Davis, 526 U.S. at 651–54. Deliberate indifference in the case of student-on-student harassment requires that the school's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Porto v. Tewksbury, 488 F.3d 67, 73 (1st Cir. 2007) (quoting Davis, 526 U.S. at 644). The "clearly unreasonable"

standard is a stringent one intended to afford flexibility to school administrators. <u>Davis</u>, 526 U.S. at 648 (declining to impose liability under a negligence or mere "reasonableness" standard). The Title IX plaintiff must show that the educational institution either subjected or caused the student to be subjected to the sexual harassment, or made the student vulnerable to it, <u>id</u>. at 644–45, either by "refus[ing] to take action to bring the [institution] into [Title IX] compliance," or by making "an official decision . . . not to remedy the violation," <u>Gebser</u>, 524 U.S. at 290. While a university may not avoid liability under the deliberate indifference standard simply by "act[ing] in some way in response to reported sexual harassment," <u>Leader v. Harvard Bd. of Overseers</u>, No. 16-10254-DJC, 2013 WL 1064160, at *4 (D. Mass. Mar. 17, 2017), "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, [or] to craft perfect solutions." <u>Fitzgerald v. Barnstable Sch. Comm.</u>, 504 F.3d 165, 174 (1st Cir. 2007), <u>rev'd on other grounds</u>, 555 U.S. 246, (2009). "A school satisfies its obligations if it engages in a reasonable process for investigating and addressing claims of sexual harassment." <u>Doe v. Emerson College</u>, 271 F. Supp. 3d 337, 356 (D. Mass. 2017).

    1.   Training

Doherty directs the court to AIC's Title IX training materials for its Title IX administrators. First, AIC's May 29, 2013, and June 26, 2013, trainings included a PowerPoint slide entitled "Investigation: Equitable Process Part III." Def.'s SOF Ex. 6C (May and June 2013 Title IX Training) 29 [#43-9]. The slide summarizes the complaint in <u>Bleiler v. College of Holy Cross</u>, a case in which a male student accused of sexual misconduct sued his college for allegedly violating his civil rights after the college expelled him following a disciplinary hearing. <u>See id.</u> The next slide, entitled "Claims/Liability" states that "students accused of a sexual assault are just as likely to sue the institution as the accusing student." <u>Id</u>. at 30. Four slides later, a slide

labeled "Lessons Learned, Con't," includes a bullet point stating "S[eparate other punishable behavior] of the perpetrator or the victim, such as alcohol or drug consumption, from the alleged assault." Id. at 34. Doherty argues that this training influenced the Hearing Board to construe the Title IX procedures in favor of male students accused of rape and indicates the school's bias and preferential treatment towards male students because "intoxication 'increase[s] the incidence of a variety of aggressive acts, including *sexual* and physical assaults." Pl. Opp'n to Def.'s Mot. for Summ. J. ("Pl's Opp'n") 12–13 [#51] (quoting Pl.'s SOF ¶ 75 [#52]) (emphasis in original).

Second, Plaintiff points to a case study in AIC's Title IX training on September 30, 2014, and October 9, 2014, arguing that it was "particularly designed to diminish Plaintiff's account of her rape, and prejudicially influence the hearing board to erroneously construct a narrative that Plaintiff had actually consented to intercourse." Pl.'s Opp'n 13 [#51]. The case study describes a situation in which a female student, Jane, was watching a movie with a male student, John, and "one thing led to another, and the next thing she knew her pants were off. John put on a condom and began penetrating her when there was a knock on the door. She told John to stop but he did not." Def.'s SOF Ex. 6D (September-October 2014 Title IX Training) 8-10 [#43-10]; Pl.'s SOF ¶ 74 [#52]. The training materials then asked the audience to answer five questions, including "[w]hat factors will you rely upon to assess the credibility of Jane, John and other witnesses?" and "[w]hat other evidence should you obtain and how will you go about obtaining it." Id. at 10. Doherty argues that this case study, included in the training a month before her sexual assault hearing, is "suspiciously identical" to her rape, but misconstrues the facts so that it appears that she consented to intercourse. Pl.'s Opp'n 13-14 [#51]. She alleges that the training was used to improperly influence the Hearing Board members and minimizes the violent and disturbing nature of her rape. Id.

"Some courts have found that that a school can be liable for an 'official policy . . . of deliberate indifference to provide adequate training or guidance that is *obviously* necessary for implementation of a specific program or policy of the recipient.'" Emerson Coll., 271 F. Supp.3d at 356 (quoting Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1178 (10th Cir. 2007)) (emphasis added). The First Circuit has not directly addressed what constitutes deliberate indifference to properly train in the Title IX context, but at least one court in this district has articulated that "the question is not whether the relevant [school] administrators could have been trained better, but whether a reasonable juror could conclude on the evidence that any inadequacies in training were *so deficient* that they constituted 'encouragement of the harassing conduct' or otherwise amounted to deliberate indifference." Id. (quoting Simpson, 500 F.3d at 1177) (emphasis added).

Doherty has not shown how the identified training materials could lead a reasonable jury to conclude that AIC's training of the relevant officials was *obviously* deficient as to constitute a deliberate indifference to provide its Title IX administrators proper training.[5] The PowerPoint slide in the May and June 2013 training presentation that discusses the complaint in Bleiler is followed by a number of slides entitled "Lessons Learned," in which AIC advised its Title IX administrators to "promptly investigate sexual assault complaints," "understand and coordinate how local police, campus police and student discipline will respond to sexual assaults," "document the initial meeting with the victim," and "refrain from concluding that an assault did (or did not) occur in a report." May and June 2013 Title IX Training 28-29 [#43-9]. When

[5] The individuals assigned to conduct the investigation and the Hearing Board members all attended Title IX trainings. The Chair of the Hearing Board, Matthew Scott, received his Title IX training "from other higher education institutions." Pl's SOF ¶ 8 [#52]. The other two members of the Hearing Board "both attended Title IX trainings in 2013 and 2014," id. ¶ 57, that are challenged by Plaintiff. The record is silent as to whether the investigators attended any of the challenged trainings, but reflects that one of the two investigators "attended an additional external Title IX training on September 19, 2014." Pl's SOF ¶ 54 [#52].

12

viewed in context, AIC's reference to <u>Bleiler</u> was properly being used to teach administrators to be <u>impartial</u> in their investigations, not to favor male students. <u>See</u> <u>id.</u>

Nor does AIC's guidance to Title IX administrators in the 2013 training to "separate other punishable behavior . . . such as alcohol or drug consumption[] from the alleged assault" show deliberate indifference. Neither the training nor AIC's sexual misconduct policy is gender-specific. Notably, both AIC's 2012-2013 and 2013-2014 Student Handbooks define "sexual misconduct" as "inappropriate physical touching, sexual exploitation and sexual intercourse without consent, as well as other forms of sexual violence," and state that "[s]exual misconduct can be committed by males or by females, and it can occur between people of the same or different sex." Def.'s SOF Ex. 3 (2012-13 Student Handbook) 8 [#43-3]; Def.'s SOF Ex. 4-5 (2013-14 Student Handbook) 4-5 [#43-4]. Moreover, contrary to Doherty's assertion that administrators are taught to "disregard" alcohol consumption, Pl.'s Opp'n 13 [#51], the training instructs Title IX administrators to separate from the sexual assault investigation—not ignore— alcohol use by "the perpetrator *or the victi*m," regardless of gender. <u>See</u> May and June 2013 Title IX Training 34 (emphasis added) [#43 –9].[6]

The evidence further shows that AIC used the challenged hypothetical—which does not state that the encounter was consensual—to teach administrators to evaluate claims of consent by making credibility determinations based on "the totality of the circumstances," including the "level of detail and consistency, existence or absence of corroborative evidence, prior bad acts and/or prior false reports, reaction or behavior after the alleged incident, behavioral changes . . . demeanor, interest, bias, motive, detail, corroboration, common sense." September and October 2014 AIC Title IX Training 11-13 [#43-10]. Doherty does not show how AIC's use of a

---

[6] AIC's 2014 training specifically instructs Title IX investigators to "[e]valuate the effect of any alcohol use" when evaluating a claim of consent, and discusses the effects that alcohol may have in claims of sexual assault. September and October 2014 Title IX Training 13-14 [#43-10].

hypothetical encourages assaultive behavior, see Doe, 271 F. Supp. at 357, or makes students more vulnerable to sexual harassment, see Fitzgerald, 504 F.3d at 172-73. Indeed, by including a hypothetical that begins with a consensual encounter but then includes a directive to "stop," the training material would more likely help administrators understand that consent may be withdrawn.

Nor has Doherty shown that she was prejudiced by the training. The mere fact that the Hearing Board did not find her credible is insufficient to show such prejudice. See, e.g., Emerson Coll., 271 F. Supp. 3d at 357 ("Doe makes a variety of conclusory allegations about the alleged inadequate training, but offers little by way of specifics, and has not shown any alleged deficiencies cause any actual harm."). A "[p]laintiff has no right to a particular remedy; instead the University is entitled to latitude in determining what constitutes a reasonable response." Wyler v. Conn. State Univ. System, 100 F. Supp. 3d 182, 195 (D. Conn. 2015) (citing Davis, 526 U.S. at 648–49 ("We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action. . . . School administrators will continue to enjoy the flexibility they require.")).

Accordingly, Doherty has failed to show how AIC's training constituted deliberate indifference.

### 2. Response to Title IX Complaint

Doherty next contends that a reasonable jury could find that AIC's response to her formal complaint were so unreasonable that AIC denied her an equitable resolution of her claim of sexual assault. Pl.'s Opp'n 14-20 [#51].

### a. Investigation

"[A] school will not be held liable for deliberate indifference if it takes 'timely and reasonable' measures to address the harassment." Emerson Coll., 271 F. Supp. 3d at 354 (quoting Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999)). cf. Doe v. Oyster River Co-op School Dist., 992 F. Supp. 467 (D.N.H. 1997) (to prove a Title IX claim, plaintiff must show that school district failed to take steps reasonably calculated to end harassment that it knew of) (citing Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 901 (1st Cir. 1988)). "The test is objective— whether the institution's response, evaluated in light of the known circumstances, is so deficient to be clearly unreasonable." Fitzgerald, 504 F.3d at 174.

The undisputed facts show that AIC's investigation was not clearly unreasonable. AIC quickly responded to Doherty's report that she had been raped, gathered statements from Doherty, Respondent, and witnesses, and ensured that Doherty was aware of her rights and provided with the resources and accommodations that she needed. See Pl's SOF ¶¶ 31-33, 36, 39, 40-42, 52, 55 [#52]. AIC further issued Respondent a trespass notice and no contact order, prohibiting him from contacting Doherty, id. ¶¶ 38, 41, 43; Def.'s SOF Ex. 18 (No contact/No Trespass Order) [#43-33], and quickly and appropriately responded to Doherty's report that she saw Respondent in the Dorm. See Pl.'s SOF ¶ 45-49 [#52]; see also Def.'s SOF Ex. 22 (Modified No Contact/No Trespass Order) [#43-37]. Two investigators interviewed ten students, took photographs of the scene, reviewed evidence, and prepared a written investigation report. Id ¶ 55. And, Doherty herself acknowledges the timeliness of AIC's response to her complaint. Pl.'s Opp'n 8, 11 [#51].

The court is not confronted with the more difficult situation where the assailant remained on campus, inflicting (or potentially inflicting) further harm on the victim and subjecting her to

further emotional vulnerability. Nor was there additional harassment or threat of harassment to Doherty after AIC received notice of the rape and began to act. The court is sympathetic to the trauma Doherty suffered as a result of her sexual assault, but this Title IX action can remedy only harm caused by AIC's post-notice actions, and not the sexual assault itself.

Although AIC's investigation and hearing process did not result in the resolution that Doherty desired, "Title IX does not guarantee that an investigation will yield the outcome that a complainant desires." Doe v. Emerson Coll., 271 F. Supp. 3d at 355. Even if the investigation questions could have been better, "the school's prompt commencement of an extensive investigation and its offer of suitable remedial measures distinguish this case from cases in which courts have glimpsed the potential for a finding of deliberate indifference." Fitzgerald, 504 F.3d at 174 (citing as examples Vance v. Spencer County Public Sch. Dist., 231 F.3d 253, 262 (6th Cir. 2000) (school district failed to "take any action whatsoever" besides talking to alleged perpetrator of harassment), and Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1244, 1247 (10th Cir. 1999) (school principle "refused to investigate" an allegation of sexual harassment)).

### b. The Hearing

Doherty contends that the investigators and Hearing Board, despite knowing the effects of trauma on rape victims' memories, unreasonably discredited her because of her inconsistent recollection of the sexual assault. Pl's Opp'n 14-15 [#51]. Title IX does not require "that complainants be deemed credible, simply because they are complainants," Doe v. Emerson Coll., 271 F. Supp. 3d at 355, and courts must "refrain from second-guessing the disciplinary decisions made by school administrators." Davis, 526 U.S. at 648 (citing New Jersey v. T.L.O., 469 U.S. 325, 342-43, n.9 (1985)). Here, no reasonable jury could determine that the Hearing Board failed

to consider the traumatic effect of the sexual assault because they questioned her about her inconsistent statements about the sexual assault.

Nor does Doherty provide any support for her assertion that asking credibility questions of a sexual assault complainant denies that complainant an equitable resolution. Pl's Opp'n at 17 [#51]. Doherty alleges that the hearing was so poorly executed that it failed to provide the equitable grievance procedures that Title IX requires, see 34 C.F.R. § 106.8, but the record reflects that the Hearing Board chair answered any questions that she had about the Title IX hearing process, Pl.'s SOF ¶ 59, offered her reasonable accommodations to make her feel safe, id., allowed her to come in and read all relevant reports and statements prior to the hearing, id. ¶ 60, allowed her to present her account of the incident and gave her the opportunity to ask questions, id. ¶ 61, informed her that regardless of the outcome, the college wanted to make her feel comfortable, id. ¶ 62, and gave her the opportunity to make a closing statement, id. ¶ 63. Her right to appeal the Hearing Board's decision was also explained to her, and she availed herself of that right. Id. ¶¶ 65-67.

The Hearing Board determined that it could not conclude that assault occurred by a preponderance of evidence. Def.'s SOF ¶ 64 [#43]. This is not an appeal of that decision; courts must respect a school's flexibility in responding to student against student harassment as long as the school's response is not "clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648; see also id. ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."); see also Tubbs v. Stony Brook Univ., 343 F. Supp. 3d 292, 316 (S.D.N.Y. 2018) ("Indeed the [Office of Civil Rights 2011 "Dear Colleague Letter"] and case law advise[s] courts to defer to schools' internal procedures, and to even pardon noncompliance, so long as schools otherwise demonstrate attentiveness to the issue."); id.

(finding that although grievance procedure may have been "flawed and imperfect . . . no reasonable juror could find that University Defendants violated their barebones Title IX obligations"). Doherty has not shown that asking questions to make a credibility determination is clearly unreasonable.

Doherty next contends that AIC's policy to "separate . . . alcohol or drug consumption[] from the sexual assault" is discriminatory against victims because it bolsters witnesses' credibility and disproportionately favors perpetrators. May and June 2013 Title IX Training 34 [#43-9]; see Pl.'s Opp'n 14–17 [#51].  Doherty argues that the policy was implemented "so inartfull[y] as to render it clearly unreasonable" "because it disproportionately favors [Respondent], despite the fact that Defendant clearly recognizes even [l]ow to moderate doses of alcohol . . . increase the incidence of sexual and physical assault.'" Pl.'s Opp'n at 16 [#51] (internal quotation marks omitted).

Although neither the Supreme Court nor the First Circuit have established a standard for evaluating a Title IX claim that a school's disciplinary procedures are discriminatory, the court uses here the Second Circuit's standard requiring "evidence 'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and indicating that "gender bias was a motivating factor.'" Doe v. Trs. of Boston Coll., 892 F.3d 67, 90 (1st Cir. 2018) (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)).[7]

Doherty cannot show a "a causal connection between the outcome of [the Hearing Board proceedings] and gender bias because she has not shown 'particular circumstances suggest[ing] that gender bias was a motivating factor.'" Id. at 91 (quoting Yusuf, 35 F.3d at 715). Doherty acknowledges the reasonableness of the challenged policy on its face, implemented to encourage

_____

[7] The First Circuit did not need to adopt a framework itself because the parties agreed to use the Second Circuit's standard. Id.

witnesses to come forward without fear of being punished. Pl's Opp'n 15 [#51]. As the court has previously mentioned, see supra Section II(B)(1), the alcohol-separation policy is a gender neutral one, and was not clearly unreasonable or motivated by a gender bias.[8]

Title IX's purpose is not to ensure that the Hearing Board ultimately reached the correct result, but rather whether AIC took reasonable measures to protect Doherty from harassment for which it had notice. See Gebser, 524 U.S. at 298-93 (finding school district not liable under Title IX for sexual harassment by a teacher of which it had no actual notice). Although the court acknowledges the trauma Doherty suffered as a result of her sexual assault, and urges AIC and other educational institutions to take vigorous steps to eliminate such incidents, Doherty has not shown that AIC violated its Title IX obligations in this case.

AIC's Motion for Summary Judgment [#41] is ALLOWED as to Count I.

B. Claims under State Law

Doherty alleges that AIC was negligent in protecting its students from sexual assault due its lax enforcement of its alcohol policy, and that this negligence caused her emotional distress. Compl. ¶¶ 94–103 [#1]).

1. Count II: Negligence

Doherty argues that AIC breached its duty to its students by "fail[ing] to take reasonable precautions to safeguard its students, and fail[ing] to follow the school's guidelines with respect to responding to reported sexual assaults perpetrated by AIC students." Id. ¶ 86. Doherty's

---

[8] Gender-based disparities in the application of facially neutral policies may also constitute a viable claim under Title IX. See Cohen v. Brown Univ., 101 F.3d 155, 171 (1st Cir. 1996) ("Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination."). Doherty does not assert a "disparate impact" claim; however, to the extent that she sought to do so, she cites to no "competent evidence" and "specific facts that demonstrate the existence of an authentic dispute" to support a claim that AIC policies differently affect people based on gender. McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).

allegations are based on the same claims underlying her Title IX challenge: that AIC's Title IX training taught AIC's faculty to disregard alcohol use during Title IX investigations and hearings. Pl's Opp'n 21-22 [#5]. In Doherty's failure-to-safeguard claim, she argues that "AIC's lax enforcement of its alcohol policy created an environment in which alcohol-induced misconduct was manifestly foreseeable, and [AIC] accepted it, ignored it, and allowed this type of misconduct to proliferate." Compl. ¶ 87 [#1].

"To state a negligence claim under Massachusetts law, a plaintiff must allege that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached that duty; (3) damage resulted; and (4) the defendant's breach caused that damage." Saldivar v. Racine, 818 F.3d 14, 20–21 (1st Cir. 2016). Plaintiff bears the burden of establishing each element of her negligence claim. See Jorgensen v. Mass. Port Auth., 905 F.2d 515, 522 (1st Cir. 1990); Doe v. Amherst Coll., 238 F. Supp. 3d 195, 227-28 (D. Mass. 2017).

"Under Massachusetts law, a duty to prevent against the criminal conduct of a third party only arises where there is a special relationship between the parties and the criminal conduct is reasonably foreseeable." Amherst Coll., 238 F. Supp. 3d at 228. Colleges and universities have the duty "'to use reasonable care to prevent injury' to their students against the criminal acts of third parties[]" that were reasonably foreseeable to the college. Mullins v. Pine Manor Coll., 449 N.E.2d 331, 337 (Mass. 1983); see also Kavanagh v. Trs. of Bos. Univ., 795 N.E. 2d 1170, 1178 (Mass. 2003). But, "[a]s to college administrators . . . 'Massachusetts does not . . . impose a common-law or statutory duty on administrators to enforce university policies.'" Amherst Coll., 238 F. Supp. at 228 (finding that the obligation to enforce university policies are created instead by contractual relationships between students and colleges).

Although negligence is usually a question for the jury, the court may decide the issue as a matter of law "when no rational view of the evidence warrants a finding that defendant was negligent." Mullins, 449 N.E. 2d at 338. Here, Doherty has provided no evidence under Massachusetts law that establishes that AIC owed her the specific duties that she seeks to impose, or that AIC breached any such duty owed.

Doherty argues that by failing to appropriately train its faculty members, AIC breached its voluntarily assumed duty to provide her with an effective and equitable investigation and adjudication process for her report of sexual assault. However, the duty that Doherty seeks to enforce arises from AIC's contract with Doherty, and not under Massachusetts tort law. See Trs. of Boston Coll., 892 F.3d at 94 ("Because it is clear that Doe's disciplinary proceedings arose from this contractual relationship, we hold that B.C. did not owe the Does any additional independent duty outside of their existing contractual relationship. Any remedy for a breach of this contractual obligation must sound in contract, not in tort."); see also Doe v. Trs. of Bos. Coll., 2016 U.S. Dist. LEXIS 137777, 2016 WL 5799297, at *27 (D. Mass. 2016) ("[T]ort obligations 'are imposed by law, independent of the promises' of contractual duties." (quoting Treadwell v. John Hancock Mut. Life Ins. Co., 666 F. Supp. 278, 289 (D. Mass. 1987))). Moreover, even if AIC did have such an independent duty to follow its policies, Doherty has not shown how AIC's training constituted a failure to use reasonable care to prevent a foreseeable injury.

Doherty's claim of AIC's "lax" enforcement of its alcohol policy fares no better. Massachusetts law "does not impose a legal duty on colleges or administrators to supervise the social activities of adult students, even though the college may have its own policies prohibiting alcohol or drug abuse." Doe v. Emerson Coll., 153 F. Supp. 3d 506, 514 (D. Mass. Dec. 23,

2015) (citing <u>Bash v. Clark Univ.</u>, 2006 WL 4114297, at *5 (Mass. Super. Ct. Nov. 6, 2006)

(imposing no duty on a college to protect a freshman student from a drug overdose despite

school policy against illegal drug possession)); <u>see also, e.g.</u>, <u>Driscoll v. Bd. of Trs. of Milton</u>

<u>Acad.</u>, 873 N.E.2d 1177, 1185 (Mass. App. Ct. 2007) (school owed no duty in tort to 17-year old

student for failing to prevent him from committing a sexual offense, even if the school

monitoring of its facilities and teenage sexual activity was not adequate); <u>Erickson v. Tsutsumi</u>,

No. CA199801842B, 2000 WL 1299515 (Mass. Super. Ct. May 17, 2000) (declining to extend

the university's duty of care to protect student hit by a car while crossing the street outside of

school's boathouse). Furthermore, aside from the single instance described, Doherty fails to

provide any evidence of AIC's allegedly "lax enforcement" of its alcohol policy.

AIC's <u>Motion for Summary Judgment</u> [#41] is ALLOWED as to Count II.

     2.  <u>Counts III: Negligent Infliction of Emotional Distress</u>

"In order to recover for negligently inflicted emotional distress, a plaintiff [must] prove

(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective

symptomatology; and (5) that a reasonable person would have suffered emotional distress under

the circumstances of the case." <u>Rodriguez v. Cambridge Housing Auth.</u>, 823 N.E. 2d 1249, 1253

(Mass. 2005) (quoting <u>Payton v. Abbott Labs</u>, 386 Mass. 540, 437 N.E.2d 171, 181 (Mass.

1982)).

Doherty's allegations of negligent infliction of emotional distress stem from the same

allegations described in Counts I and II. Compl. ¶¶ 94-114 [#1]. As Doherty has failed to show

that AIC was negligent, the court ALLOWS AIC's <u>Motion for Summary Judgment</u> [#41] as to

Count III. <u>See, e.g.</u> <u>Amherst Coll.</u>, 238 F. Supp. 3d at 228-29 (allowing motion for judgment on

the pleadings as to claim of negligent infliction of emotional distress where plaintiff failed to show that college owed her a duty, and therefore failed to establish negligence).[9]

## IV. Conclusion

For the foregoing reasons, the court ALLOWS Defendant American International College's <u>Motion for Summary Judgment</u> [#41] as to each of Doherty's claims.

IT IS SO ORDERED.

Date: March 31, 2019                                    /s/ Indira Talwani
                                                       United States District Judge

---

[9] In Count IV, Doherty alleged intentional infliction of emotional distress. In her <u>Opposition</u>, Doherty did not defend this claim, <u>see</u> Opp'n [#52], and at the hearing on AIC's motion, Doherty's counsel acknowledged that Doherty was abandoning the claim. Accordingly, AIC's <u>Motion for Summary Judgment</u> [#41] is ALLOWED as to Count 4.